PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

**AO 241 (Rev. 5/85)**

| **UNITED STATES DISTRICT COURT** | District |
| | Southern |

| Name | Prisoner No. | Case No. |
| Clifford Williams | A237-994 | *CI-99-438* |

Place of Confinement

Mansfield Correctional Institution, 1150 N. Main Street, Mansfield, Ohio 44901

*JUDGE SMITH*
*MAGISTRATE JUDGE KING*

| Name of Petitioner | Name of Respondent (authorized person |
| (include name under which convicted) | having custody of petitioner) |
| | |
| Clifford Williams v. | Betty Mitchell, Warden |

The Attorney General of the State of:

Ohio, Betty Montgomery

### PETITION

1. Name and location of court which entered the judgment of conviction under attack Butler County Court of

   Common Pleas, Case No. CR90-08-0665

2. Date of judgment of conviction  Convicted January 10, 1991 Sentenced February 20, 1991

3. Length of sentence  Death; 10-25 years; 8-15 years; 10-25 years

4. Nature of offense involved (all counts) One count of Aggravated Murder, Ohio Rev. Code § 2903.01 with capital

   specifications ; two counts of Aggravated Robbery § 2929.04 (A)(7); and one count of felonious assault 2903.11

   (A)(2)

5. What was your plea?  (Check one)

   (a)  Not guilty              ☒
   (b)  Guilty                  ☐
   (c)  Nolo contendere         ☐
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give
   details: _____

6. If you pleaded NOT guilty, what kind of trial did you have?  (Check one)
   (a)  Jury                    ☒
   (b)  Judge only              ☐

7. Did you testify at the trial?
   Yes ☐   No ☒ (Unsworn statement given at mitigation hearing)

8. Did you appeal from the judgment of conviction?
   Yes ☒   No ☐

9. If you did appeal, answer the following:

  (a) Name of Court  Butler County Court of Appeals

  (b) Result  Convictions and Sentences Affirmed

  (c) Date and result and citation, if known  State v. Williams, Nos. CA91-04-060, CA92-06-110, 1992WL317025

  (Ohio App. 12 Dist., Nov. 2, 1992).

  (d) Grounds raised  See Attachment A


  (e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

    (1) Name of court  Ohio Supreme Court

    (2) Result  Affirmed

    (3) Date of result and citation, if known  State v. Williams, 73 Ohio St. 3d 153, 652 N.E.2d 721 (1995).

    (4) Grounds raised  See Attachment B


  (f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

    (1) Name of court  United States Supreme Court

    (2) Result  Petition for Writ of Certiorari Denied


    (3) Date of result and citation, if known  Williams v. Ohio, 516 U.S. 1161, 116 S.Ct. 1047 (1996).

    (4) Grounds raised  See Attachment C


10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?

Yes ☒   No ☐

11. If your answer to 10 was "yes" give the following information:

  (a) (1) Name of court  Butler County Court of Common Pleas

    (2) Nature of proceeding  Petition for Post Conviction Relief under Ohio Rev. Code § 2953.21

    (3) Grounds raised  See Attachment D

_____

_____

(4) Did you receive an evidentiary hearing on your petition, application or motion?

    Yes ☐    No ☒

(5) Result  Petition Dismissed  _____

(6) Date of result  July 17, 1997  _____

(b) As to any second petition, application or motion give the same information:

  (1) Name of court  _____

  (2) Nature of proceeding  _____

  _____

  (3) Grounds raised  _____

  _____

  _____

  _____

  (4) Did you receive an evidentiary hearing on your petition, application or motion?

      Yes ☐    No ☐

  (5) Result  _____

  (6) Date of result  _____

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

  (1) First petition, etc.     Yes ☒    No ☐
  (2) Second petition, etc.   Yes ☐    No ☐

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

  _____

  _____

12. State *concisely* every ground on which you claim that you are being held unlawfully.  Summarize *briefly* the *facts* supporting each ground.  If necessary, you  may attach pages stating additional grounds and *facts* supporting same.

   CAUTION:  In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court.  If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one:   See Attached Grounds for Relief and supporting facts

Supporting FACTS (state *briefly* without citing cases or law)

B. Ground two:

Supporting FACTS (state *briefly* without citing cases or law)

C. Ground three: _____

_____

_____

Supporting FACTS (state *briefly* without citing cases or law) _____

_____

_____

_____

D. Ground four: _____

_____

_____

Supporting FACTS (state *briefly* without citing cases or law) _____

_____

_____

_____

_____

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:

_____

_____

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?

Yes ☐     No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(a) At preliminary hearing _____

_____

(b) At arraignment and plea _____

_____

(c) At trial  David T. Davidson, Key Bank Building Suite 828, 6. S. Second St., Hamilton, Ohio 45011; Craig D. Hedric, 723 Dayton Street, Hamilton, Ohio 45011

(d) At sentencing Same as (c)

(e) On appeal Al Edmunds, 308 North Second Street, Hamilton, Ohio 45011; Michael Shanks, 315 S. Monument Street, P.O. Box 687, Hamilton, Ohio 45012 on direct appeal to the Butler County Court of Appeals; Joanne Bour-Stokes and Richard Vickers, both of the Office of the Ohio Public Defender, 8 East Long Street, Columbus, Ohio 43215 on appeal to the Ohio Supreme Court; and Richard J. Vickers and Tracey Leonard, both of the Office of the Ohio Public Defender on direct appeal to the United States Supreme Court

(f) In any post-conviction proceeding  Tracey Leonard and Laurence Komp both of the Office of the Ohio Public Defender, 8 East Long Street, 11th Floor Columbus, Ohio 43215

(g) On appeal from any adverse ruling in a post-conviction proceeding  Same as (f)

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?

Yes ☒      No ☐

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

Yes ☐      No ☒

(a) If so, give name and location of court which imposed sentence to be served in the future:

(b) Give date and length of the above sentence:

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

Yes ☐   No ☒

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct.  Signed on

_____
(Date)

_____
Signature of Petitioner

## I.  NOTICE OF INTENTION TO CHALLENGE PRESUMPTION OF CORRECTNESS OF ALL STATE COURT FACT-FINDINGS UNDER 28 U.S.C. § 2254(d) & (e)(1) TO THIS CASE.

1) The Ohio Attorney General, as counsel for the Respondent-Warden in other *habeas corpus* cases, has argued that the Petitioner must challenge the applicability of the presumption of correctness of state court factfindings when filing his *habeas* petition.  Mr. Williams disputes the validity of this argument.  Nonetheless, Petitioner hereby provides notice of his intention to challenge the presumption of correctness of all state factfindings made in his case.  See 28 U.S.C. § 2254(d) (pre-Antiterrorism and Effective Death Penalty Act) (hereinafter "AEDPA"); 28 U.S.C. section 2254(e)(1)(post-AEDPA).

2) None of the state court factfindings in this case are entitled to a presumption of correctness.  These include, but are not limited to, any factual findings made by the trial court before, during and after trial and post-conviction; the trial court opinion filed pursuant to Ohio Rev. Code § 2929.03(F); the opinion of the Court of Appeals for the Twelfth Appellate District on direct appeal and on post-conviction appeal; and the opinion of the Ohio Supreme Court on direct appeal and post-conviction appeal.

3) Mr. Williams also intends to challenge the applicability of the post-AEDPA 28 U.S.C. §§ 2254(d) and (e)(1) to his case.  Application of these sections would be unconstitutionally retroactive under Landgraf v. U.S.I. Film Products, 511 U.S. 244 (1994), and its progeny.  See In re Sonshine, 132 F.3d 1133 (6th Cir. 1997); In re Hanserd, 123 F.3d 922 (6th Cir. 1997).

## II.  STATEMENT OF THE CASE

4) On September 19, 1990, a Butler County Grand Jury indicted Petitioner Clifford D. Williams on the following counts and specifications:

a) Count 1 of the indictment alleged that Petitioner purposely caused the death of Wayman Hamilton while committing or attempting to commit an aggravated robbery, or while fleeing immediately after committing or attempting to commit an aggravated robbery in violation of Ohio Rev. Code Ann. § 2903.01(B).

b) Specification 1 to Count 1 alleged that the offense was committed while the Petitioner, as the principal offender, was committing or attempting to commit an Aggravated Robbery as specified in Ohio Rev. Code § 2929.04 (A)(7).

c) Specification 2 to Count 1 alleged that the offense was committed for the purpose of escaping detection, apprehension, trial or punishment for the Aggravated Robbery.

d) Specification 3 to Count 1 alleged that the offense was committed while the Petitioner had a firearm.

e) Count 2 of the indictment alleged that the Petitioner committed Aggravated Robbery by knowingly obtaining money and services from Wayman Hamilton.

f) Specification to Count 2 alleged that the offense was committed while the Petitioner had a firearm.

g) Count 3 alleged that the Petitioner committed Aggravated Robbery by knowingly attempting to obtain money from Jeff Wallace.

h) Specification to Count 3 alleged that the offense was committed while the Petitioner had a firearm.

i) Count 4 alleged a violation of Ohio Rev. Code Ann. § 2903.11(A)(2), felonious assault of Jeff Wallace.

j) Specification to Count 4 alleged that the offense was committed while the Petitioner had a firearm.

5) Approximately 2 and 1/2 months later, on January 3, 1991, the voir dire of the jury commenced. The following morning, on January 4, 1991, the voir dire of the jury concluded.

6)     On January 7, 1991,  the trial joining both the August 3, 1990 and August 6, 1990

offenses commenced.  (Following a motion by defense counsel, the trial court declined to sever

the trial for the charges relating to the aggravated murder of Wayman Hamilton on August 3,

1990, from the charges relating to the assault of Jeff Wallace on August 6, 1990).  Petitioner was

represented at trial by Mr. David T. Davidson, Esq. and Mr. Craig D. Hedric, Esq.

7)     On January 10th, the jury convicted Petitioner Williams as charged.

8)     On January 16, 1991, the sentencing hearing regarding Petitioner Williams'

aggravated murder conviction commenced.  On January 17, 1991, the jury recommended that a

sentence of death be imposed.

9)     On February 20, 1991, the trial court accepted the jury's recommendation and

sentenced Petitioner Williams to death on the first count of the indictment.  Also on February 20,

1991, the trial court denied Petitioner Williams' motion for a new trial based on newly

discovered evidence.

10)    On February 26, 1991, the trial court filed an opinion pursuant to O.R.C. §

2929.03(F).

11)    On January 21, 1992,  Petitioner Williams appealed his conviction and sentence to

the Twelfth District Court of Appeals. Petitioner was represented by Mr. Al Edmunds, Esq. and

Mr. Michael D. Shanks, Esq.,  in the Court of Appeals.

12)    On November 2, 1992, the Twelfth District Court of Appeals affirmed Petitioner

Williams' conviction and sentence. State v. Williams, Nos. CA91-04-060, CA92-06-110, 1992

WL 317025 (Ohio App. 12 Dist., Nov. 2, 1992).

13)    On  May 13, 1994, Petitioner Williams filed an appeal to the Supreme Court of

Ohio.  Before the Supreme Court of Ohio, Mr. Williams was represented by Ms. Joann M. Bour-

3

Stokes and Mr. Richard J. Vickers, Assistant State Public Defenders at the Office of the Ohio Public Defender.

14) On August 16, 1995, the Ohio Supreme Court affirmed Petitioner's conviction and sentence. State v. Williams, 73 Ohio St. 3d 153, 652 N.E.2d 721 (1995).

15) On January 2, 1996, Petitioner Williams filed a Petition for Writ of Certiorari in the United States Supreme Court. The Petitioner was represented before the United State Supreme Court by Mr. Richard D. Vickers and Ms. Tracey A. Leonard, Assistant State Public Defenders.

16) On March 4, 1996, the United State Supreme Court denied certiorari. Williams v. Ohio, 516 U.S. 1161, 116 S. Ct. 1047 (1996).

17) On September 20, 1996, Petitioner Williams filed a state post-conviction petition in the trial court (Court of Common Pleas, Butler County, Ohio). The Petitioner was represented during his state post-conviction appeals by Ms. Tracey A. Leonard and Mr. Laurence Komp, Assistant State Public Defenders.

18) On July 14, 1997, by written decision and without benefit of any discovery or evidentiary hearing, the trial court dismissed Petitioner's state post-conviction petition.

19) On February 24, 1998, Petitioner Williams filed a state post-conviction appeal to the Court of Appeals (12th Judicial District).

20) On June 22, 1998, by written decision, the Court of Appeals (12th District) affirmed the trial court's decision dismissing Petitioner's post-conviction petition.

21) On August 5, 1998, Petitioner Williams filed his state post-conviction appeal to the Ohio Supreme Court.

22) On October 7, 1998, the Ohio Supreme Court denied certiorari regarding Petitioner's appeal. The Ohio Supreme Court subsequently denied Petitioner's motion to reconsider on November 18, 1998.

23) On December 28, 1998, Petitioner Williams' filed his Notice of Intent to File a Federal *Habeas Corpus* Petition, along with Motion for Appointment of Counsel, in the Federal District Court, Southern District of Ohio.

24) On January 21, 1999, Petitioner filed a motion to stay execution date pending filing of *habeas corpus* petition.

25) On February 16, 1999, this Court granted Petitioner's stay of execution pending filing of *habeas corpus* petition.

## STATEMENT OF FACTS

26) On August 3, 1990, at approximately 10:20 p.m., Hamilton Police Officer Mark Christian was dispatched to the site of a reported shooting on Beckett Street in Hamilton, Ohio. When Officer Christian arrived, he discovered a taxi cab with the driver slumped behind the wheel. The driver, Wayman Hamilton, had been shot once in the forehead.

27) Officer Christian took steps to secure the crime scene. An ambulance arrived within three minutes. A crowd of thirty to forty persons, responding to the sound of sirens, gathered at the crime scene. When questioned by Officer Christian, several of these persons stated that they had heard a gunshot but could relate no other information pertaining to the shooting.

28) Wayman Hamilton was placed in the ambulance and taken to a nearby hospital. Officer Christian followed and arrived at the hospital while Mr. Hamilton was being treated. Mr.

Hamilton's clothing and wallet were given to Officer Christian by emergency room personnel. Wayman Hamilton's wallet contained sixty dollars and twenty-four cents ($60.24).

29)  Wayman Hamilton was taken by helicopter to another hospital where he subsequently died. At the time of his death, investigating police had no suspects in Mr. Hamilton's murder.

30)  On August 6, 1990, at approximately 10:00 p.m., in Hamilton, Ohio, Clifford Williams was offered a ride in a truck driven by Jeff Wallace. Mr. Wallace was an itinerant construction worker seeking employment in Hamilton. Mr. Wallace was also a user of cocaine and had ingested cocaine and alcohol on the day he came into contact with Mr. Williams.

31)  Jeff Wallace transported Clifford Williams to Mr. Williams' apartment where Wallace waited outside while Mr. Williams entered the apartment. Upon Mr. Williams' return to the truck, he and Mr. Wallace drove through Hamilton with no particular destination.

32)  During the course of their ride together, a confrontation occurred. Jeff Wallace incurred a "grazed" wound in the head by a gunshot. He was later hospitalized for his injury.

33)  In the interim between August 3 and August 6, 1990, the Hamilton Police had investigated the shooting murder of Wayman Hamilton. The police had contacted the dispatcher at the Clifton Cab Company where Mr. Hamilton was employed. The dispatcher, Earl Ray Jones, indicated that Mr. Hamilton had been dispatched to the Fuel Mart station on Compton Road, Mt. Healthy, Ohio, on the night Hamilton was killed. Police then contacted William Teasley and James Trivett, who were employed at the Compton Road Fuel Mart on the night of Hamilton's death. Teasley and Trivett related that they recalled an individual who had contact with them at the Fuel Mart on the evening of August 3, 1990. They also remembered that a person called for a taxi cab, and was transported from the Fuel Mart in a Clifton taxi cab that

evening. In the course of their contact with Trivett and Teasley, the police created a composite picture based on their recollections. They were also asked to review approximately a thousand photographs of African-American males contained in police archives. They were, however, unable to provide an identification based on their review. Subsequently, the police obtained an out-of-court identification of Mr. Williams from Teasley and Trivett by showing them a photo array consisting of three (3) photographs. Teasley and Trivett identified Mr. Williams as the person transported from the Fuel Mart via taxi cab on August 3, 1990. Shortly after this identification, the police arrested Clifford Williams for the murder of Wayman Hamilton.

34) Subsequent to Petitioner's arrest, Jeff Wallace remained hospitalized. During that time, a hospital security guard provided Mr. Wallace with a newspaper article that contained Mr. Williams' photograph. The article dealt with Mr. Williams' arrest in the Wayman Hamilton murder case. .Mr. Wallace contacted the police and advised them that he thought Mr. Williams was the man who shot him. Detective Simpson of the Hamilton Police Department arranged a lineup for Mr. Wallace to view. Mr. Wallace selected Mr. Williams from the lineup.

35) On September 19, 1990, Clifford Williams was indicted by the Butler County Grand Jury for the death of Wayman Hamilton and the shooting of Jeff Wallace. Both of these crimes were returned by the grand jury in a four count indictment. Count One charged Ohio Rev. Code Ann. Section 2903.01(B) aggravated murder in the death of Wayman Hamilton. Attached to this count of aggravated murder were two capital specifications, O.R.C. § 2929.04(A)(3) and O.R.C. § 2929.04(A)(7), and a gun specification. Count Two alleged that Clifford Williams had committed the aggravated robbery of Wayman Hamilton. This count also carried a gun specification. Count Three charged Aggravated Robbery of Jeff Wallace; also attached to this count was a gun specification. Count Four charged that Appellant had

committed felonious assault on Jeff Wallace. It too carried a gun specification. On September 21, 1990, Clifford Williams entered a plea of not guilty to all counts in the indictment.

36) From the date of the indictment on September 19, 1990, to the date of Petitioner's trial beginning January 7, 1991 - a mere 14 weeks time - Petitioner's case proceeded in a hurried fashion. A review of the record reveals that much of this rush was incited by the trial court, Judge Valen.

37) Prior to trial, Mr. Williams' counsel moved the trial court to sever the Wallace counts for separate trial. Counsel argued that the inclusion of these counts would prejudice Clifford Williams, especially so in light of the capital charges against Mr. Williams. The trial court denied the motion to sever. The court's stated basis for this denial was that the evidence pertaining to the August 6th offense was probative on the issue of identity as to the August 3rd offense. Mr. Williams' counsel renewed the motion to sever twice during trial.

38) Clifford Williams' counsel also filed numerous other pretrial motions. During the preliminary hearing in Mr. Williams' case it was revealed that the State had achieved his arrest through the use of a confidential informant. The information that was provided by the confidential informant was placed in an affidavit for a search for 1002 Vidourek, Hamilton, Ohio, the apartment where Clifford Williams was arrested.

39) As a result of this information, counsel for Mr. Williams filed a timely Motion to Discover Informant on November 13, 1990. At a motions hearing on November 26, 1990, counsel argued that disclosure of the informant's identify was necessary for a variety of reasons: (1) the information provided by the informant made Mr. Williams the lead suspect in the case. The State had no other evidence. There was no eyewitness to Wayman Hamilton's murder. The gun used in the murder was never found; (2) Clifford Williams was facing the loss of his life; (3)

8

the informant had identified the suspect as "Donta Jones". The informant was the only person who identified Clifford Williams as Donta Jones. As a result, this called into question the reliability of the informant's identification.

40)     The trial court denied the defense request. In denying the motion, the trial court made the comment that knowledge of the information would not benefit the defense; that information from the informant would be detrimental to the defense because the information reportedly contained a confession by Clifford Williams; and that Mr. Williams knew the identify of the informant because he, Mr. Williams, knew with whom he had spoken and in what circumstances.

41)     Defense counsel also moved the court, pre-trial, for funds to retain a mitigation expert to assist in preparation for the mitigation-penalty phase in Petitioner's case. This motion was denied. After the guilty verdict was rendered, defense counsel renewed this motion on January 11, 1991 (just a few days before the mitigation hearing was to begin), stating to the court that they were not adequately prepared to proceed with the mitigation hearing. This renewed motion was likewise denied.

42)     Further, prior to trial, Mr. Williams' counsel had filed a Motion to Exclude Reference to Criminal Record of Accused. However, during opening statement, the prosecutor informed the jury that Mr. Williams had a juvenile criminal record. The prosecutor then introduced testimony that Mr. Williams had a juvenile record through State's witness William Teasley. The prosecutor also introduced a lengthy explication of Mr. Williams' juvenile record through Hamilton Police Department Detective Gross. Mr. Williams' counsel objected to the introduction of this testimony and moved for a mistrial. The trial court denied counsel's motion.

43)  On December 5, 1990, defense counsel filed a Motion to Suppress Identification Testimony.  This motion challenged, *inter alia*, the identification of Clifford Williams by Jeff Wallace.  A hearing was held on the Motion to Suppress on January 2, 1991.  Defense counsel had subpoenaed Jeff Wallace to testify at the hearing, but Jeff Wallace did not honor his subpoena.  Given his failure to appear, defense counsel requested a continuance, citing the importance of Mr. Wallace's identification (of the Petitioner) to this case.  The trial court denied the motion and ordered the trial to go forward the next day.

44)  The process of *voir dire* and empanelling of Petitioner's jury, which began January 3, 1991 and finished January 4, 1991, was conducted in hurried fashion.  Minimal questioning of the prospective jurors was conducted by either counsel or the court.  The court stated that in his jurisdiction the courts attempt to conduct *voir dire* in 1 or 1 and 1/2 days, not the typical 4-6 days one hears about.  The trial court seemingly boasted that, "I think that this jury in this type of case was chosen in almost record time," as opposed to in California, the court noted, where sometimes it takes weeks to choose jurors.  Defense counsel's questioning of prospective jurors was brief, particularly for a capital trial, nor did defense counsel object to the rushed process.

45)  During *voir dire*, the trial court asked three potential jurors if they, because of their relationships to police officers, would be embarrassed to return a not guilty verdict.  Each of these three jurors was seated in Clifford Williams' case.  The State also had two police officers seated at the prosecutor's table during trial.

46)  The record from the *voir dire* is not entirely clear as to how many of the initial prospective jurors were African-Americans.  At least two, but no more than 4, of the 75 panel members were African-Americans or partially of African-American descent.

10

47)     The State's case against Clifford Williams included no eyewitness identification of Mr. Williams as the perpetrator of Mr. Hamilton's murder. The State collected over 50 fingerprints from the cab and the scene of the crime, some of which were identifiable (though never disclosed to the defense), but none of which matched the fingerprints of Mr. Williams. Although the State searched Mr. Williams' apartment, no weapon or ammunition was recovered to link Mr. Williams to either the Hamilton murder or the Wallace shooting. No money was ever recovered from Mr. Williams that could be linked to Mr. Hamilton. No physical evidence was ever presented at trial to support the charge that a theft had been committed.

48)     The State introduced testimony regarding a couple of bloodstains found on clothing of Mr. Williams' taken during a search. However, the State's bloodstain expert was unable to determine that the blood originated from either Wayman Hamilton or Jeff Wallace. The State also adduced lengthy testimony from its latent print expert regarding the presence of various fingerprints in Wayman Hamilton's cab. None of the prints were, however, left by Clifford Williams.

49)     The State introduced testimony from Clifton Cab dispatcher Earl Ray Jones regarding Wayman Hamilton's fear of being robbed. The State also had admitted into evidence a bloodstained Bible that Jones identified as belonging to Wayman Hamilton. The Bible was retrieved from the taxi cab Mr. Hamilton was driving when he was murdered.

50)     The State also introduced and had admitted Jeff Wallace's hospital records detailing the treatment Wallace received for his gunshot wound.

51)     Firearms identification testimony was introduced through State's witness David Hall. At issue was the State's contention that cartridge casings found in Wayman Hamilton's cab and Jeff Wallace's truck were from the same pistol, thus tying Mr. Williams to both crimes. Hall

11

testified that the cartridge casings could not be compared on the basis of firing pin impressions or breech mark impressions. Hall opined that the cartridges, which were from three separate manufacturers, had been extracted from the same pistol at some point in time. Hall could not, however, say that the cartridges had been fired by the same pistol.

52) During the guilt-innocence phase of the trial, Mr. Trivett testified on behalf of the State. Mr. Trivett testified, *inter alia*, that he observed Petitioner enter the taxi cab driven by Wayman Hamilton on the night Mr. Hamilton was murdered. Mr. Trivett's testimony was important to the state's case, due to the lack of direct and physical evidence to implicate Petitioner in the slaying of Mr. Hamilton.

53) During cross-examination of Mr. Trivett, defense counsel requested to be provided a copy of a written statement Mr. Trivett had given to the police. After the trial court conducted an *in camera* review of the statement for any inconsistencies with testimony (consistent with Ohio criminal procedural rules), and declined to provide the statement to Petitioner's counsel, defense counsel then requested that the trial court file the statement under seal so as to preserve it for appellate review. In spite of the fact that the Ohio rules of criminal procedure mandated that the court file such a written statement under seal for appellate review, the court refused to do so. To this day neither the Petitioner nor any appellate or other court is aware of what Mr. Trivett's written statement to the police contained.

54) The State presented the testimony of Jeff Wallace. Mr. Wallace testified that on August 6, 1990, he had borrowed an individual's truck to go buy the individual some rolaids. He testified that he did not know the name of the person whose truck he borrowed. Mr. Wallace testified that Petitioner waved him over as he was pulling into a gas station and asked for a ride. Mr. Wallace testified that he let Petitioner in his truck although he did not know where he was

going to give him a ride to. Mr. Wallace then testified that he drove Petitioner to an apartment, as Petitioner wanted to get some money. Mr. Wallace testified that after Petitioner returned to the truck, Petitioner asked Mr. Wallace to pull down an alley. Mr. Wallace testified that he refused to go down the alley and asked Petitioner to get out of the truck, when Petitioner then pulled out a gun and attempted to rob Mr. Wallace. Mr. Wallace testified that he threw the truck in gear and subsequently two bullets were fired, on striking him in the back of the head.

55)     Jeff Wallace now admits to an entirely different version of the events that transpired on August 3, 1990, between he and the Petitioner. (See **First ground for relief**, *infra*)

56)     At the close of the State's case, defense counsel informed the Court that Clifford Williams wished to testify as to Counts III and IV, the felonious assault and aggravated robbery charges of August the 6th. He also wished to retain his constitutional right not to testify as to Counts I and II, the aggravated murder and aggravated robbery charges of August the 3rd.

57)     Defense counsel then made a Rule 29 Motion to Dismiss, which was overruled. Counsel then made the actual motion to the court for an order allowing Clifford Williams to testify in his own behalf as to Counts III and IV, but also allowing him to remain silent and not be subject to cross examination on Counts I and II.

58)     The Court overruled this Motion, and the Petitioner did not testify at all at his trial. The defense rested without presenting any evidence.

59)     On January 10, 1991 the jury returned a verdict of guilty as to all counts and specifications charged against Appellant.

60)     Prior to the penalty phase of the trial, defense counsel informed the trial court that counsel was not prepared to go forward. Counsel tied their lack of preparedness to the trial court's previous denial of counsel's motion for appointment of a mitigation specialist to assist in

13

preparing the defense case in mitigation. The trial court denied defense counsel's renewed motion for a mitigation specialist, refused to grant the defense a continuance, and the penalty phase went forward.

61)     At the penalty phase, defense counsel demonstrated their lack of preparation. Trial counsel introduced testimony from psychiatrist Dr. Glenn Weaver, who testified that Mr. Williams suffered from the major psychiatric disorder paranoid schizophrenia. In Dr. Weaver's opinion, Mr. Williams had suffered from this mental disease since his early teens. His paranoid schizophrenia was deemed to have played a role in events on the night of Mr. Hamilton's murder. Dr. Weaver also testified that paranoid schizophrenia is a disease process such that in Clifford Williams' case the disease would respond to treatment.

62)     Dr. Weaver's testimony on cross-examination did not fare well. Dr. Weaver had not met with or examined Petitioner until the Friday (January 11, 1991) before the hearing. The history taken was entirely from the interview with Petitioner, as no other documents or records had been obtained or reviewed. Though Dr. Weaver testified on direct that Petitioner had been psychiatrically evaluated two times as a teenager in California, Dr. Weaver had not seen any records of such evaluations. The prosecution, however, had possession of these juvenile records of Petitioner, and used them to damage Dr. Weaver's credibility on cross-examination. The court issued a ruling allowing the State to question Dr. Weaver based on the juvenile institution records that he had not been provided or reviewed.

63)     Moreover, during Dr. Weaver's appearance, defense counsel neglected to elicit an opinion consistent with Ohio statutory requirements regarding a defendant's mental impairment as a mitigating factor. This failure was noted by the trial court in its sentencing opinion.

64)     Defense counsel had Petitioner give an unsworn statement to the jury at the mitigation hearing. Petitioner simply read a written statement into the record. Petitioner's statement was not well prepared, however, and appeared to have been written by someone other than the Petitioner.

65)     Defense counsel also presented two family members as witnesses at Petitioner's mitigation-penalty hearing: Petitioner's mother and maternal grandmother. The testimony of these two witnesses was inadequately prepared, and their appearances were brief. Their presentation consisted essentially of testimony that Clifford was a good son, liked to "fix things" as a kid, and that they did not want to see him executed.

66)     The presentation of Petitioner's mitigation case was lacking. Defense counsel failed to retain a mitigation specialist. Defense counsel failed to contact or interview numerous family members or acquaintances of Petitioner in preparation of the hearing, including the Petitioner's biological father, paternal grandmother, sister, stepbrother, girlfriend and aunts and uncles. Much valuable information from such witnesses regarding Petitioner's life, background, and environment could have been gained. (See discussion under **Tenth ground for relief**, *infra*)

67)     Defense counsel also failed to obtain the services of a cultural expert, social worker, or psychologist. Such an expert was needed in this case, in light of Petitioner's socio-economic background and history of being raised in, and surrounded by, an environment that was dangerous, violent, lacking in opportunities, and, in this case, physically and emotionally abusive. Such an expert could have assisted in the preparation of evidence or testimony about Clifford William's that would have helped to "humanize" the Petitioner before the eyes of the jury. Specifically, defense counsel failed to obtain a cultural mitigation expert who could have presented testimony regarding: the overwhelming amount of risk factors extant in Clifford

15

Williams' life; the violent and dangerous neighborhoods he grew up in and the various influences of such environments on a young boy; the fact that his mother, like her mother before her, became pregnant with him when she was just thirteen years old, and delivered him when she was in the eighth grade; the fact that he was moved around a lot and stayed in different homes and was taken care of by different relatives; that his mother had a recurring problem with substance abuse; that there was a complete lack of stability in his household; that he never had a stable father figure in his life; that he never had any positive role models in his life to speak of; that his biological father initially denied being his father; that as a child he moved no less than seven different times; that he was exposed to men (his mother's boyfriends) who physically abused him; that he was exposed to a step-father over an extended period of time who was emotionally and physically abusive to both Clifford and his mother; that he was exposed to relatives and acquaintances who were imprisoned; that he was exposed to gangs; that he suffered a number of personal losses in his relatively short life; that there was a  lack of significant positive factors in his life such as local support in the community, support in the schools, the presence someone or some program to help stimulate him intellectually and creatively and encourage his strengths,  and the presence of an emotionally available and stable adult to provide him needed guidance.   Defense counsel, however, failed to present such evidence. (See discussion under **Tenth ground for relief**, *infra*)

68)    Prior to closing argument at the mitigation phase the State moved the trial court to allow the jury to consider the evidence presented on the Wallace counts (Counts III and IV) in the jury's sentencing deliberations. Defense counsel objected.  The trial court then confusedly instructed the jury that the jury was to "give no consideration of sentence or evidence" as to the Wallace counts.   The trial court then reiterated its instruction that the jury was to consider all the

evidence (including exhibits) that was admitted at trial, including all evidence pertaining to the Wallace shooting, with a limiting instruction that the evidence was being admitted as to the issue of identity. The court reasoned that the evidence was admissible because the State had the duty of again proving beyond a reasonable doubt the aggravating circumstances of the offense.

69)    At one point during the mitigation-penalty deliberations the jury reached a stalemate. During deliberations, the jury sent a question to the trial court. The question was the following: "We are at a stalemate. What can we do?" The trial court contacted counsel, but apparently before counsel could arrive and apparently before the trial court provided any instructions to the jury, the jury returned with its death verdict, approximately thirty minutes after it had sent its question to the trial court.

70)    On February 8, 1991, the trial court conducted a hearing in Mr. Williams' case to decide whether to accept the jury's recommendation that Mr. Williams receive the death sentence. At this hearing, the trial court read into the record the substance of its O.R.C. § 2929.03(F) opinion. The trial court announced at the hearing that it would accept the jury's death recommendation. In doing so, the trial court specifically referred to the shooting and attempted robbery of Jeff Wallace as a reason to find the existence of the aggravating circumstances and concomitantly impose death.

71)    The trial court noted that Dr. Weaver's testimony regarding Mr. Williams' mental disease of paranoid schizophrenia was not mitigating because Dr. Weaver did not link the mental disease to Mr. Williams' behavior or the date of Mr. Hamilton's murder. The trial court also stated that Mr. Williams' mental disease did not render him unable to distinguish right from wrong. The trial court addressed Clifford Williams' mitigating evidence regarding his

17

background by noting that untold thousands of persons had endured similar hardships without turning to violent crime.

72) Subsequent to the mitigation-sentencing hearing, the trial court heard Mr. Williams' Motion For New Trial that had been filed prior to the guilt phase of his trial. The trial court had refused Mr. Williams' counsel's request to have the motion heard prior to proceeding with the penalty phase.

73) At the hearing on the new trial motion, Mr. Williams presented testimony through witness Larry Ingram, who was incarcerated in the Hamilton County Jail, regarding events observed by Mr. Ingram on the evening of August 3, 1990. Mr. Ingram was on Beckett Street in Hamilton, Ohio that evening when he observed a taxi cab stop and a person other than Appellant emerge from the cab. According the Ingram, the person he observed was a man named Tippy Jones. Shortly after Jones emerged from the cab, the driver slumped forward.

74) Mr. Ingram testified that his visual acuity was limited but that he was able to identify persons through their distinctive body movements. The prosecutor responded by pointing out Mr. Ingram's vision deficits and Ingram's lack of credibility vis-a-vis the fact that Ingram had a criminal record.

75) The trial court subsequently denied Appellant's Motion For New Trial.

## IV. FEDERAL CONSTITUTIONAL GROUNDS FOR RELIEF

**First ground for relief: The trial court's denial of Petitioner's motion to sever the August 3, 1990 and August 6, 1990 offenses violated Petitioner's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States' Constitution.**

76) The trial court abused its discretion in denying Petitioner's pre-trial motion to sever the August 3rd and August 6th offenses, resulting in a trial that was fundamentally unfair.

18

77)     Mr. Williams was charged in a four-count indictment involving the two following separate and distinct alleged offenses:

> 1) aggravated murder and aggravated robbery (Counts I
> and II) with death penalty specifications regarding the August 3,
> 1990 death of Wayman Hamilton; and
>
> 2) felonious assault and aggravated robbery (Counts III and
> IV) regarding the August 6, 1990 shooting incident with Jeff
> Wallace.

78)     Defense counsel moved the trial court on November 26, 1990 for an order severing Counts III and IV for trial purposes.  Defense counsel primarily argued that, in an aggravated murder case entailing a possible penalty hearing and potential death sentence, the joinder of the murder charge with offenses separate and distinct in terms of time, place, and elements of proof, was extremely prejudicial to Mr. Williams throughout all stages of the proceedings. The motion was made pursuant to Ohio Rule of Criminal Procedure 14, entitled "Relief from Prejudicial Joinder", which stated in relevant part that:

> **If it appears that a defendant** or the state **is prejudiced** by a
> joinder of offenses or of defendants in an indictment, information,
> or complaint, or by such joinder for trial together of indictments,
> information or complaints, the court **shall** order an election or
> separate trial of counts, grant a severance of defendants, or provide
> such other relief as justice requires.  (Emphasis added.)

79)     By entry of November 28, 1990, the trial court denied the motion.  The trial court explained its decision not to sever the offenses as follows:

> Judge Valen:  ... the evidence pertaining to Counts III and IV, is
> admissible in the trial of Counts I and II, therefore there is no
> prejudice to the defendant in joinder of the offenses for a single
> trial.

(Tr. 48)

19

80)     The trial court's reasoning is flawed. It does not follow to reason that because the evidence is admissible it does not prejudice the defendant. The evidence was clearly prejudicial due to, *inter alia*, the well-recognized risk that evidence of the second (August 6th) offense created the likelihood that the jury would convict Petitioner of the first (August 3rd) offense based not strictly on the evidence concerning the first offense - which evidence was circumstantial and lacking - but in part on the basis of the second offense and on the basis of a perception that Petitioner was a "bad man". What the trial court apparently meant by the above was that the obvious prejudice to Petitioner caused by the joinder of the offenses was outweighed or superceded by the evidence due to its probative value in tending to show the identity of the assailant as had been argued by the State. Ohio Rule 14 of Criminal Procedure 14, however, indicates that the appearance of prejudice is sufficient, and makes no mention of any balancing or weighing of such prejudice against other considerations.

81)     Further, even if such balancing by the trial court was proper, the court erred in concluding that the evidence of the second offense was otherwise admissible. That evidence should not have been admissible because, in this instance, the prejudicial impact of the evidence outweighed its value. The state argued to the court that the August 6th offense was probative of identity in conjunction with the August 3rd offense, due to similarities in *modus operandi*.[1] (Tr., Vol. II, p. 18) Under the facts even then existing, this was a tenuous contention. In one instance there was a fatal shooting of a cab driver, with no eyewitnesses and little evidence (if any beyond mere speculation) of motive. In the other instance there was an alleged assault and robbery of a previously convicted felon (Mr. Wallace) who had been doing cocaine throughout the day and

---

[1] The prosecution also stressed to the jury, in closing argument at the guilt-innocence phase, the presence of the same *modus operandi* in the August 3rd and August 6th offenses.

20

was in an area known for drug dealing.[2] While both victims had been shot in the head, Mr. Wallace was only "grazed" by the bullet, raising questions and suspicions about the perpetrator's intent, if any, in the shooting.

82) Moreover, based on evidence not previously discovered, it is now apparent that the two offenses had even less in common than originally indicated. Contrary to his testimony at trial and to what he apparently told law enforcement at the time, victim/witness Jeff Wallace now provides a significantly different version as to what transpired on August 6, 1990. Jeff Wallace now states that it was he who sought Mr. Williams (and not *vice-versa*), looking to obtain some crack cocaine. Mr. Wallace now acknowledges that it was his intent to rob Petitioner (and not *vice-versa*) of crack cocaine, as he did not possess money to pay for the crack cocaine and planned, as **his** *modus operandi*, to obtain and drugs through the window of the truck and speed away before paying. Furthermore, Mr. Wallace now states that the gun may have gone off accidentally, indicating frantic activity taking place at the time the gun discharged. Mr. Wallace now states that Petitioner may not have intended to shoot him.

83) Based on Mr. Wallace's recent admissions, the nature of the August 6th offense - if it was an "offense" - was substantially different than the nature of the August 3rd offense. If not before, it is now obvious that any claim of a common "*modus operandi*" regarding the two incidents cannot reasonably be sustained. Consequently, the joinder of the offenses was not warranted and rendered the trial of Mr. Williams fundamentally unfair.

84) Aside from the above, the joinder of the offenses was prejudicial to Petitioner for other reasons as well. Significantly, as a result of the joinder of the offenses the Petitioner possessed two mutually antagonistic defenses. At trial the Petitioner desired to waive his 5th

---

[2] The state also contended that ballistics evidence suggested that the same or a similar gun had been used in the two offenses. As discussed later herein, this evidence, however, was inconclusive. (See discussion, *infra*, Fifteenth

21

Amendment rights and testify regarding the August 6th offense involving Mr. Wallace, while not waiving such right regarding the offense of August 3rd. Indeed, defense counsel requested the trial court for permission to so testify, while at the same time requesting to preserve Petitioner's 5th Amendment right not to testify regarding the August 3rd offense. The trial court declined to allow the Petitioner to take the stand and testify for this limited purpose. Thus, because of the joinder of the offenses, Petitioner was precluded from exercising his significant right, and moreover his desired trial strategy, of testifying regarding the August 6th offense to confront and rebut the testimony of his accuser and alleged victim, Mr. Wallace.

85) Additionally, Petitioner was prejudiced by the joinder of the two offenses because of the likely detrimental impact of the additional evidence regarding the August 6th offense on the jury during the mitigation phase. This prejudice would have occurred simply from the fact that the jury deliberating on the sentence for the capital (August 3rd) offense was the same jury that heard at trial all of the evidence on the separate (August 6th) offense. It was for this very reason that defense counsel, prior to presentation of evidence at the mitigation-penalty phase, moved the court for selection of a new panel of jurors for the sentencing. (Tr., Vol. XI, p. 10) That motion was denied.

86) Moreover, this prejudice to the petitioner was even further exacerbated, by the trial court's decision to admit all of the trial evidence on the August 6th offense at the mitigation-penalty proceeding. The mitigation proceeding, of course, was conducted strictly to determine the appropriate sentence for the August 3rd offense. Petitioner acknowledges that the trial court did instruct the jury that it was to consider the evidence regarding the August 6th offense (all of which was admitted at the mitigation hearing) only for the purpose of showing identity. The trial court's assumption, however, that the jury would not, either consciously or otherwise, consider

---

ground for relief.)

such evidence for other purposes and to the prejudice of Petitioner in deciding on his sentence was naive and mistaken. Such assumption, particularly in a death penalty case, was an abuse of discretion.

87) For the reasons above, the trial court's denial of Mr. Williams' motion to sever the two separate offenses violated Mr. Williams' rights as guaranteed under the Eighth and Fourteenth Amendments to the United States' Constitution.

**Second ground for relief: The trial court's decision to admit into evidence at the penalty phase of the August 3, 1990 offense all evidence admitted during the guilt/innocence phase regarding the August 6, 1990 offense (involving State witness Jeff Wallace) violated Petitioner's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States' Constitution.**

88) The trial court erred to the prejudice of Petitioner by admitting into evidence and allowing the jury to consider, at the mitigation-penalty phase for the August 3, 1990 capital offense, all evidence regarding the August 6, 1990 (Jeff Wallace) non-capital offense or incident. This ground for relief is related to the First Ground, set forth above, as it stems from - and further exacerbates the prejudice caused by - the trial court's decision not to sever the two cases for trial.

89) As noted above, the defense counsel moved the court for an order to impanel a new jury to hear the penalty phase of this case. The reasoning behind the motion was that the jury trying the guilt-innocence phase had been exposed to evidentiary matters concerning the felonious assault charge (August 6th offense) that, at least in part, were inadmissible and irrelevant as far as the aggravating circumstances were concerned on the aggravated murder charge (August 3rd offense). As defense counsel pointed out, once the jury heard all of this evidence it is not very likely they could must simply brush it aside, even if the court were to instruct them to do so. Here, however, the trial court did not do so, but rather instructed the jury that they could consider that evidence - in fact all of it.

23

90) At the conclusion of the mitigation hearing and after the Petitioner provided an

unsworn statement, the following occurred:

> Judge Valen: All right, State ready to proceed?
>
> Mr. Eichel: Your honor please, pursuant to the statute and State versus DePew, we reintroduce all the evidence at this stage which was previously submitted at the trial.
>
> Judge Valen: Counsel have anything to say on that?
>
> Mr. Davidson: Yes, we do, Your Honor.
>
> Mr. Davidson: I am not sure of what they are asking the Court to do at this time.
>
> Judge Valen: He asked the Court to -- introduced the evidence at trial. They don't have to present the evidence again.
>
> Mr. Davidson: What evidence, Your Honor? I mean, there is some that has nothing to do with anything here today, some things with Counts Three, and Four, which is not before this jury on mitigation.
>
> (Tr., Vol. XI, p. 139)

91) After a lengthy discussion between the State and defense counsel and the court,

the following exchange occurred:

> Mr. Davidson: Your Honor, we just don't understand --
>
> Judge Valen: You just don't understand my ruling? you just don't like my ruling.
>
> Mr. Hedric: We just don't understand your ruling.
>
> Judge Valen: Perhaps, you don't understand this, but I can't explain it more. I will give a limiting instruction to the jury. He has to prove beyond a reasonable doubt the aggravated circumstances, and I told you that.
>
> Mr. Hedric: Note our strenuous objection, Your Honor.
>
> (Tr., Vol. XI, p. 145)

24

92)     The trial court subsequently instructed the jury as follows:

> Judge Valen: All right.
>
> Now ladies and gentlemen, I am going to -- the evidence will be
> admitted that the Prosecutor has just outlined, that is, **all the
> evidence that was admitted at the trial in chief can now be
> considered by you in this mitigation or sentencing hearing**. But
> I want to give a limiting instruction, because as I said to you
> before, your consideration on this sentence phase goes only to
> Count One, the aggravated murder with the two Specifications that
> we had outlined, and I will outline those again in my final charge.
> And that is what your consideration is as to sentence.
>
> (Tr., Vol. XI, p. 146)  (Emphasis added.)

93)     This instruction was given to the jury prior to counsels' closing arguments.  The

court could not have been any clearer in leading the jury to believe that all of the evidence at the

guilt-innocence phase, which included the evidence on the August 6th felonious assault charge,

was allowed to be considered by them in determining a sentence for the aggravated murder

conviction.  This was wrong, and highly prejudicial to the Petitioner.  The court did limit their

sentencing verdict to a sentence on the murder case.  They were not to determine a sentence on

the other Counts:

> Judge Valen: ... You are to give no consideration of sentence or
> evidence as to any other Counts in the indictment or as to any
> Counts of Jeff Wallace. **But all that evidence that was admitted
> can be used and you may consider that evidence** since the
> Prosecutor has to prove Count One beyond a reasonable doubt
> again, only as it is relevant to the issue of identity, or existence of
> purpose, motive, scheme, plan or a system, absence of mistake, or
> acts of the Defendant in committing the acts which are the
> aggravating circumstances that the Defendant was found guilty of
> committing as contained in Specification One, and Two, of Count
> One.
>
> (Tr., Vol. XI, p. 147)  (Emphasis added.)

25

94)     The court thus is instructing the jury, foremost, that while they are not to consider a sentence for the second (Jeff Wallace) offense, they can consider at mitigation all of the evidence admitted at trial regarding the second offense. This is erroneous. The evidence admitted at trial regarding the Jeff Wallace felonious assault offense was not properly admissible at Petitioner's mitigation-penalty proceeding regarding the aggravated murder.

95)     The purpose of the state's presentation of the Jeff Wallace evidence at trial, in the first place, was to help prove identity. Indeed, that is the reason the trial court ruled against Petitioner in denying his request to sever the two cases. Once the state succeeded at trial in the guilt-innocence phase, and achieved their conviction of Petitioner for aggravated murder utilizing all of the evidence of the separate offense to show identity, the usefulness of this evidence in the administration of justice was, or should have been, terminated. The evidence had no bearing and should have had no place in the jury's deliberation on the sentence for the August 3rd capital offense.

96)     The basis of the trial court's ruling to admit at mitigation all of the evidence regarding the Jeff Wallace offense is unclear. The only indication from the record, based on language highlighted above, is that the court was operating under an erroneous belief that the state possessed some duty at the mitigation-penalty hearing to prove beyond a reasonable doubt the existence of the aggravating circumstances. This burden, of course, had already been met by the state at the guilt-innocence trial, and did not need to be proven again. There exists no legal authority to support this position of the trial court.

97)     The purpose of the mitigation-penalty proceeding in this instance, as previously stated, was solely to determine the appropriate sentence for the aggravated murder. Such proceeding is governed by evidentiary limitations. The function of the hearing is presentation of

26

any factors in mitigation of defendant's commission of the crime, to which the state is afforded the opportunity to present evidence or arguments in rebuttal. The evidence was improperly admitted before the jury to the severe prejudice of the Petitioner.

98) Once having determined to admit the evidence of the Jeff Wallace offense at mitigation, the trial court's instruction to the jury attempting to limit its application was an exercise in futility. It is not reasonable to believe that a jury, at a sentencing proceeding, would or even could consider all of such evidence strictly as to the issue of identification of the defendant - which had already been proven to the jury's satisfaction anyway - and at the same time successfully prevent it from influencing their decision as to sentence.

99) The state, not surprisingly, seized upon this error causing further proliferation of the prejudicial impact upon Petitioner. At closing of the mitigation hearing, the prosecutor argued to the jury:

> Review the evidence, and by that, as you know, the evidence
> includes the testimony, and all the exhibits, everything you heard
> from the witness stand. Everything you heard at the trial,
> everything you heard today.

(Tr., Vol. XI, p. 149)

100) The prosecutor further argued:

> The defendant committed the ultimate crime. One of several, and,
> yes, there are others by statute, but this is one of them, too.

(Tr., Vol. XI, p. 151)

101) The court then went on to charge the jury for the penalty phase hearing. No where in the charge did the court ever make the distinction between the evidence presented at the guilt phase as between the murder charge and the felonious assault case.

102)    The court committed prejudicial error by failing to instruct the jury that they could not consider the evidence of the felonious assault case, when weighing the mitigating factors against the aggravating circumstance.  In it's charge to the jury before final arguments the court further erred in instructing the jury that they could indeed consider all of the evidence at the guilt phase.  As stated before these errors were a derivative of the court's error in failing to sever the two cases.

**Third ground for relief:  The State's failure to properly provide relevant discovery regarding State witness Jeff Wallace's criminal history violated Petitioner's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States' Constitution.**

103)    Jeffrey Wallace was a crucial witness for the State of Ohio in this case. As noted above, Wallace alleged that Petitioner tried to rob him and then shot him on the night of August 6, 1990, three days after the August 3, 1990 homicide of Wayman Hamilton.

104)    As described above, the trial court, based upon Wallace's allegations, denied Petitioner's pre-trial motion to sever counts three and four (those involving Wallace) from those involving the Hamilton homicide. (Tr. Vol. II, pp. 11-25).

105)    The credibility of Jeffrey Wallace with respect to the allegations he made regarding the night of August 6, 1990 was a critical factor or consideration for the court in its denial of Petitioner's pre-trial severance motion.

106)    As such, any evidence which could undermine Wallace's credibility was material to the defense.  Clearly, any impeachment evidence regarding Wallace would have assisted counsel in cross-examining Wallace during the trial as well as supporting the pre-trial motion to sever counts as discussed above.

107)    The State of Ohio had the following information in its custody or within its control but failed to provide it to Petitioner's trial counsel:

28

Jeff Wallace was arrested for shoplifting in 1989;

Jeff Wallace was convicted of grand theft auto twice in 1989;

Jeff Wallace was convicted of assault and resisting arrest in 1989;

Jeff Wallace was in violation of his probation at the time of the incident and trial.

(See Exhibit M, Petitioner's September 20, 1996 State Post-conviction Petition, Court of Common Pleas, Butler County).

108)    The State of Ohio had an affirmative duty to disclose this favorable evidence to the defense, prior to trial, since it was material and directly related to the issues of guilt and/or punishment. The fact that on direct testimony Mr. Wallace testified that he had felony convictions for battery and grand theft does not excuse the State's failure to provide this information to Petitioner's counsel.

109)    The State of Ohio had a duty to search the files of law enforcement officials and produce evidence regarding Wallace's record. This duty existed whether the evidence was actually or constructively within the State's possession because said evidence was favorable to the defense. The State cannot build a proverbial "Chinese wall" between itself and law enforcement officials and claim that it was not in possession of said evidence.

110)    As a result of these actions, Petitioner's rights as guaranteed by the following provisions of the Constitution of the United States were violated: (1) the prohibition against cruel and unusual punishment guaranteed by the Eighth Amendment; (2) substantive due process and other unremunerated rights guaranteed by the Ninth Amendment; (3) rights "retained by the People" as guaranteed by the Tenth Amendment; (4) the right to procedural and substantive due process as guaranteed by the Fifth and Fourteenth Amendments; (5) the right to equal protection

29

of the law as guaranteed by the Fourteenth Amendment; and (6) the right to effective assistance

of counsel guaranteed by the Sixth Amendment. See Brady v. Maryland (1963) 373 U.S. 83.

> **Fourth ground for relief: The trial court's errors in failing to require provision to trial counsel of the written statement of a State witness, and in refusing to preserve for the record such statement at Petitioner's request, violated Petitioner's rights as guaranteed by the Eighth, and Fourteenth Amendment to the United States' Constitution.**

111) James Trivett was a key state's witness in the state's case against Petitioner.

Trivett testified, *inter alia*, that he observed Petitioner enter the taxi cab driven by Wayman

Hamilton on the night Mr. Hamilton was murdered. (Tr., Vol. VII, p. 137) Trivett's testimony

was critical to the state's case, due to the lack of direct and physical evidence to implicate

Petitioner in the slaying of Mr. Hamilton.

112) During cross-examination of Mr. Trivett by defense counsel, Trivett testified that

he had provided a written statement to the police investigating the Hamilton murder. (Tr., Vol.

VII, p. 140) Defense counsel then requested to be given a copy of the statement or, alternatively,

that the trial court review the statement for inconsistencies as provided for in Ohio R. Crim. P.

16(B)(1)(g). (Id.) The prosecutor noted that the statement was one and one-half pages in length.

(Id., at 141)

113) Following the trial court's *in camera* review of Mr. Trivett's statement to the

police, a discussion ensued at side bar that demonstrated that neither the trial judge nor the state

was aware of the law. The discussion went as follows:

(Discussion at the bench.)

> Judge Valen: The Court has reviewed this statement for inconsistencies as to what he said, and finds that there were no inconsistencies from the statement. Now, I don't believe that -- if there are things in his statement that he did not testify to, that is not subject to review. It is only for consistencies.

30

You have to come around here.

Mr. Davidson:  We have alluded -- we believe that we are entitled to the statement.  We should be given a copy of this statement.  In light that the Court is inclined not to give us a copy, **we ask that a copy of this statement be made part of the record -- sealed and made part of the record, so should the matter go before the Court of Appeals, they can make the same determination also, so that there is a perfect record.**

Mr. Piper:  Well, Your Honor, we feel that it has been sufficiently reviewed by the Court.  The Court has reviewed it for inconsistencies.  To make it part of the record, all that does is later on, supply a statement that previously isn't suppleable [sic] under the Rules of Evidence, and under the criminal rules.  And, Mr. Davidson hasn't stated any reasons as to why they should obtain a copy of this.  The Court has already ruled on getting copies of the statements.

Mr. Davidson:  If there are no inconsistencies, what do they have to hide?

There must be something in there they don't want us to have.

Mr. Piper:   That is true.  There is additional information, but they are not entitled to additional information.  I am not saying that it is true that we are hiding it, but the statement is a page and a half long, and his testimony was very short, and they are not supposed to be given his statement for cross-examination.  It is for inconsistencies, and we have conducted an examination and it is fine.

Mr. Davidson:  The -- **Your Honor, we would request that it be sealed, the statement, for review by the Court of Appeals, and not by us**.

Judge Valen:  The Court, again, finds that there are no inconsistencies.  I have read it very carefully, also find that you are not entitled to a copy of it, and **I will not seal it**.

Mr. Piper:  Thank you, Your Honor.

Mr. Hedric:  Thank you, Your Honor.

(End of discussion at the bench.)

31

(Tr., Vol. VII, pp. 141-43)

114)    The trial court's refusal to preserve the statement of state's witness James Trivett

was a blatant error.  The trial court's action was in direct contravention of the plain language of

Ohio R. Crim. P. 16(B)(1)(g).  That statute provides:

> (g)  In camera inspection of witness' statement.  Upon
> completion of a witness' direct examination a trial, the court on
> motion of the defendant shall conduct an in camera inspection of
> the witness' written or recorded statement with the defense attorney
> and prosecuting attorney present and participating, to determine
> the existence of inconsistencies, if any, between the testimony of
> such witness and the prior statement.
>
> If the court determines that inconsistencies exist, the
> statement shall be given to the defense attorney for use in cross-
> examination of the witness as to the inconsistencies.  If the court
> determines that inconsistencies do not exist the statement shall not
> be given to the defense attorney and he shall not be permitted to
> cross-examine or comment thereon.
>
> **Whenever the defense attorney is not given the entire
> statement, it shall be preserved in the records of the court to be
> made available to the appellate court in the event of an appeal.**

Ohio R. Crim. P. 16(B)(1)(g) (Emphasis added.)

115)    The above language is clearly mandatory.  Moreover, the trial court is required to

preserve such a statement even absent a motion or request by defense counsel.[3]  Here, the trial

court was afforded every opportunity - defense counsel having twice requested preservation of

the statement - to follow the law, yet still refused to do so.  This erroneous decision violated

Petitioner's rights, under both state[4] and federal law[5].

116)    The trial court's refusal to preserve the statement of witness James Trivett violated

Mr. Williams' rights to be free from cruel and unusual punishment and to due process and equal

---

[3] See State v. Billingsley, No. 91-AP-129 (Franklin Ct. App. Apr. 23, 1993)

[4] Indeed, under Ohio case law decisions interpreting this statute, the refusal by the trial court to preserve the witness'
statement has been held to constitute reversible error.  See State v. Billingsley, supra.

[5] A violation of a mandatory state procedural requirements gives rise to a violation of an individual's state created
liberty interests under the due process clause of the Fourteenth Amendment to the United States Constitution.

protection as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

> **Fifth ground for relief: The trial court's errors in providing improper jury instructions at the penalty phase of Petitioner's trial, including an instruction that a life sentence must be by unanimous verdict, violated Petitioner's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States' Constitution.**

117) During the penalty phase of Petitioner's trial, the court erroneously instructed the jury contrary to Ohio law that a verdict of life must be unanimous:

> You shall recommend the sentence of death if unanimously, that is all twelve, find by proof beyond a reasonable doubt that the aggravated circumstances outweigh the mitigating factors.

> If you do not so find, you should <u>unanimously</u> recommend either life sentence with parole eligibility after serving twenty years of imprisonment, or life sentence with parole eligibility after serving thirty years of imprisonment.

> \*\*\*

> And, again, <u>all twelve</u> must agree on either twenty or thirty.

> \*\*\*

> So, your verdict form <u>must be unanimous</u> as to either verdict form that is filled out. (Tr. Vol. XI, pp. 204-06). (Emphasis added).

118) Under the Ohio death penalty statute, a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not by proof beyond a reasonable doubt outweigh the mitigating factors. Indeed, Ohio jurors are to be so instructed.[6]

---

[6] <u>State v. Brooks</u> (1996) 75 Ohio St. 3d 148; see also <u>Mapes v. Coyle</u> 171 F. 3d 408 (6th Cir. 1999) (constitutional and reversible error for trial court to give sentencing instructions which provided that, *inter alia*, in order to return a verdict less than death, "you must **unanimously** find that the State has failed to prove beyond a reasonable doubt

119)    During the penalty phase of Petitioner's trial, the trial court also erroneously instructed the jury as to the definition of mitigating factors. (Tr., Vol. XI, p. 202).

120)    The Court defined mitigating factors as "factors that while they do not justify or excuse the crime, nevertheless, in fairness and mercy, may be considered by you as extenuating or inducing the -- reducing the degree of the defendant's blame or punishment." (Id.) (Emphasis added).

121)    The court failed to understand that mitigating factors are not related to a capital defendant's culpability or blame, but rather are those factors which are relevant to the issue of whether the defendant should be sentenced to death.

122)    By so instructing, the trial court caused the jury to focus on Petitioner's involvement and conduct in the offense, not on him as an individual with a unique history, character and background.

123)    By so instructing, the trial court violated the fundamental tenets of United States Supreme Court case law which requires individualized sentencing decisions to ensure the reliability of the determination that death is the appropriate penalty.

124)    During the penalty phase of Petitioner's trial, the trial court also erroneously instructed the jury to first reject death as a penalty before it could consider life as a sentence. (Tr., Vol. XI, p. 204)

125)    The trial court instructed as follows:

> You shall recommend the sentence of death if unanimously, that is all twelve, find by proof beyond a reasonable doubt that the aggravated circumstances outweigh the mitigating factors.

---

that the aggravating circumstances of which the defendant was found guilty of committing outweigh the mitigating factors.") (Emphasis added.)

> If you do not so find, you should unanimously recommend
> either life sentence with parole eligibility after serving twenty
> years of imprisonment, or life sentence with parole eligibility after
> serving thirty years of imprisonment.

(Id.). (Emphasis added).

126) By so instructing, the trial court instructed the jury to "acquit" of the death

sentence before it could consider a life sentence which encroaches on the province of the jury to

decide questions of fact. By so instructing, coerced decisions are more likely to occur.

127) During the penalty phase, the trial court further erred in its repeated use of the

term "recommend" or "recommendation" in relation to the jury's verdict - *e.g.*, "[i]t is your

responsibility to decide what your sentence to recommend to this court ... " - so as to water

down or minimize the jury's sense of responsibility for its decision. (Tr., Vol. XI, p. 200).

128) The trial court further erred in providing an instruction indicating to the jury that

the Ohio death penalty statute mandates imposition of the death penalty if aggravating factors

outweigh mitigating factors.

129) Lastly, the trial court erred (at both phases of the trial) in providing an improper

and misleading instruction to the jury regarding the meaning of the State's burden of proof

"beyond a reasonable doubt."

130) The trial court instructed the jury on reasonable doubt at both the guilt-innocence

and mitigation-penalty phases. Each instruction tracks the language of Ohio Rev. Code Ann.

Section 2901.05(D):

> Reasonable doubt is present when, after you have carefully
> considered and compared all the evidence, you cannot say you are
> firmly convinced of the truth of the charge. Reasonable doubt is a
> doubt based on reason and common sense. Reasonable doubt is
> not a mere possible doubt, because everything relating to human
> affairs or depending on moral evidence is open to some possible or
> imaginary doubt. Proof beyond a reasonable doubt is proof of such

35

> character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

(Tr., Vol. IX, p. 77-78)

...

> Reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced that the aggravating circumstance outweighs the factors in mitigation. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

(Tr., Vol. XI, p. 202)

131) This reasonable doubt standard represented by the trial court's instruction is unconstitutional. This standard does not adequately convey the stringent "beyond a reasonable doubt" standard. The "willing to rely and act" language in the trial court's instruction provided the jury with no guidance because it was too lenient. The instruction was also flawed because the "firmly convinced" phrase does not represent a reasonable doubt standard; rather it represents a clear and convincing standard.

132) The "unwilling to rely and act" language is particularly problematic. There is a substantial difference between a juror's verdict of guilt beyond a reasonable doubt, the basis of which gives rise to an individual's loss of liberty, and a person making a judgment in a matter of personal importance to him. As a result, jurors are given a definition of reasonable doubt in the first sentence of 2901.05(D) which conveys a standard of proof below that required by Due Process.

133) This constitutional defect resulting from the trial court's instruction was exacerbated in this case by the State's reasonable doubt discussion during voir dire:

Is there anyone who feels that way?

Is there anyone, when they are deciding what is reasonable, and not reasonable -- in other words, what is reasonable doubt, and what is not reasonable doubt -- is there anyone who has a problem or a difficulty deciding -- or deciding in a large part using your God given common sense?

In other words, what is reasonable, and what is not reasonable, is associated with day-to-day life experiences, and your common sense tells you what that is.

Does that create a difficulty or problems for anybody in using something as simple as your common sense to help you to decide what the facts are?

(Tr., Vol. V, p. 81)  This discussion by the State diluted the reasonable doubt standard and diminished for the jury the stringency required for the reasonable doubt standard.

134)  The instructions and discussion by the prosecutor allowed the jury to improperly find Mr. Williams guilty and sentence him to death on a standard less than reasonable doubt.

135)  The above trial court's erroneous instructions violated Petitioner's right to be free from cruel and unusual punishment and right to Due Process as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**Sixth ground for relief:  The trial court's error in considering duplicative aggravating circumstances and other irrelevant and improper factors in the sentencing of Petitioner violated Petitioner's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States' Constitution.**

136)  During the penalty phase of the trial, the trial court instructed the jury concerning the method used to arrive at a verdict of either death or some life sentence. (Tr., Vol.XI, pp. 199-214).

137)  The jury was told to determine whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt and, if so, a sentence of death should be returned. (Id. at 205-08).

138)    The jury was never instructed as to what weight to give any of the aggravating circumstance(s) or mitigating factors but told simply that "you (the jury) are the sole judges of the weight of the evidence". (Id. at 203).

139)    The State of Ohio indicted the Petitioner with two capital specifications as follows: (a) the first specification was under O.R.C. § 2929.04(A)(7) which alleged that the homicide was done during the commission of an aggravated robbery; and (b) the second capital specification was under O.R.C. § 2929.04(A)(3) which alleged that the homicide was done to escape detection.

140)    The jury found Petitioner guilty of both the "(A)(7)" and "(A)(3)" specifications. (Tr. Vol. X, pp. 3-8).

141)    Under Ohio law, where two or more aggravating circumstances arise from the same act or indivisible course of conduct and are duplicative, the duplicative aggravating circumstances should be merged for purposes of sentencing.[7] In the trial of this case, the evidence illustrated in unequivocal terms that the two aggravating circumstances set forth in the indictment were duplicative and involved one course of conduct. The trial court should have merged the "(A)(7)" and "(A)(3)" aggravating circumstances.[8]

142)    As a result of the merger, the jury would have been instructed that it was to weigh the one, rather than two, aggravating circumstance against all the mitigating factors to determine the appropriate sentence.

---

[7] See State v. Jenkins (1984) 15 Ohio St. 3d 164 (syllabus five).
[8] State v. Williams (1995) 73 Ohio St. 3d 153, at 171.

38

143)    Based on this error, the death sentence was rendered in an arbitrary and erroneous manner because the trier of fact had no clear direction as to the proper procedure it should utilize to conduct the weighing process and return a sentence.

144)    Based on this error, Petitioner's right to be free from cruel and unusual punishment under the Eighth Amendment as well as his right to due process and equal protection under the Fifth and Fourteenth Amendments to the U.S. Constitution were violated.

**Seventh ground for relief: The trial court's error in permitting the State to argue the nature and circumstances of the offense as an aggravating factor violated the Petitioner's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States' Constitution.**

145)    Pursuant to the Ohio death penalty statutory scheme and Ohio law, the State is not permitted in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are aggravating circumstances. Under Ohio law, the nature and circumstances of the offense are mitigating factors, and only to be considered as such.[9] The State of Ohio repeatedly argued to the jury and represented that the nature and circumstances of the offense were aggravating circumstances.

146)    The State of Ohio repeatedly misstated the law that mitigation had something to do with the offense, *i.e.,* the nature and circumstances thereof that reduced Petitioner's culpability therein.

147)    The State argued improperly: "What is mitigating? It is up to you, whatever you say it is. But as a guide, you are supposed to consider whether the defense's evidence somehow lessens the degree of the Defendant's culpability in this. It doesn't". (Tr. Vol. XI, p. 151). (Emphasis added).

---

[9] State v. Wogenstahl (1996) 75 Ohio St. 3d 344 (second syllabus), and at 354; See Ohio Rev. Code § 2929.04(B)..

39

148) The State argued improperly: "Whether it excuses the Defendant's blameworthiness, whether it mitigates, or excuses, or even explains the crime in such a way that is relevant to any reason why he shouldn't be put to death". (Id. at 151).

149) The State argued improperly: "[t]he defendant committed the ultimate crime and deserves the ultimate punishment". (Id. at 153).

150) The State argued improperly:

- "[w]e are not here on just a murder case, are we?".

- "then, you have to ask yourself: what was this law (the death penalty) created for?".

- "And, I contend to you, it was created for this exact crime".

- "I got the photograph out (of the decedent Hamilton) and I was going to show it to you, but I have changed my mind - but you look at it, and you look at the bullet hole in his head. It was a cold blooded execution, and if ever there were aggravated circumstances, you are entitled, and you will hear

- despite Mr. Hedric telling you that you can't consider the evidence in the case, that is not why you are here -- yes, you can". (Tr. Vol. XI, pp. 204-06). (Emphasis added).

151) The State argued improperly: "[t]he value of that cab fare, that is an aggravated circumstance". (Id. at 187).

152) The State argued improperly: "that the wages of sin is death ... Wayman Hamilton was cold-bloodedly executed". The State contended that this is "the exact type of crime for which we have capital punishment". (Id. at 192).

153) Based on these improper arguments, Petitioner's right against cruel and unusual punishment under the Eighth Amendment as well as his equal protection and due process rights under the Fifth and Fourteenth Amendments to the United States Constitution were violated.

Petitioner's death sentence is void or voidable because it was rendered in an arbitrary and erroneous manner.

> **Eighth ground for relief:** The jury's verdicts of guilty with respect to the August 3, 1990 charges were contrary to the weight of the evidence and law in violation of Petitioner's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States' Constitution.

154)    As noted above, Petitioner was charged under Ohio Rev. Code § 2903.01(B) with the aggravated murder of Wayman Hamilton in count one of the indictment.

155)    The aggravated murder was charged under Ohio's felony murder concept; in that, the indictment in count one alleged that the murder was committed during the course of conduct of an aggravated robbery offense.

156)    Underlying the offense of aggravated robbery, and central to it, is that a theft offense was either committed or attempted to have been committed. See Ohio Rev. Code § 2911.01. In the case *sub judice* there was no physical evidence, *i.e.,* no proof, that a theft had been committed. Petitioner's conviction with respect to this element of the offense was based on nothing more than speculation.

157)    The State of Ohio failed to produce sufficient evidence in which a jury could infer that a theft offense had been committed.

158)    The State's entire argument that a theft offense had been committed was based on the theory that Petitioner took cash from Hamilton's shirt pocket and/or failed to pay for the thirty-two (32) dollar cab fare (a theft of services). (See State's closing argument, Tr. Vol. IX, pp. 19-20). The only support for this theory regarding this element of the offense was limited to the following circumstantial evidence:

> a.    that the Petitioner entered a Clifton cab that Hamilton was driving which picked him up at a Fuel Mart on Compton Road. (Tr. Vol. VII, pp. 113-20);

41

b. that prior to calling for a cab, Petitioner told witness Teasley (an employee of Fuel Mart) that "he didn't have any money and he wanted to use the phone". (Tr. Vol. VII, pp. 112-13).

c. that approximately 30-45 minutes later, cab driver Wayman Hamilton was found shot to death in the Clifton cab which had traveled to Hamilton, Ohio. (Tr. Vol. VII, pp. 68-72);

d. that the cab's meter, located on the dashboard, registered $32.10. (Tr. Vol. VII, p. 248);

e. that Hamilton had $60.24 of cash in the wallet carried on his person. (Tr. Vol. VII, pp. 79-80);

f. that Hamilton had generated approximately $50.00 in cab fares the evening of August 3, 1990 prior to Petitioner entering the cab. (Tr. Vol. VII, p. 90).

g. that **some** cab drivers for Clifton cab kept cash earned while working in more than one place on their person because of the fear of being robbed. (Id. at 87-96). (Emphasis added.)

159) This evidence was insufficient to sustain a finding that a theft offense, and thereby a robbery, was committed.

160) As such, insufficient evidence existed for the jury's verdict that the Petitioner was guilty of aggravated murder under the "felony-murder" theory.

161) As such, Petitioner was not even "death eligible" because insufficient evidence existed that the homicide was committed during the commission of another aggravated felony offense.

162) Following this logic, insufficient evidence existed as to the first capital specification in count one of the indictment under O.R.C. § 2929.04(A)(7) which alleged that the aggravated murder was committed during the cause of an aggravated robbery.

163) Likewise, insufficient evidence existed that supports the jury's finding that the homicide was committed to "escape detection" as set forth in the second capital specification in count one charged under O.R.C. § 2929.04(A)(3). The State of Ohio provided no factual basis, other than a conclusory comment, that Petitioner was guilty of the "(A)(3)" specification. (Tr., Vol. IX, p. 22) No witnesses observed the shooting. Petitioner made no comments implicating himself in the homicide. No physical evidence existed which could be used to infer that the homicide was done to escape detection.

164) The State's argument regarding the "(A)(3)" specification was based upon complete speculation and unsupported by any evidence. If the State's argument were to be followed, then every capital defendant guilty of an "(A)(7)" specification would also be guilty of an "(A)(3)" specification. Clearly, this is not an accurate interpretation of the law.

165) Further, there was insufficient evidence to prove beyond a reasonable doubt that Clifford Williams shot and killed Wayman Hamilton, *i.e.*, committed the offense of murder. The evidence as to this offense was also circumstantial and based on speculation. The motive of robbery in this case is guesswork Nobody saw Mr. Hamilton get shot, or saw the perpetrator of the shooting. The only individual who claimed to have witnessed anything around the time of the shooting, Larry Ingram, stated at Petitioner's hearing for a new trial that he had observed Tippy Jones get out of the cab, and not Clifford Williams. (Tr., Vol. XIV, p. 13-15). Mr. Ingram said that he then observed the cab driver with his head bowed down. (*Id.*, p. 14)

166) Even assuming, *arguendo*, that the identifications of Clifford Williams by witnesses Trivett, Teasly and Wallace were all reliable, and even further assuming that the ballistics evidence was reliable, it is still not at all proven by the evidence that Clifford Williams shot and killed Wayman Hamilton. A number of plausible scenarios exist which exculpate the

43

Petitioner. For instance, Petitioner could have gotten into the cab with Mr. Hamilton, been driven to the scene of the crime, and gotten out to go retrieve money and someone else either came along, or returned instead of Petitioner, and shot Mr. Hamilton. With respect to the ballistics evidence, the most that was shown was that cartridges had, **at one point in time**, been discharged from the same gun used at both the August 3rd and August 6th scenes. There was no evidence one way or the other however, as to whether Clifford Williams had consistently possessed the gun that he was allegedly witnessed to have used on August 6th, or that Clifford Williams owned the gun. It is entirely plausible that such gun could have been passed between individuals, including Tippy Jones. This scenario is consistent with the testimony of Larry Ingram, cited above.

167)     Based on this lack of evidence, and the speculation involved in Petitioner's conviction, Petitioner's death sentence was imposed in violation of his rights under the Fifth, Eighth and Fourteenth Amendments under the United States Constitution; specifically, the sentence of death violates the cruel and unusual punishment clause of the Eighth Amendment because it was rendered in an arbitrary and erroneous manner.

> **Ninth ground for relief: The trial court's error in denying Petitioner's motion for provision of an expert to assist in preparation and presentation of mitigation evidence during the penalty phase violated Petitioner's rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States' Constitution.**

168)     On November 30, 1990, Mr. Williams' counsel moved the trial court for the appointment of a mitigation specialist to assist counsel in preparing the defense case for the penalty phase. The trial court, by entry journalized on December 5, 1990, denied counsel's motion. Subsequently, at the outset of the sentencing phase, Petitioner's counsel objected to going forward for the reason that counsel had "not had adequate time to prepare for the mitigation hearing." (Tr., Vol. XI, p. 12) Counsel attributed the lack of preparedness to the trial

court's previous denial of counsel's request for a mitigation specialist. The trial court then addressed the denial of the mitigation specialist, inter alia, as follows:

> Judge Valen: The Court has never denied you the use of any expert if you could show the necessity for it. ... You have not told me anything except that the Public Defender School told you that you have to have one.
>
> And, as far as this Court is concerned, just because the Public Defender tells you that you have to file a certain motion, or that it takes so many weeks to voir dire a jury, or so many weeks to try a capital case, or that you cannot -- you are not -- do not have the ability to conduct a mitigation hearing, I think if that is what they told you, it is improper. It is not the law. It is not the law in Ohio, anyway, and that counsel is fully capable of preparing the mitigation hearing.

(Tr., Vol. XI, p. 14) The court continued:

> Now, if this case is reversed because counsel states that they are not prepared and that was a deliberate act by saying that we will only be prepared if we can have a mitigation specialist, then the Court will have to deal with that in whatever manner is proper.
>
> Now, all I want to know is have you prepared your mitigation hearing to the best of your ability as lawyers trained and having gone to Public Defenders School and qualified [sic] to try capital cases? Have you done that?
>
> Mr. Davidson: Your Honor, I can represent to you, we have.
>
> Judge Valen: Fine, that is all I want to know.
>
> Let's proceed with the hearing.[10]

(Tr., Vol. XI, p. 16)

---

[10] After the hearing had been completed, the trial court, in its opinion in support of Mr. Williams' death sentence, stated, "[t]he Defendant, through his witnesses and his unsworn statement, told very little about himself ...." State v. Williams, case no. CR90-08-0665, (p. 6) (Butler C.P., 2-11-91) (Sentencing Entry).

169) The trial court's veiled threat to Petitioner's counsel, implying consequences to counsel for counsel's objection to going forward with the penalty phase, was improper. Equally inaccurate was the trial court's position that counsel's attendance at continuing legal education seminars pursuant to C.P. Sup. R. 65 (*i.e.* "Public Defenders School" [sic]) somehow qualified counsel as mitigation specialists.

170) The mitigation specialist is a recognized and vital member of the defense team in any capital trial. Based on the trial court's denial of a mitigation specialist, considerable relevant evidence was not presented to the jury during the penalty phase. Based on experience and training, a mitigation specialist is particularly adept at gaining sensitive information from a capital defendant, his family and friends. Exhibits P, Q, R, T, U and V (attached to Petitioner's State post-conviction petition, September 20, 1996, Court of Common Pleas, Butler County), are an example of information available at the time of the trial but not presented.

171) If the trial court had granted the request, the above relevant information could have been presented so that the jury could understand and picture the environment of Petitioner as he grew up and the events which influenced and shaped his behavior.

172) Without this information, an accurate psychological evaluation of Petitioner could not be performed. (See Exhibit P, Petitioner's State Post-conviction Petition, September 20, 1996, Court of Common Pleas, Butler County).

173) Here, Clifford Williams' counsel was prevented from pursuing the type of investigation required in Mr. Williams' capital case when the trial court denied his motion for a mitigation specialist. The trial court's action deprived Clifford Williams of the "raw materials integral to the building of an effective defense." See Ake v. Oklahoma, 470 U.S. 68, 77 (1985).

46

174)    As a result of these actions, Petitioner's rights as guaranteed by the following provisions of the Constitution of the United States were violated: (1) the prohibition against cruel and unusual punishment guaranteed by the Eighth Amendment; (2) substantive due process and other unenumerated rights guaranteed by the Ninth Amendment; (3) rights "retained by the People" as guaranteed by the Tenth Amendment; (4) the right to procedural and substantive due process as guaranteed by the Fifth and Fourteenth Amendments; (5) the right to equal protection of the law as guaranteed by the Fourteenth Amendment; and (6) the right to effective assistance of counsel guaranteed by the Sixth Amendment.  His death sentence warrants reversal and his case should be remanded for resentencing.

> **Tenth ground for relief:  Trial counsel's numerous failures regarding preparation and presentation of evidence at the penalty phase of the trial constituted ineffective assistance of counsel in violation of Petitioner's rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States' Constitution.**

> a)  Trial counsel failed to adequately prepare for the mitigation-penalty phase of Petitioner's trial

175)    As noted above, at the outset of the sentencing phase Petitioner's counsel objected to going forward to the court for the reason that counsel had "not had adequate time to prepare for the mitigation hearing." (Tr., Vol. XI, p. 12)  As the mitigation hearing proceeded, defense counsel's failure to adequately prepare, to the detriment of their client,  became increasingly apparent.

> i) *Trial Counsel failed to obtain and present a cultural mitigation expert for the mitigation-penalty phase*

176)    Petitioner was deprived of effective assistance of counsel by his trial counsel's failure to obtain a cultural mitigation expert to assist in the presentation of Petitioner's mitigation evidence. The effective assistance in this case was in part induced by the Court.  Consequently,

Petitioner was also deprived of the expert assistance necessary to present an adequate defense in his capital case.

177)  A cultural expert was needed in this case, given Petitioner's socio-economic background and history of being raised in, and surrounded by, an environment that was dangerous, violent, lacking in opportunities, and, in this case, physically and emotionally abusive.  Such an expert could have assisted in the preparation of evidence or testimony about Clifford Williams that would have helped to "humanize" the Petitioner before the eyes of the jury.

178)  A cultural mitigation expert would have created a picture for the jury of Clifford Williams' culture and environment, one very different from their own.  Rather than seeing Clifford exclusively in terms of the crimes for which he was found guilty, the jury would have been exposed to Clifford's culture and environment which could well have significantly influenced the sentence he received.

179)  A cultural mitigation expert would have been able to impart information to a cultural expert that attorneys are not equipped to deal with professionally and logistically.  A cultural expert would have gleaned from the mitigation interviews, that Clifford Williams was exposed to violence, abuse, drugs and crime ever since he was born.  From this environment, Petitioner Williams observed and learned certain behavior.  Combined with this environment was his unstable upbringing: Clifford Williams was without any consistent adult supervision, emotional support, residence or community in which he could develop positive community values.

180)  Such an expert could have provided assistance and testimony regarding:

the overwhelming amount of risk factors extant in Clifford Williams' life; the violent and dangerous neighborhoods he grew up in and the various influences of such environments on a young boy; the fact that his mother, like her mother before her, became pregnant with him when she was just thirteen years old, and delivered him when she was in the eighth grade; the fact that he was moved around a lot and stayed in different homes and was taken care of by different relatives; that his mother had a recurring problem with substance abuse; that there was a complete lack of stability in his household; that he never had a stable father figure in his life; that he never had any positive role models in his life to speak of; that his biological father initially denied being his father; that as a child he moved no less than seven different times; that he was exposed to men (his mother's boyfriends) who physically abused him; that he was exposed to a step-father over an extended period of time who was emotionally and physically abusive to both Clifford and his mother; that he was exposed to relatives and acquaintances who were imprisoned; that he was exposed to gangs; that he suffered a number of personal losses in his relatively short life; that there was a lack of significant positive factors in his life such as local support in the community, support in the schools, the presence of someone or some program to help stimulate him intellectually and creatively and encourage his strengths, and the presence of an emotionally available and stable adult to provide him needed guidance.

181) Defense counsel's failure to retain such an expert and present such evidence fell below accepted standards of practice in a capital trial. This deficient performance highly prejudiced Petitioner, and violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

49

ii) *Trial counsel failed to obtain a mitigation specialist and failed to adequately investigate and interview mitigation witnesses and develop mitigation facts for hearing*

182) Trial counsel's failure to retain the services of a mitigation specialist, or other like expert, constituted ineffective assistance of counsel in violation of Petitioner's constitutional rights. Petitioner Williams was also deprived of his right to expert assistance to prepare an adequate defense in his capital case.

183) Counsel did move the court for funds for retention of such an expert, pre-trial, but the court denied such request. (See **Ninth ground for relief**, *supra*, for discussion regarding the court's failure to grant this motion). Counsel renewed this motion, but not until after a guilty verdict on the capital murder charge had been returned. The trial court indicated to counsel that their request for such an expert would have been granted had counsel merely shown a particularized need for such expert. Trial counsel's failure in this regard falls below accepted standards, and highly prejudiced the Petitioner.

184) Petitioner was prejudiced by trial counsel's deficient performance in that there was considerable mitigation evidence that could have been presented to the jury. A mitigation specialist was needed to assist in collection of needed information about Petitioner's background to present to the jury. Such an expert was particularly needed in this case, in light of Petitioner's background and history. As with the cultural expert, such an expert could have assisted in the preparation of evidence or testimony about Clifford Williams that would have helped to "humanize" Mr. Williams before the eyes of the jury, and helped the jury in terms of an explanation or understanding of Petitioner's alleged wrongful conduct.

185) Further, this mitigation evidence could have been provided to and synthesized by a cultural mitigation expert to explain to an all white middle class jury the Petitioner's background, environment, and other influences that went into helping to make the Petitioner the

50

person that he is in terms the jury could understand. Based on experience and training a mitigation specialist is particularly adept at gaining sensitive information from the defendant, his family and friends. (See Exhibit P, attached to Petitioner's State post-conviction petition, September 20, 1996, Court of Common Pleas, Butler County),

186) This information could also have been given to the psychiatrist, Dr. Weaver. The information obtained from a mitigation specialist, in conjunction with the clinical interviews and testing, enables a psychologist to draw a relatively complete picture of the environment in which the defendant grew up and the events which influenced the defendant. All of this information is crucial to an accurate psychological evaluation.

187) Counsel also failed to adequately prepare generally for the mitigation. For instance, defense counsel had Petitioner give an unsworn statement to the jury at the mitigation hearing. Petitioner simply read a written statement into the record before the jury. Petitioner's statement was not well-prepared, however, and appeared to have been written by someone other than the Petitioner.

188) Defense counsel failed to attempt to compensate for the lack of a mitigation specialist by endeavoring to build a mitigation case themselves. The preparation of the two lay witnesses presented (Clifford's mother and maternal grandmother) was inadequate. Counsel failed to spend sufficient time interviewing these two witnesses and preparing their testimony.

189) Defense counsel also failed to contact or interview numerous relatives and acquaintances of Petitioner to assist in preparation for the mitigation-penalty hearing. Had counsel contacted and interviewed these individuals, they could have provided information and testimony such as that contained in Exhibits P, Q, R, T, U and V (attached to Petitioner's State post-conviction petition, September 20, 1996, Court of Common Pleas, Butler County).

51

Specifically, defense counsel could have and should have contacted and interviewed, *inter alia*, the following individuals:

- David Bauniel III (Clifford's stepbrother)

- LaTanya Williams (Clifford's sister)

- Clifford George Sr. (Clifford's biological father)

- Marie George (Clifford's paternal grandmother)

- Larenda Jackson (Clifford's aunt)

- Linda Stenson (Clifford's aunt)

- Shanita Cook (Clifford's girlfriend)

- other relatives, friends and acquaintances

190)    These individuals all had useful information to provide to counsel to assist in preparation of, and provision of testimony at, Petitioner's mitigation hearing. For instance, although Clifford's biological father, Clifford George, had maintained contact with his son, (and Petitioner had even lived with his father for awhile), he was never contacted by defense counsel. Petitioner's father certainly would have wanted to testify on his son's behalf at the mitigation hearing had he been contacted by counsel. Information from all of these individuals would have provided supportive facts and elaboration on the culturally mitigating factors described above (paragraph 80), such as the emotionally and physically abusive environments to which Petitioner was subjected, the physical beatings by Petitioner's step-father, the substance abuse problems of his mother, the instability of Petitioner's environment, and the lack of a much needed father figure or other positive role model in Petitioner's life.

191) Defense counsel's failure to conduct this necessary investigative work and factual development highly prejudiced the Petitioner and adversely effected the presentation of evidence at his mitigation hearing.

192) As a result of these deficiencies in performance by defense counsel, Petitioner's rights as guaranteed by the following provisions of the Constitution of the United States were violated: (1) the prohibition against cruel and unusual punishment guaranteed by the Eighth Amendment; (2) substantive due process and other unenumerated rights guaranteed by the Ninth Amendment; (3) rights "retained by the People" as guaranteed by the Tenth Amendment; (4) the right to procedural and substantive due process as guaranteed by the Fifth and Fourteenth Amendments; (5) the right to equal protection of the law as guaranteed by the Fourteenth Amendment; and (6) the right to effective assistance of counsel guaranteed by the Sixth Amendment.

192) Further, Petitioner required discovery as provided by the Ohio Rules of Civil Procedure in order to fully develop and pursue this claim. Denial of the request for discovery as it related to this claim amounted to a deprivation of substantive and procedural due process as guaranteed by the aforementioned state and federal constitutional provisions.

iii) *Trial counsel failed to obtain a psychiatrist until the last minute*

193) Defense counsel also failed to adequately and timely retain and prepare its mental health expert to testify at Petitioner's mitigation hearing. At the penalty phase, defense counsel introduced testimony from psychiatrist Dr. Glenn Weaver, who testified that Petitioner suffered from the major psychiatric disorder paranoid schizophrenia. In Dr. Weaver's opinion, Mr. Williams had suffered from this mental disease since his early teens. His paranoid schizophrenia was deemed to have played a role in events on the night of Mr. Hamilton's murder. Dr. Weaver

also testified that paranoid schizophrenia is a disease process such that in Clifford Williams' case the disease would respond to treatment.

194)  Dr. Weaver's testimony on cross-examination did not fare well. Dr. Weaver had not met with or examined Petitioner until the Friday (January 11, 1991) before the hearing. The history taken was entirely from the interview with Petitioner, as no other documents or records had been obtained or reviewed. Though Dr. Weaver testified on direct that Petitioner had been psychiatrically evaluated two times as a teenager in California, Dr. Weaver had not seen any records of such evaluations. The prosecution, however, had possession of these juvenile records of Petitioner, and used them to damage Dr. Weaver's credibility on cross-examination. The court issued a ruling allowing the State to question Dr. Weaver based on the juvenile institution records that he had not been provided or reviewed.

195)  Moreover, during Dr. Weaver's appearance, defense counsel neglected to elicit an opinion consistent with Ohio statutory requirements regarding a defendant's mental impairment as a mitigating factor. This failure was noted by the trial court in its sentencing opinion.

196)  This failure by Petitioner's counsel fell below accepted standards of practice in a capital trial and constituted ineffective assistance of counsel, in violation of Petitioner's rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

b) Trial counsel failed to object to various prejudicial jury instructions:

197)  Petitioner was denied his constitutional right to effective assistance of counsel due to his counsel's failures to object to the numerous improper and prejudicial instructions provided by the trial court to the jury during the mitigation-penalty phase of Petitioner's trial. These improper instructions are discussed thoroughly in this Petition in the **Fifth ground for relief**, *supra*. Specifically, trial counsel failed to object to the following improper instructions:

i) *trial counsel failed to object to the improper jury instruction that a life verdict must be unanimous;* (See **Fifth ground for relief,** *infra*)

ii) *trial counsel failed to object to an improper "acquittal first" instruction at the mitigation-penalty phase;* (See **Fifth ground for relief,** *infra*)

iii) *trial counsel failed to object to the improper jury instruction regarding the definition of mitigating factors;* (See **Fifth ground for relief,** *infra*)

iv) *trial counsel failed to object to the improper instruction regarding the jury making only a "recommendation";* (See **Fifth ground for relief,** *infra*)

v) *trial counsel failed to object to the improper jury instruction that the existence of mitigating factors does not preclude death sentence;* (See **Fifth ground for relief,** *supra*)

vi) *trial counsel failed to object to the improper jury instruction regarding the burden of proof "beyond a reasonable doubt";* (See **Fifth ground for relief,** *supra*)

vii) *trial counsel failed to object to the improper jury instruction regarding the death penalty as mandatory;* (See **Fifth ground for relief,** *supra*)

viii) *trial counsel failed to object to use of duplicative aggravating circumstances in sentencing;* (See **Sixth ground for relief,** *infra*)

198) Trial counsel's failures to object to these improper jury instructions fell below an objective standard of reasonableness, and adversely affected the results of Petitioner's trial. As a result, Petitioner was deprived of his federal constitutional rights as guaranteed under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

c) Trial counsel failed to object to prosecutorial misconduct at the mitigation-penalty phase of Petitioner's trial.

199) Petitioner was denied his constitutional right to effective assistance of counsel due to his counsel's failures to object to improper prosecutorial arguments and remarks before the jury during the mitigation-penalty phase of Petitioner's trial. These numerous improper statements made by the officers of the state are discussed thoroughly in the **Sixteenth ground**

**for relief**, *infra*. Specifically, trial counsel failed to object regarding the following prosecutorial misconduct:

> i) *prosecutorial comments that misstated the weighing process to be employed at the penalty phase*; (See **Sixteenth ground for relief**, *infra*, for detailed discussion regarding impropriety and prejudicial impact of this prosecutorial misconduct)

> ii) *prosecutorial comments regarding the jury's role in merely "recommending" a sentence so as to downplay or minimize the jury's responsibility*; (See **Sixteenth ground for relief**, *infra*, for detailed discussion regarding impropriety and prejudicial impact of this prosecutorial misconduct)

> iii) *prosecutorial comments indicating the death penalty was mandatory in Petitioner's case, precluding the possibility of a reasoned, moral response or a response based on considerations of fairness or mercy*; (See **Sixteenth ground for relief**, *infra*, for detailed discussion regarding impropriety and prejudicial impact of this prosecutorial misconduct)

> iv) *prosecutorial argument attacking the testimony of defense witnesses at the mitigation phase*; (See **Sixteenth ground for relief**, *infra*, for detailed discussion regarding impropriety and prejudicial impact of this prosecutorial misconduct)

> v) *prosecutorial comment in violation of Petitioner's Fifth Amendment rights*; (See **Sixteenth ground for relief**, *infra*, for detailed discussion regarding impropriety and prejudicial impact of this prosecutorial misconduct)

> vi) *prosecutorial comment regarding Petitioner's mitigation evidence of youth and mental disease.* (See **Sixteenth ground for relief**, *infra*, for detailed discussion regarding impropriety and prejudicial impact of this prosecutorial misconduct)

> vii) *prosecutor's expressions at closing argument of his personal opinion and beliefs*; (See **Sixteenth ground for relief**, *infra*, for detailed discussion regarding impropriety and prejudicial impact of this prosecutorial misconduct)

200)  Trial counsel's failures to object to these improper prosecutorial arguments and comments before the jury fell below an objective standard of reasonableness, and adversely affected the results of Petitioner's trial. As a result, Petitioner was deprived of his federal constitutional rights as guaranteed under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**Eleventh ground for relief:** **Trial counsel's numerous failures with respect to the guilt/innocence phase of Petitioner's trial constituted ineffective assistance of counsel in violation of Petitioner's rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States' Constitution.**

a) Trial counsel rendered ineffective assistance during voir dire.

201)    Petitioner was denied his constitutional right to effective assistance of counsel due to the ineffectiveness of his defense counsel during voir dire. Counsel repeatedly misstated the law to the jury with regard to the weighing process at sentencing and stated that the crime itself is an aggravating circumstance to be considered by the jury.

202)    As a result, the jurors were led to believe that Petitioner had the burden of proving that the mitigators outweighed the aggravators and that the entire crime is the aggravating circumstance against which they are to weigh a mitigating factor.

203)    This error was not harmless in that it only exacerbated the errors relating to the inadequate, misleading and prosecution-biased instructions and argument throughout the trial, (see Exhibit L, Petitioner's September 20, 1996 state post-conviction Petition), rendering it impossible for the State to prove beyond a reasonable doubt that Petitioner would have been convicted and/or sentenced to death but for these cumulative errors.

204)    As a result of these actions, Petitioner's rights as guaranteed by the following provisions of the Constitution of the United States were violated: (1) the right to effective assistance of counsel guaranteed by the Sixth Amendment; (2) the prohibition against cruel and unusual punishment guaranteed by the Eighth Amendment; (3) substantive due process and other unremunerated rights guaranteed by the Ninth Amendment; (4) rights "retained by the People" as guaranteed by the Tenth Amendment; (5) the right to procedural and substantive due process as guaranteed by the Fifth and Fourteenth Amendments; and (6) the right to equal protection of the law as guaranteed by the Fourteenth Amendment.

205) Further, Petitioner Williams requested discovery in his state post-conviction proceedings, as provided by the Ohio Rules of Civil Procedure, in order to fully develop and pursue this claim. Denial of the request for discovery as it related to this claim deprived Petitioner of substantive and procedural due as guaranteed by the aforementioned federal constitutional provisions.

b) Trial counsel failed to present any scientific evidence regarding the shell casings found at the scenes of the crimes.

206) Trial counsel's failure to present any expert testimony or scientific evidence at Petitioner's trial regarding the shell casings or cartridges found at the respective scenes of the two subject offenses denied Petitioner his right to effective assistance of counsel.

207) At the guilt-innocence phase of Petitioner's trial, the state presented a ballistics expert, David Hall, who testified regarding examination of three cartridge casings (one recovered from the scene of the August 3rd offense and two recovered from the scene of the Jeff Wallace offense), concluding that the cartridges had all been extracted from the same gun. Gun cartridges and fragments were introduced by the state at trial through their expert and were admitted into evidence. These exhibits were crucial to the state's case because they provided the only inculpatory physical evidence linking Petitioner to both shootings. As there was no witness to the August 3rd shooting of Mr. Hamilton, the state's case hinged on upon the same gun having been used to commit the shootings on both August 3 and August 6, 1990.

208) Despite the criticalness of this issue, defense counsel did not present at trial an expert or any scientific evidence regarding the ballistics evidence or the cartridges found at the scenes of the crimes. This failure, whether by decision or otherwise, prejudiced Petitioner because the state was thereby able to present this important evidence uncontested, though the issues presented were highly debatable.

209) Defense counsel did have in its possession a short written report retained from a ballistics expert prior to trial. The written report essentially reached the same conclusion as the state's expert regarding the inconclusiveness as to whether the three subject cartridges had been fired from the same gun. The defense's expert report, however, is much stronger on this point than is the state's expert who indicated at trial that, while inconclusive, there was physical evidence suggesting that indeed the cartridges had been fired from the same gun. At trial, cross-examination of the state's ballistic expert went as follows:

> Mr. Davidson: Okay, and we have three different types of bullets here, or casings?
>
> Mr. Hall: That is correct. There are three different manufacturers.
>
> Mr. Davidson: Three manufacturers? Okay. And sir, were you able to get any measurements off the firing pin, at all?
>
> Mr. Hall: In the comparisons, the firing pin impressions were of the same size, and they appeared to be of the same smoothness, too.
>
> Mr. Davidson: The measurements were not different?
>
> Mr. Hall: **Not from what I could see under the microscope. They were pretty much right on.**
>
> (Tr., Vol. VIII, p. 126) (Emphasis added.)

210) In contrast, the defense counsel's retained expert had stated in his report that:

> There is insufficient breach block markings or firing pad impression markings to either match or positively exclude these three cartridges from having been fired from the same gun. **It is noted that the size of the firing pin impression on the three cartridges vary significantly which could be the result of them having been fired by different weapons.**

(Exhibit EE, Petitioner's September 20, 1996 Petition to Vacate or Set Aside Judgment and/or Sentence, Court of Common Pleas, Butler County Ohio.) (Emphasis added.)

59

211)    In addition to this discrepancy, it is also not clear whether the defense expert was as convinced as the state's expert regarding whether the cartridges had been extracted from the same gun.  On this point the defense expert's written report merely states that such a finding was "indicated".  (Id.)  It is also not entirely clear whether the defense expert may have meant, by use of the words "the same gun", that the cartridges may have been extracted at some point in time from the same model of gun, i.e., a gun simply produced by the same manufacturer.

212)    Moreover, defense counsel should have presented their own expert to help educate the jury and explain the significance, and the lack thereof, of the state's presentation on this issue.  Importantly, an examination of the research done on the utility of various methods of cartridge identification indicates the relative unimportance of basing firearms identification solely on "extractor" markings.  Firing pin impressions and breech face markings are the most highly accepted methods of cartridge identification.[11]  In cartridge identification cases, the firing pin impression is the most important identifying mark.  In this case, no match could be made based on these impressions.  Extractor marks, inter alia, are less useful.[12]  Further, as the state's expert acknowledged, all three of the subject cartridge cases were made by different manufacturers.  Comparison of different makes of cartridge cases can diminish the accuracy of the identifications.  Indeed, when firearms examiners do have a particular weapon from which they test fire cartridges to compare with cartridges retrieved, they recognize the importance of using the same kind of ammunition for their test cartridges as the cartridges retrieved.[13]

---

[11] See, e.g., Richard Saferstein, Criminalistics, Introduction To Forensic Science, 309 (1977); Department of the Army Pamphlet 27.22 (July 1987).

[12] See Vincent DiMaio, Gunshot Wounds, Practical Aspects of Firearms, Ballistics, and Forensic Techniques, 34 (1985)

[13] See Vincent DiMaio, Gunshot Wounds, Practical Aspects of Firearms, Ballistics, and Forensic Techniques, 34 (1985) ("It is extremely important that the same brand and preferably the same lot of ammunition be used for testing."); see also Joseph H. Matthews, Firearms Identification, Vol. I, 22 (!972).

60

213) This information should have been presented to the jury at trial by Petitioner's own independently retained ballistics expert. Trial counsel's failure to do so deprived Petitioner of his right to effective assistance of counsel.

214) As a result of these actions, Petitioner was deprived of his constitutional rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

c) Trial counsel failed to object to improper instructions provided to the jury.

215) Petitioner was denied his constitutional right to effective assistance of counsel due to his counsel's failures to object to improper instructions provided to the jury during the guilt-innocence phase of his trial. Specifically, trial counsel failed to object regarding the following instructions:

i) *Trial counsel failed to object to the trial court's preliminary instructions at the guilt-innocence phase of Petitioner's trial.* (See **Twelfth ground for relief**, *infra*, for detailed discussion of impropriety and prejudicial impact of this jury instruction)

ii) *Trial counsel failed to object to improper jury instructions regarding purpose, specific intent and causation.* (See **Twelfth ground for relief**, *infra*, for detailed discussion of impropriety and prejudicial impact of this jury instruction)

216) Trial counsel's failures to object to these improper instructions fell below an objective standard of reasonableness, and adversely affected the results of Petitioner's trial. As a result, Petitioner was deprived of his federal constitutional rights as guaranteed under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

d) Trial counsel failed to object to prejudicial prosecutorial misconduct.

217) Petitioner was denied his constitutional right to effective assistance of counsel due to his counsel's failures to object to prosecutorial misconduct during the guilt-innocence phase of Petitioner's trial. Specifically, trial counsel failed to object regarding the following:

*i) Trial counsel failed to object to prosecutor's use of peremptory challenges to exclude death-scrupled jurors.* (See **Sixteenth ground for relief**, *infra*, for detailed discussion regarding the impropriety and prejudicial impact of this conduct)

*ii) Trial counsel failed to object to various improper and prejudicial remarks made by prosecutor before the jury throughout Petitioner's trial.* . (See **Sixteenth ground for relief**, *infra*, for detailed discussion regarding the impropriety and prejudicial impact of this conduct)

218)     Trial counsel's failures to object to these improper actions by the prosecution fell below an objective standard of reasonableness, and adversely affected the results of Petitioner's trial. As a result, Petitioner was deprived of his federal constitutional rights as guaranteed under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

e) Trial counsel failed to object to various improper evidentiary rulings and admissions.

219)     Petitioner was denied his constitutional right to effective assistance of counsel due to his counsel's failures to object to various improper trial court rulings on evidentiary matters and the introduction of evidence that should not have been admitted. Specifically, trial counsel failed to object regarding the following:

*i) Trial counsel failed to object to the court's ruling regarding Petitioner's lack of standing to challenge unlawful search under the 4th Amendment* (See **Seventeenth ground for relief (a)**, *infra*)

*ii) Trial counsel failed to object to admission of Wayman Hamilton's blood-stained Bible* (See **Sixteenth ground for relief (c)**, *infra*)

*iii) Trial counsel failed to object to misleading firearms identification evidence, and the prosecutor's arguments regarding same*

*iv) Trial counsel failed to object/move to strike "alias" from indictment and prosecutor's references to "alias" during trial*

*v) Trial counsel failed to ensure a complete record for appellate review*

220)     Trial counsel's failures to object to these improper rulings and admissions of evidence  fell below an objective standard of reasonableness, and adversely affected the results

of Petitioner's trial.  As a result, Petitioner was deprived of his federal constitutional rights as guaranteed under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**Twelfth ground for relief:  The trial court's provision of improper jury instructions at the guilt/innocence phase of Petitioner's trial violated the Petitioner's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States' Constitution.**

221)     Prior to closing argument at the trial phase, the trial court gave a preliminary set of instructions to the jury which contained the following comments:

> Closing arguments are not evidence. The evidence   came from the witness stand. They are merely the interpretation of that evidence as given by defense counsel and how they feel you should interpret the evidence as applied to the law as I will give it to you.

(Tr. Vol. IX, pp. 7-8).(Emphasis added).

222)     This instruction diminished the defense closing argument and the defense case. The trial court gave no similar instruction as to the State of Ohio.

223)     The trial court's comments were constitutionally inappropriate and eradicated the line between its role as a neutral arbiter of the law and the jury's role as the arbiter of the facts.

224)     The trial court also gave an erroneous instruction on purpose during the trial phase of Petitioner's case. (Tr. Vol. IX, p. 86).

225)     The trial court instructed as follows regarding the issue of purpose:

> A person acts purposely when the gist of the offense is a prohibition against conduct of a certain nature regardless of what the offender intends to accomplish thereby, if it is his specific intention to engage in conduct of that nature."

Id.

226) By instructing on both definitions of purpose contained in Ohio Rev. Code § 2901.22(A), the trial court introduced an improper definition upon which the jury could find the element of purpose and return a conviction of aggravated murder.

227) The instruction of purpose relieved the State of its burden of proving every element of the offense beyond a reasonable doubt.

228) The trial court also instructed the jury improperly regarding the meaning and definition of "proof beyond a reasonable doubt," to the prejudice of the Petitioner.

229) Due to these improper instructions, Petitioner was denied of his constitutional right to trial by jury as guaranteed by the Sixth Amendment as well as his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

**Thirteenth ground for relief: The trial court's denial of Petitioner's motion for disclosure of the State's confidential informant violated Petitioner's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States' Constitution.**

230) The government achieved the Petitioner's arrest in this case through the use of a confidential informant. The information provided by the confidential informant was placed in an affidavit for a search warrant for 1002 Vidourek, the apartment where Petitioner was arrested.

231) The affidavit read as follows:

> Affiant received informant on or about the 6th of August. Informant was at a location in the City of Hamilton. Donta Jones the informant heard a conversation that Donta Jones made a statement that he had shot the cab driver in the head. Informant further described the clothing that Donta Jones was wearing at the time of this statement, and they match the certain information that Hamilton police detectives have come up with. The informant further related to the affiant of Donta Jones is from Cincinnati, and he's staying at the above address at this time.

(Tr., Vol. II, p. 39)

232)    Petitioner's trial counsel filed a timely motion to discover the identity of the

informant on November 13, 1990.  A hearing on the motion was held November 26, 1990.  The

trial court denied the defense request (and later denied a motion to reconsider).  In denying the

motion, the trial court reasoned as follows:

> The reason that the informant is not going to be used to
> prove an element of the crime is that there is no indication that it
> would be beneficial to the defense.  As a matter of fact, the
> indication that I have is that this information would be detrimental
> to the defense.  It's a confession.
>
> The informant, if he overheard the conversation of the
> defendant, would be known to the defendant; and, therefore, he can
> subpoena whatever witnesses he wishes to.  He knows who he
> talked to and in what circumstances, if anybody.  And following
> the decision I cited earlier, State of Ohio versus Hatton, it seems to
> be that that is almost on all fours on this case.  And therefore, the
> motion to sever -- I mean, motion to reveal the informant is
> overruled.

(Tr., Vol. II, p. 49)

233)    The above reasoning by the trial court in denying the motion is flawed.  The first

sentence quoted above makes no sense at all.  Secondly, the court apparently misunderstands the

applicable legal standard, mistakenly believing that disclosure of the informant was not required

unless the information or potential testimony of the informant,  as provided to the police, would

be of benefit to the defense.  The applicable state law standard (essentially consistent with the

federal constitutional standard), however, was that as enunciated in State v. Williams (1983), 4

Ohio St. 3d 74, 446 N.E.2d  779: "The identify of an informant must be revealed to a criminal

defendant when the testimony of the informant is vital to establishing an element of the crime **or**

would be helpful or beneficial to the accused in preparing or making a defense to criminal

charges." (Emphasis added.)  The correct standard, therefore, was whether either:  1) the

informant's information is vital to the state in its prosecution of the crime; or 2) disclosure would

in some way benefit the accused in presenting a defense. Hence, it was inaccurate, if not absurd, for the trial court to consider that disclosure of the informant's identity was only warranted if the information - which had thus far been provided only to the police - from the informant, who in all likelihood would be called to testify by the state, was to the benefit of the accused.

234) Disclosure of the informant's identity was necessary to Petitioner for a variety of reasons: (1) The information provided by the informant made Petitioner the lead suspect in the case. The State had no physical evidence linking Petitioner to the crime. There were no eyewitnesses to Wayman Hamilton's murder. The gun used in the murder was never found; (2) Clifford Williams was facing the loss of his life; (3) The informant had identified the suspect as Donta Jones. The informant was the only person who identified Clifford Williams as Donta Jones. As a result, this called into question the reliability of the informant's identification. "Additionally, if the informant was mistaken about the name of the alleged perpetrator, he may have been mistaken about other facts as well. From the defense standpoint, at least arguably, the government may have made a "rush to judgment" and latched onto the wrong person based on misinformation provided by the informant. Importantly, despite the fact that the informant had given the police the name of "Donta Jones" and the police had arrested a Clifford Donta Williams, law enforcement officers never arranged to have the informant see in person Mr. Williams to verify that he was indeed the individual he overheard make the purported inculpatory statement." Given these uncertainties, Petitioner should have been provided the identity of the informant, at the very least in order to determine to what extent the facts surrounding the informant and his provision of information to the government were of benefit to the defense.

235)    Further, the information supplied by the informant was ultimately funneled to the jury to the Petitioner's detriment. Specifically, Clifford Williams' identification as "Donta Jones" was revealed to the jury. In its opening, the state referred to Clifford Williams as "Clifford Donta Jones." (Tr., Vol. VII, p. 46) Detective Gross also explained to the jury that Clifford Williams was the "Donta Jones" the police were looking for.

236)    The "Donta Jones" component of the state's case was obviously critical to linking Clifford Williams to the crime. The informant was the only person to allege that Clifford William's was "Donta Jones." Once the "Donta Jones" information was conveyed to the jury , Petitioner had a right to challenge the reliability of that information. To accomplish this, Petitioner needed the identity of the informant, and it was error by the trial court to refuse to order its release.

237)    These actions violated Mr. Williams' rights to be free from cruel and unusual punishment and to due process in a capital case, as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

**Fourteenth ground for relief: The assistance rendered by Petitioner's appellate counsel was ineffective in violation of Petitioner's rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States' Constitutions.**

238)    Petitioner's appellate counsel failed to raise substantial errors before the Butler County Court of Appeals.

239)    This failure deprived Petitioner of the right to appellate counsel as well as meaningful appellate review in his capital case.

240)    Petitioner's appellate counsel failed to raise the following issue on direct appeal:

1.    The trial court's failure to suppress illegally obtained evidence based on Appellant's lack of standing.

2.  The inclusion of an alias in Appellant's indictment and the reference to that alias at trial.

3.  The ineffective representation by counsel at trial.

4.  The trial court's failure to ensure that the jury process accorded Appellant a fair trial.

5.  The trial court's irrelevant and improper statements at Appellant's sentencing hearing and in its O.R.C. § 2929.03(F) opinion.

6.  The trial court's improper excusal of potential juror Ronald Partin.

7.  The unconstitutionality of Ohio's mandatory capital sentencing scheme.

8.  The trial court's failure to inquire when the jury announced its penalty decision.

9.  The trial court's prohibition against defense counsel asking about Appellant's innocence in voir dire.

10. The trial court's failure to continue the suppression hearing.

11. The trial court's constitutionally infirm instructions at the penalty phase.

12. The trial court's improper instructions at the guilt phase.

13. The trial court's instruction and the State's voir dire on reasonable doubt.

14. The trial court's improper reference to the penalty phase during trial.

15. The trial court's failure to allow defense counsel to argue, at the penalty phase, Appellant's reaction to the guilt verdict.

16. The admission of Appellant's juvenile record.

17. The use of duplicative aggravating circumstances by the jury, trial court and court of appeals.

18.   The out-of-court identification procedures used to link Appellant to the crimes.

19.   The introduction of Wayman Hamilton's blood-stained Bible into evidence which was considered by the jury as a State's Exhibit at both the guilt and sentencing phases.

20.   The introduction of Jeff Wallace's hospital records which were considered by the jury at the sentencing phase.

21.   The introduction of misleading firearms identification evidence and inaccurate prosecutorial argument regarding that evidence.

22.   The failure to ensure that the court of appeals had a complete record so that the court of appeals and the Ohio Supreme Court would be able to adequately review Appellant's capital case in the manner required by O.R.C. § 2929.05.

23.   Prosecutorial misconduct that occurred at Appellant's trial including:

   A.   prosecutorial vouching for State's witnesses;

   B.   the introduction of irrelevant fingerprint evidence;

   C.   the introduction of cumulative evidence;

   D.   the introduction of victim impact evidence;

   E.   prosecutorial testifying, speculation and opinion that had no basis in record evidence;

   F.   prosecutorial comment or the failure of the defense to present witnesses;

   G.   prosecutorial comment that misstated the record;

   H.   prosecutorial comment that misstated the weighing process to be employed at the penalty phase;

   I.   prosecutorial comment that the death penalty was mandatory in Appellant's case;

        J.       improper prosecutorial comment attacking the testimony of defense witnesses at the mitigation phase;

        K.      improper prosecutorial comment that a key defense witness was a "hired" witness;

        L.       improper prosecutorial comment that violated Appellant's Fifth Amendment rights;

        M.     improper prosecutorial comment regarding Appellant's mitigating evidence of Appellant's youth and his mental disease.

24.     The trial court's action in committing Appellant's jurors to a death verdict during voir dire.

25.     The trial court's refusal to order the prosecutor's file to be sealed for in camera review.

26.     The trial court's queries during group voir dire as to whether Appellant's jurors would be embarrassed to return a not guilty verdict.

27.     The trial court's denial of Appellant's request for expert assistance to prepare for the sentencing     phase of his trial.

28.     The trial court's refusal to order a key State's witness's statement to be preserved in the records of the court so as to be made available to appellate courts reviewing Appellant's case.

241)   Based on Appellate counsel's deficient performance, Petitioner was denied his right to effective appellate counsel under the Sixth Amendment as well as his rights guaranteed under the Eighth and Fourteenth Amendments to the United States Constitution.

**Fifteenth ground for relief:  The State's refusal to release to Petitioner's post-conviction counsel the physical ballistics evidence, including the shell casings found at the scene of the offenses, for independent evaluation, and the trial court's refusal during state post-conviction proceedings to grants funds for such evaluation, violated Petitioner's rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States' Constitution.**

242)   At the guilt-innocence phase of Petitioner's trial, the state presented a ballistics expert, David Hall, who testified regarding examination of three cartridge casings (one recovered

from the scene of the August 3rd offense and two recovered from the scene of the Jeff Wallace offense), concluding that the cartridges had all been extracted from the same gun. Gun cartridges and fragments were introduced by the state at trial through their expert and were admitted into evidence. These exhibits were crucial to the state's case because they provided the only inculpatory physical evidence linking Petitioner to both shootings. As there was no witness to the August 3rd shooting of Mr. Hamilton, the state's case hinged on upon the same gun having been used to commit the shootings on both August 3 and August 6, 1990.

243) Despite the criticalness of this issue, defense counsel did not put present at trial an expert or any scientific evidence regarding the ballistics evidence or the cartridges found at the scenes of the crimes. While presumably this was done for strategic reasons, such a decision by defense counsel appears questionable at the very least. Defense counsel did possess a short written report retained from a ballistics expert prior to trial. The written report essentially reaches the same conclusion as the state's expert regarding the inconclusiveness as to whether the three cartridges had been fired from the same gun. The defense's expert report, however, is much stronger on this point than is the expert of the state, who indicates that while inconclusive, there was physical evidence suggesting that indeed the cartridges had been fired from the same gun. At trial, cross-examination of the state's expert went as follows:

> Mr. Davidson: Okay, and we have three different types of bullets here, or casings?
>
> Mr. Hall: That is correct. There are three different manufacturers.
>
> Mr. Davidson: Three manufacturers? Okay. And sir, were you able to get any measurements off the firing pin, at all?
>
> Mr. Hall: In the comparisons, the firing pin impressions were of the same size, and they appeared to be of the same smoothness, too.

Mr. Davidson: The measurements were not different?

Mr. Hall: **Not from what I could see under the microscope. They were pretty much right on.**

(Tr., Vol. VIII, p. 126) (Emphasis added.)

244) In contrast, the defense counsel's retained expert had stated:

> There is insufficient breach block markings or firing pad impression markings to either match or positively exclude these three cartridges from having been fired from the same gun. **It is noted that the size of the firing pin impression on the three cartridges vary significantly which could be the result of them having been fired by different weapons.**

(See Exhibit EE, Petitioner's September 20, 1996 Petition to Vacate or Set Aside Judgment and/or Sentence, Court of Common Pleas, Butler County Ohio.) (Emphasis added.)

245) In addition to this discrepancy, it is also not clear whether the defense expert was as convinced as the state's regarding whether the cartridges had been extracted from the same gun. On this point the defense expert's report merely says that such a finding was "indicated". (Id.) It is also not entirely clear whether the defense expert may have meant, by use of the words "the same gun", that the cartridges may have been extracted at some point in time from the same model of gun, *i.e.*, a gun simply coming from the same manufacturer.

246) Because of such discrepancies, counsel for Petitioner during state post-conviction proceedings attempted to retain a second independent expert evaluation of the ballistics evidence. As any claim for relief on this issue entails presentation of evidence *de hors* the record, the state post-conviction proceedings were the appropriate venue for development of this claim. However, the state interfered with this attempt by refusing to produce the evidence requested. The state insisted that any further examination of the evidence be conducted in their presence. Moreover, having then filed the post-conviction petition with the trial court, defense

72

counsel moved the trial court for funds to pay for the further expert examination of the ballistics evidence. The trial court, however, denied that motion.

247) Thus, Petitioner was denied the opportunity, due to an inadequate corrective process in Ohio state post-conviction proceedings, to conduct a further evaluation of the ballistics evidence. This denial prejudiced Petitioner as it prevented him from attempting to uncover likely exculpatory evidence to present to a court of law. As a result, Petitioner was deprived of his constitutional rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**Sixteenth ground for relief:** **Prosecutorial misconduct committed throughout the stages of Petitioner's capital trial violated Petitioner's constitutional rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution**

248) The prosecutors in Clifford Williams' case committed misconduct throughout his trial. The presence of prosecutorial misconduct, from opening statement at the guilt phase through closing argument at the penalty phase, deprived Petition of a fair determination of his guilt and a reliable sentencing determination.

a.) The prosecution improperly used peremptory challenges to exclude jurors with reservations about the death penalty

249) It is well-established that the State may not exclude for cause those prospective jurors who merely have scruples about imposing the death sentence in a capital trial. It is equally improper for the prosecutor to use his peremptory challenges to exclude those same scrupled jurors. In Mr. Williams' case, the prosecutor used his peremptory challenges to create a jury composed entirely of persons who favored execution. This was violative of Mr. Williams' right to equal protection and a fair and impartial jury in a capital case under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

73

250)     Two prospective jurors in the case *sub judice*, Mrs. Sturgel and Mr. Shafer, expressed reservations about the death penalty during their voir dire. (Tr., Vol. V, pp. 201-03, 205-14) Despite those reservations, each juror stated either that he or she could recommend the death penalty if the facts warranted it. (Tr., Vol. V, pp. 203, 213-14) Thus, in accordance with the law, neither of the two prospective jurors could have been excused for cause and in fact neither was excused for cause. The prosecutor, however, did not want any scrupled jurors on his panel. When his opportunity came, he exercised his first two peremptory challenges to exclude both Mrs. Sturgel and Mr. Shafer. (Tr., Vol. VI, pp. 86-88)

251)     The prosecutor's use of several of his peremptory challenges to exclude scrupled jurors also violates those guarantees contained in the equal protection clause. The exercise of the peremptory challenge is covered by the equal protection clause. A capital defendant has the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria.

252)     Mr. Williams was not accorded this right in the case *sub judice*. Through the use of its peremptories, the State eliminated all persons on Mr. Williams' jury who expressed any reservations about the death penalty. The result of this process was to discriminate against all the death-scrupled members of the jury.

253)     The prosecutor's systematic use of peremptory challenges to exclude all prospective jurors with some reservations about the death penalty violated Petitioner's right to equal protection and a fair and impartial jury in a capital case under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

b) The prosecution made prejudicial, inaccurate statements during voir dire regarding proof beyond a reasonable doubt

74

254) During voir dire the prosecutor engaged in an inaccurate commentary on reasonable doubt. The prosecutor made the following comments during the group voir dire of Petitioner's jurors:

> Is there anyone who feels that way?
>
> Is there anyone, when they are deciding what is reasonable, and not reasonable - in other words, what is reasonable doubt, and what is not reasonable doubt -- is there anyone who has a problem or a difficulty deciding -- or deciding in a large part using your God given common sense?
>
> In other words, what is reasonable, and what is not reasonable, is associated with day-to-day life experiences, and your common sense tells you what that is.
>
> Does that create a difficulty or problems for anybody in using something as simple as your common sense to help you to decide what the facts are?

(Tr., Vol. V, p. 81) This commentary inaccurately depicted the stringent "beyond a reasonable doubt" standard to be applied in the jury's guilt determination. The prosecutor's comments undermined the bedrock principle that proof beyond a reasonable doubt must be proof of guilt with utmost certainty. Moreover, the prosecutor's comments exacerbated the trial court's erroneous instructions on reasonable doubt.

c) The prosecution engaged in prejudicial misconduct during the guilt-innocence phase of Petitioner's trial

(OPENING STATEMENT AND GUILT PHASE EVIDENCE)

255) The prosecution made improper and damaging remarks to the jury during opening argument of the guilt-innocence phase. Prior to trial, Petitioner's counsel had filed a Motion to Exclude Reference to Criminal Record of Accused. However, during opening statement the prosecutor informed the jury that Mr. Williams had a juvenile criminal record. (Tr., Vol. VII, p. 44) The prosecutor later introduced testimony that Petitioner had a juvenile record through

State's witness William Teasley. (Tr., Vol. VII, p. 115) The prosecutor also introduced a lengthy explication of Petitioner's juvenile record through Hamilton Police Department Detective Gross. (Tr., Vol. VII, p. 262-263). Petitioner's counsel objected to the introduction of this testimony and moved for a mistrial. (Tr., Vol. VII, p. 263) The trial court denied counsel's motion. (Tr., Vol. VII, p. 266) (See **Nineteenth ground for relief**, *infra*)

256) The argument and evidence regarding Mr. Williams' juvenile record encompassed other acts evidence that should not have been admitted at his capital trial.

257) The prosecutor, during opening statement, also made improper comments that constituted wholesale vouching for the forthcoming testimony of key State's witness Jeff Wallace with respect to his identification of Petitioner. (See Tr., Vol. VII, p. 56)

258) The prosecutor also presented argument and adduced evidence that was simply irrelevant to Petitioner's case.

(BLOODSTAIN EVIDENCE)

259) Prior to trial on November 16, 1990, defense counsel received a report through supplemental discovery regarding bloodstain analysis by the Ohio Bureau of Criminal Identification and Investigation, (hereafter "B.C.I."). At issue was a comparison of bloodstains on a pair of Petitioner's pants. Although the State provided blood samples for analysis from Petitioner and Wayman Hamilton, the criminalist at B.C.I. was only able to determine that the bloodstains on the pants were human blood. The criminalist could not provide an ABO typing. App. p. 53. Subsequently, on December 27, 1990, Petitioner's counsel, based on the criminalist's findings, filed a Motion to Exclude Evidence of Blood and Blood Samples. Counsel moved the court to issue an order *in limine* prohibiting the prosecution from mentioning at any time

76

throughout the trial or presenting evidence or testimony in regards to blood samples found on the clothing of the accused.

260)  Nonetheless, the prosecutor presented commentary regarding the bloodstains in opening statement:

> We sent the blue jeans to B.C.I., which is the Bureau of Criminal Identification, to find out if they -- what they could find out about blood.
>
> Evidence in this case, we will hear from them that they find the two little things of blood on the blue jeans. All they can tell you, it is human blood. They can't tell you whose blood it is. There wasn't sufficient blood sample to give you a typing.

(Tr., Vol. VII, p. 53)  Defense counsel objected following the close of the prosecutor's opening statement and moved for a mistrial. (Id. at 58)  The trial court overruled the motion. (Id.)

261)  The prosecutor later adduced testimony from Angela Edwards, the B.C.I. criminalist who conducted the bloodstain analysis. (Tr., Vol. VIII, p. 47-56)  On direct examination, Ms. Edwards stated that she could not obtain a blood type as to the bloodstains on Appellant's pants. (Id. at 53)  On cross-examination, the following colloquy occurred:

BY MR. HEDRIC:

> Q.    Now, ma'am, as you sit here today, as an expert for B.C.I., in blood, typing of blood, you cannot tell the ladies and gentlemen of this jury that the blood on those jeans, the two stains are either Wayman Hamilton's blood, or Jeff Wallace's blood, can you?
>
> A.    No, I cannot.

(Id. at 64)

262)    This evidence was irrelevant as it did not tend to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would have been without the evidence, and should not have been presented. The introduction of Dr. Edward's testimony, and the prosecutor's argument attendant to her testimony, could well have confused and misled the jury.

### (FINGERPRINT EVIDENCE)

263)    The prosecutor also presented argument and adduced testimony regarding fingerprint analysis that was absolutely irrelevant to any fact proving Petitioner's guilt. Despite the fact that the law enforcement officers found no fingerprints matching those of Petitioner, the prosecution presented fingerprint testimony of Russell McSeveney, a "latent print examiner" for B.C.I. This testimony was irrelevant -- it did not tend to make the existence of any fact that was of consequence to Petitioner's guilt more probable or less probable than it would be without the testimony. Its introduction, however, created a situation in which the jury was prompted to speculate as to whether Petitioner's fingerprints could have been left at the scenes of the crimes charged. The introduction of this evidence was therefore wholly prejudicial and constituted misconduct.

### (OTHER IMPROPER EVIDENCE)

264) The prosecutor also introduced improper evidence through State's witnesses Patricia Perry and Claude Simpson. Ms. Perry was a security guard that worked at the hospital where Jeff Wallace was treated for his gunshot wound. (Tr., Vol. VII, p. 199) The substance of her testimony was that she provided a newspaper article to Mr. Wallace that contained a photograph of Petitioner and that Mr. Wallace identified Petitioner from the newspaper article photo (State's Exhibit 4) as his assailant. (Id. at 200-201) Perry's testimony was wholly unnecessary as it was cumulative to the testimony of Mr. Wallace (who testified prior to Perry regarding his perusal of the newspaper photo of Petitioner. (Id. at 180-181) Therefore, its introduction was improper.

265) The testimony of Hamilton Police Detective Claude Simpson regarding Mr. Wallace's identification of Petitioner from the newspaper article photograph (Tr., Vol. VII, p. 225) was also cumulative to Wallace's own testimony. Its introduction was unnecessary and prejudicial.

(VICTIM IMPACT EVIDENCE)

266) During the State's case-in-chief at the guilt phase of Petitioner's trial, the prosecutor introduced victim impact evidence during the testimony of Earl Ray Jones. Mr. Jones was employed at the Clifton Cab Company as a dispatcher when Wayman Hamilton was murdered while driving a Clifton taxi cab. (Tr., Vol. VII, p. 83)

267) Mr. Jones testified that he had known Mr. Hamilton for five years -- they had begun work at Clifton Cab Company on the same day. (Id. at 88) During his testimony, Mr. Jones was asked to identify items marked as a State's Exhibit No. 2 taken from the cab Mr. Hamilton was driving when he was murdered. The following colloquy occurred between the prosecutor and Mr. Jones:

79

> Q.      Okay.
>
> Sir, I am going to hand you what has been previously marked as State's Exhibit No. 2, marked for identification purposes only at this time, and previously shown to defense counsel, and I am going to ask you if you could look at this exhibit, please?
>
> And, I am going to ask you if you could -- I am gong to ask you if you could identify this exhibit for me, please?
>
> A.      Yes.  This is his trip sheet.  This is his badge number, and this looks like a little calculator that he added his trip sheet up with, and this is the little Bible that he carried.
>
> Q.      Okay, and you keep saying, "his".  Who are you referring to, sir?
>
> A.      Wayman.

(Tr., Vol. VII, p. 89, emphasis added.)

268)    Moreover, State's Exhibit 2 was admitted into evidence.  (Tr., Vol. VIII, pp. 156-157)  Thus, Wayman Hamilton's bloodstained Bible, titled *"Personal Bible Verses of Comfort Assurance Salvation"* was provided to the jury and was considered as evidence at both the guilt (Tr., Vol. IX, p. 78) and sentencing phase (Tr., Vol. XI, pp. 148, 201)

269)    Subsequent to this testimony, Mr. Jones testified regarding Wayman Hamilton's fear of being robbed:

> Q.      Okay, did you keep your money in two different places?
>
> A.      I sure did.  At that particular time, there were a lot of cab robberies in Cincinnati, and most drivers were scared to death, you know, so they were hiding their money everywhere.
>
> Q.      Okay, did you -- do you know for a fact whether Wayman Hamilton had this fear of this knowledge"

> A.     Yes, I know for a fact, because that is what he was doing on that side of town, because the cab robberies were in the other part of town, most of them, and he was working over there to keep from getting robbed.

(Id. at 94)

270)     The prosecutor then emphasized this testimony in closing argument:

> Earl Jones told you -- and if you have a hard time believing that this man kept his money in two places, Earl Jones told you that Wayman Hamilton was afraid of being robbed. That is why he was working the North College Hill area.
>
> ...
>
> There is an open pocket knife in those photographs. I don't know whose it is. It could be the paramedics. It could have been a knife that Wayman Hamilton had underneath his leg because he was afraid.

(Tr., Vol. IX, p. 59)

271)     This type of evidence, and argument, which detailed Wayman Hamilton's personal characteristic of being religious and which informed the jury of Mr. Hamilton's fear of being robbed was and is inadmissible at the guilt phase of a capital trial. The evidence pertaining to a victim's background is irrelevant and immaterial to the guilt or innocence of the accused and the penalty to be imposed.

272)     The presence of Wayman Hamilton's blood-stained Bible in the jury room during sentencing deliberations constituted the introduction of emotion-laden evidence that was irrelevant to Petitioner's personal responsibility and moral guilt.

273)     Wayman Hamilton's blood-soaked Bible is the type of evidence, which when introduced, is so unduly prejudicial that it renders a trial fundamentally unfair. In sum, the prosecutor's introduction of this evidence was improper and constituted prejudicial misconduct.

(IMPROPER AND PREJUDICIAL GUILT-INNOCENCE PHASE CLOSING ARGUMENT)

274) During closing argument at the guilt-innocence phase of Petitioner's trial, the prosecutor engaged in commentary and argument that was improper. Such argument constituted prejudicial misconduct.

275) The prosecutor first argued that Clifford Williams failed to raise and prove an insanity defense to the Jeff Wallace counts of Aggravated Robbery and Felonious Assault. ("He wasn't in some insane state of mind. No proof of that.") (Tr., Vol. IX, p. 13) This was improper as it is error for the State to comment on the accused's failure to testify or produce evidence.

276) Further, this argument was misleading to the jury who may well have speculated that Petitioner should have raised this defense. It was surely not correct to fault Petitioner for failing to raise this defense when his counsel had not requested a pretrial sanity or competency evaluation. Further, it is improper for the prosecutor to comment negatively on the strategies employed by defense counsel.

277) During closing argument, the prosecutor once again engaged in inaccurate commentary regarding the jury's use of reasonable doubt in its deliberations:

> Your standard is beyond a reasonable doubt, and that is not possible doubt, that is not imaginary doubt, that is not dreamed up doubt, imaginary doubt, not lawyer's words. It is proof beyond a reasonable doubt, what you reasonably common sense believe.
>
> Is there any reason to doubt that the Defendant did this?
>
> There is no reason in this case to doubt his identify as to all the crimes in this case.

(Tr., Vol. IX, p. 11)

278) This commentary improperly depicted the stringent "beyond a reasonable doubt standard to be applied in the jury's guilt determination. (See also Sixteenth ground for relief (b),

*supra*, for discussion of improper prosecutorial remarks regarding "reasonable doubt" during opening argument). Moreover, the prosecutor's comments exacerbated the trial court's erroneous instructions on reasonable doubt.

279) The prosecutor also engaged in improper vouching for the police witnesses who testified against Petitioner:

> There are several things that I need to talk to you about, and, first of all, you know we have this categorization of the great State of Ohio, and I would like to remind you, no, we don't have the great State of Ohio in this here  courtroom today, but what I do bring to you is about forty-five, forty-six years of police experience. That is what I bring to you, and I will rest the  case on that any day, and I think the Hamilton Police Department, in this particular case, has done an absolutely outstanding job.

(Tr., Vol. IX, p. 50)

280) The message from the prosecutor was clear:  the jury was to believe the State's police witnesses because of their experience as police officers.  Further, the prosecutor's vouching was exacerbated by the group voir dire questioning of several jurors who were related or acquainted with police officers.  The trial court inquired if the jurors would be embarrassed to return a not guilty verdict given the relationships of the jurors with police officers.  The inference that the jurors could draw from such questions was that a not guilty verdict would be an affront to the police and that law abiding citizens should be embarrassed to return such a verdict. Moreover, at least three of the jurors who sat in Petitioner's case had a relationship or friendship with police officers.

281) The preceding facts establish prejudicial misconduct in this case.

282) In Clifford Williams' case the prosecutor argued that the police witnesses, due to their experience, were to automatically be believed.

83

283)    It is improper for a prosecutor to vouch for the credibility of a witness by either bolstering the witness by placing behind him the prestige of the government or alluding to off-record information supporting the testimony.  The rationale behind this prohibition is that the jury gets the impression that the prosecutor is monitoring the witness's testimony for accuracy - "something the prosecutor ... is quite unable to do.

284)    The prosecutor also presented argument on matter that had absolutely no basis in the record of Petitioner's trial when he argued that Petitioner had disposed of the pistol by throwing it in "the river":

> And, you have got a few contact wounds on the right leg, and some on the back, and when you are running through the woods, when you are running to 1002 Vidourek -- which, by the way, isn't the river just another block past Vidourek?
>
> It wouldn't be the first time a gun ended up in the river, would it?

(Tr., Vol. IX, p. 56)

285)    This argument is improper and based on facts not in the record.  The State presented no witness nor any physical evidence in support of such a claim.  This improper testifying by the prosecutor would have caused the jury to speculate that Petitioner  had possession of a pistol and had disposed of the pistol after shooting Jeff Wallace.  Thus the prosecutor was able to repair a crucial evidentiary deficiency in the State's case (*e.g.*, the missing weapon) and at the same time ascribe fault for the fact the evidence was missing to Clifford Williams.

286)    The prosecutor also improperly attacked Petitioner's counsel for failing to present testimony on his behalf from a "ballistics expert":  "By the way, where was their ballistics expert?  You know, we are so good on pounding the great State of Ohio, where is their ballistics

84

expert?". (Tr., Vol. IX, p. 65) It was error for the State to make such commentary. The firearms identification evidence presented by the State through State's witness David Hall was critical to the jury's determination as to whether Petitioner was guilty of the capital charges against him. (See Proposition of Law No. XIII.) To reiterate, it is error for the State to comment on the accused's failure to testify or produce evidence. To do so manifests an attack on the accused's fundamental constitutional rights.

287) Moreover, Petitioner's counsel, in lieu of presenting expert rebuttal testimony as to the State's firearms identification evidence, chose instead to rely upon cross-examination and argument. The prosecutor's argument improperly called into question defense counsel's efforts..

288) Finally, in closing at the guilt phase the prosecutor made the following inaccurate argument to the jury: "Ladies and gentlemen, you -- you represent the standards of this community. This man killed Wayman Hamilton. This man attempted to kill Jeff Wallace, and did commit felonious assault. Thank you." (Tr., Vol. IX, p. 71) Petitioner's counsel immediately moved the trial court for a mistrial based on the fact that Petitioner had not been indicted for the attempted murder of Jeff Wallace. (Id.) Counsel requested, in the alternative, for the trial court to provide a corrective instruction. (Id.) The trial court denied counsel's motion for a mistrial and failed to provide a corrective instruction. (Id. at 74-75)

289) The above prosecutorial misconduct at the guilt-innocence phase of Petitioner's capital trial deprived him of a fair trial, in violation of Petitioner's rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. .

d) The prosecution engaged in prejudicial misconduct during the mitigation-penalty phase of Petitioner's trial

290) The prosecutorial misconduct in Petitioner's case continued into the penalty phase of his trial. The prosecutor's opening statement contained crucial misstatements of the law

governing capital sentencing. During opening statement the prosecutor presented the following commentary regarding mitigating factors to be presented to the jury:

> This mitigation phase, or this stage that we are in now, the defense has the responsibility of going forward and showing you that there are mitigating factors. And you, collectively, decide: Do these mitigating factors -- number one, I think you have to decide: Do they exist?
>
> Do they show you truly mitigating factors?
>
> If you decide that you have been shown mitigating factors, then you decide: Do these mitigating factors outweigh the aggravated circumstances?

(Tr., Vol. XI, p. 28)

...

> I would also like to emphasize to you that you do not kill anybody. You decide the factors in this case as to whether or not there are mitigating factors that outweigh the aggravated circumstances, and depending on how you determine that and balance that out, you decide what the appropriate punishment is.
>
> You do not individually have the right to say anything about what it should be. You collectively decide as a jury, twelve people deliberating, just like you did when you considered the guilt phase. So, don't let somebody put on you the responsibility for his actions.

(Tr., Vol. XI, pp. 26-27)

291) The import of the prosecutor's comments is straightforward. The jury was required to decide as a group (e.g. collectively) that evidence presented by Petitioner constituted a mitigating factor or factors. Only after a "collective" (unanimous) decision that a mitigating factor or factors existed was the jury to undertake the crucial weighing process of aggravation and mitigation. This type of misstatement of the law is improper and prejudicial.

86

292)    Moreover, the prejudicial effect of the prosecutor's misstatement was exacerbated when the trial court instructed Petitioner's jury that it was to consider the arguments of counsel in the jury's sentencing decision.  (Tr., Vol. XI, p. 201)

293)    Moreover, the prosecutor made the following comments to the jury during opening statement:

> There is an option of death, a recommendation of death to the Court.  There is an option of life with parole eligibility after thirty years, and there is a recommendation of life with parole eligibility after twenty years.  There is no recommendation other than the death sentence of a life imprisonment that contains no eligibility for parole.

(Tr., Vol. XI, p. 27)  The prosecutor made similar statements in closing argument at the penalty phase of Petitioner's trial.  (Tr., Vol. XI, pp. 149, 153)  The prosecutor thus informed the jury that its decision to impose the death sentence upon Appellant was just a recommendation.

294)    Moreover, the prejudicial effect of the prosecutor's comments was exacerbated by the trial court's instructions that the jury verdict was just a recommendation.

295)    The prosecutor also engaged in prejudicial misconduct during closing argument at the penalty phase.  For example, the prosecutor repeatedly informed Petitioner's jury that the mitigating factors presented by the Petitioner had to outweigh the aggravating circumstances in his case.  (Tr., Vol. XI, pp. 150, 151, 180, 186, 1881, 192)  This was a misstatement of O.R.C. § 2929.03(D)(1) and (2) which specifically provide that the prosecution has the burden of proving, and the jury shall determine, that the aggravating circumstances the defendant was  found guilty of committing outweigh the factors presented in mitigation of the death sentence.

296)    In effect, the prosecutor's comments shifted the burden from the State to the Petitioner to prove that mitigation outweighed aggravation.  This was absolutely improper.  The

impact of this type of argument was heightened by the trial court's instruction to the jury to consider counsel's arguments in its sentencing deliberations. (Tr., Vol. XI, p. 201)

297)    The prosecutor also presented argument that if the jury determined that aggravation outweighed mitigation then a death verdict was mandatory:

> If these aggravating circumstances do outweigh anything else you find relevant to mitigation, relevant to why this offense can be excused, or explained, or mitigated in any way, then the law is clear. The law is that you shall recommend the sentence of death. Not may, not could, shall. You shall recommend death if the aggravating circumstances outweigh the mitigating factors presented.

(Tr., Vol. XI, pp. 150-151)

298)    This argument was improper. The prosecutor's comments told the jury that they could not show mercy to Clifford Williams, regardless of the outcome of their weighing of aggravation and mitigation.

299)    The prosecutor also presented improper attacks through argument as to Dr. Glenn Weaver, a psychiatrist who testified regarding Petitioner's O.R.C. § 2929.04(B)(3) mental disease at the penalty phase. (Tr., Vol. XI, pp. 50-129) (See Ground for relief, supra, for discussion of the impropriety and prejudice of this prosecutorial conduct.)

300)    Petitioner's case, the improper remarks prejudicially affected Clifford Williams' substantial rights and, moreover, the State cannot demonstrate, beyond a reasonable doubt, that the jury would have sentenced Petitioner to death had there been no prosecutorial misconduct. It cannot be said, beyond a reasonable doubt, that if the jury would have given greater weight to Dr. Weaver's testimony that it would have, nevertheless, returned a death verdict.

301)    Further, the prosecutor improperly attacked the defense presentation of the O.R.C. § 2929.04(B)(4) mitigating factor of Petitioner's youth. The prosecutor argued as follows:

"Age? He is eighteen. Boys will be boys? Is that going to be the excuse in this case?" (Tr., Vol. XI, p. 152, emphasis added.)

302)    This argument was improper and prejudicial on two bases. First, the youthful age of a capital defendant is a relevant mitigating factor and was so in Petitioner Williams' capital case.[14] In Ohio, the courts have consistently recognized that youth is a relevant mitigating factor. Additionally, the argument by the prosecutor, defining the mitigating factor of Petitioner's youth as an "excuse," was improper in that culpability is no longer an issue at the penalty phase. Moreover, the trial court's instruction to the jury to consider the arguments of counsel in its sentencing deliberations compounded the prejudice of the prosecutor's argument. (Tr., Vol. XI, p. 201)

303)    The prosecutor also offered his personal opinion that Mr. Williams' case required the death penalty. The prosecutor argued: "Well, it comes from our legislature, and, I guess -- although I have to tone myself down so that I don't yell, or shout it out to you -- but, I guess, if ever there was a crime that deserved the death penalty, this is it." (Tr., Vol. XI, p. 179, emphasis added.)

304)    The prosecutor was testifying, in effect, that he had far more experience in these matters than the jury - had determined that of all the cases he had seen, this was one of those so heinous as to require the sanction of death. Such argument is improper.

305)    The prosecutor's argument prejudiced Mr. Williams by telling the jury that the crime with which he was charged warranted the death penalty. Again, the trial court instructed

---

[14] At the time of Appellant's capital trial he was eighteen (18) years old. (Tr., Vol. XI, p. 135)  Had Appellant been two months younger at the time of the crime, he would not have been eligible for the death penalty.  O.R.C. § 2929.03(D)(1).

89

the jury to consider counsel's arguments when deciding whether Clifford Williams was to live or die. (Tr., Vol. XI, p. 201)

306)     Finally, the prosecutor presented the following argument regarding Appellant's parole eligibility and purported age when paroled:

> And if I am wrong, then you tell me, "Mr. Piper, a life sentence with a possibility of parole after twenty years, thirty-eight, that is fair."
>
> I will accept it.
>
> "Mr. Piper, a life sentence, a parole eligibility possibility after thirty years, the Defendant will be forty-eight." You tell me that is fair, and I will accept it.
>
> MR. HEDRIC: Your Honor, I would like to object and approach the bench.

(Tr., Vol. XI, pp. 188-189)

307)     The prosecutor's comment was absolutely improper.

308)     The prosecutorial misconduct throughout Mr. Williams' capital trial rendered his convictions and death sentence fundamentally unfair and unreliable in violation of his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**Seventeenth ground for relief:** **The trial court's erroneous rulings regarding various pre-trial motions violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

309)     The trial court erred in denying numerous pre-trial motions filed by Petitioner's counsel, in violation of Petitioner's constitutional rights.

a) the trial court erred in failing to suppress search evidence on the basis of lack of standing

310)    The trial court's failure to suppress illegally obtained evidence for want of standing was erroneous. The trial court did not consider, nor did Petitioner's counsel argue, the proper standard for determining one's standing to challenge the validity of a search. Hence, Petitioner was deprived of his rights as guaranteed by the Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

311)    On September 26, 1990, a search warrant was executed for 502 South Monument, Apt. 6, pursuant to the investigation of the murder of Wayman Hamilton and the shooting of Jeff Wallace - acts for which Clifford Williams was a suspect. Though the warrant authorized police to search diligently for a .25 caliber handgun, ammunition, and certain articles of clothing, officers seized instead a card and two photographs. (Tr., Vol. VII, p. 77)

312)    Defense counsel filed a motion to suppress the evidence, and it was overruled on the grounds that Clifford Williams did not have standing to challenge the search, as the apartment belonged to Jennifer Daley - not Petitioner. The judge based his decision entirely upon the fact that the apartment searched was not Clifford Williams' apartment. (Tr., Vol. VII, pp. 80, 234) Under Fourth Amendment jurisprudence, one's standing to challenge the validity of a search is not contingent upon a property right in the location searched. Because this was the precise basis upon which the trial judge overruled the motion to suppress, his ruling constituted error.

313)    The law is clear with respect to one's standing to challenge an illegal search and seizure. One's standing to attack the validity of a search and seizure depends not upon whether he holds title to the location that was searched, but upon the nature of his interest in the items that were seized and the location from which they were seized.

91

314) The proper test for determining standing is straightforward and is contingent upon a legitimate expectation of privacy. The issues presented are whether: (1) the party has a subjective expectation of privacy in the object of the search, and (2) society is prepared to recognize that expectation as reasonable.

315) Thus, before a court can determine whether a defendant has standing to challenge the legality of a search, the court must have facts pertaining to the nature of the defendant's interest in the location that was searched. In other words, a court should not render a decision based solely upon the argument that the premises searched was not the defendant's apartment. Here, it was not enough for the trial court to simply say that Clifford Williams did not have standing to challenge the seized evidence because the apartment was not his. The prosecution erred in asserting it. The judge erred in accepting it.

316) Therefore, the judge's ruling in this instance constituted an abuse of discretion, in violation of Petitioner's rights as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States' Constitution.

b) the trial court erred in failing to suppress out-of-court identifications of Petitioner

317) The out-of-court identification procedures used to implicate Clifford Williams for the murder of Wayman Hamilton and the shooting of Jeff Wallace were unduly suggestive. The subsequent in-court identifications were not independently reliable, and thus the failure to suppress the identification evidence deprived Petitioner of his due process and constitutional rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

318) At trial, two witnesses, William Teasley and James Trivett, identified Clifford Williams as the man getting into Wayman Hamilton's cab on the night of his murder. Detective

Gross obtained separate out-of-court identifications from both Teasley and Trivett by showing them three Polaroid's of young black men (Tr., Vol. VII, pp. 119, 139); both men identified Williams as the young man who had hailed a Clifton cab at the Fuel Mart where they were working. (Tr., Vol. VII, pp. 120, 139)

319) Detectives were also able to secure several out-of-court statements from Jeff Wallace identifying Clifford Williams as the man who had shot him a few days after Wayman Hamilton was killed. Wallace tentatively identified Petitioner as the man who had shot him from a newspaper picture about the Hamilton shooting, and from six photographs that Detective Simpson brought him at the hospital. (Tr., Vol. VII, pp. 181, 219) Only after these tentative identifications was he able to identify Petitioner in a line-up. These methods were impermissibly suggestive, and the subsequent in-court identifications were inherently unreliable.

320) United States Supreme Court has designated five factors that must be weighed in order to determine the reliability of a witness' identification: The witness' opportunity to view the suspect at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description, the witness' level of certainty when making the identification, and the amount of time between the crime and the identification.[15] Application of these factors in the case *sub judice* reveals that the out-of-court identification procedures that implicated Clifford Williams were unduly suggestive, and were not independently reliable.

321) An identification is unduly suggestive when the defendant is singled out in any way from the others. The rationale for excluding unduly suggestive out-of-court identifications is twofold. The exclusion is designed to protect against and deter police misconduct. Moreover, courts must be wary of procedures that involve a substantial risk of misidentification.

---

[15] Neil v. Biggers, 409 U.S. 188 (1972).

322)    There were several things about the manner in which Detectives Gross and Simpson obtained out-of-court identifications of Petitioner that were unduly suggestive. Detective Gross took only three Polaroid's to Teasley and Trivett from which they identified Petitioner. When Gross showed them to Teasley, Gross asked if any of these was the man from the gas station that night. (Tr., Vol. VII, pp. 119-120) Gross' phrasing of this question suggested that a photo of the man whom the police suspected was indeed among those Polaroid's - and there were only three from which to choose. Moreover, Gross indicated that when he asked Petitioner Williams to accompany him to the station, Petitioner grabbed some clothes and went. (Tr., Vol. VII, p. 260) The shirt he grabbed, and consequently the shirt he was wearing when he was photographed, was gray or faded-black. (Tr., Vol. VII, pp. 260, 270) This means that the Polaroid which was shown to Teasley and Trivett conformed to the descriptions that they had given of the person getting into the Clifton cab; specifically, that the man at the Fuel Mart that night was wearing a charcoal gray shirt. (Tr., Vol. VII, p. 117) In sum, the out-of-court identifications of Petitioner that Detective Gross obtained through the use of those three Polaroid's were the result of an impermissibly suggestive procedure.

323)    The out-of-court identifications that Detective Simpson secured from Jeff Wallace were no less suggestive. One of Mr. Wallace's first recognition's of the man who had shot him stemmed from a newspaper article and picture detailing the Wayman Hamilton shooting. (Tr., Vol. VII, p. 181) That Wallace made an identification of his assailant from a newspaper picture of an accused murderer screams of inherent, inevitable suggestibility - and even this identification was tentative. (Tr., Vol. VII, p. 181) Wallace had been unable to make a positive identification of his assailant prior to seeing that picture. (Tr., Vol. VII, p. 220) Adding to this, when Wallace did attend a line-up, he was told to write down the number of the man that he

94

recognized. (Tr., Vol. VII, p. 182) It is true that Wallace was never told he had to make an identification; but Wallace's own testimony indicates that he was told to write down what number the suspect **was** (suggesting that the assailant was indeed up there, and that Wallace should in fact identify him). Essentially, Jeff Wallace identified his assailant from a newspaper picture of an accused murderer; it would be close to impossible for this method **not** to be impermissibly suggestive.

324)    The witnesses' respective opportunities to view the suspect were riddled with distractions. Teasley indicated that the suspect had been at the filling station for 35 or 45 minutes. (Tr., Vol. VII, p. 117) Trivett suggested that it was 20 minutes. (Tr., Vol. VII, p. 137) Teasley admitted that he was busy with customers that night. (Tr., Vol. VII, p. 118) Trivett explained that he was involved with taking inventory and waiting on customers, and could not even say with any degree of certainty how long the suspect had been there. (Tr., Vol. VII, p. 147) And both Teasley and Trivett placed the suspect at their filling station between 9:00 and 10:00 p.m., so it would have been dusk, if not dark. (Tr., Vol. VII, pp. 119, 135)

325)    The witnesses' own testimonies suggest that none of them were focused on the suspect enough to make reliable identifications. The inconsistencies throughout the testimonies of Teasley and Trivett indicate how little they were in fact paying attention. As previously mentioned, Teasley was, by his own admission, busy with customers that night. (Tr., Vol. VII, p. 118) And Trivett admitted that he was too busy with inventory and customers to notice the time. (Tr., Vol. VII, p. 145) Teasley insisted that the suspect had been at the filling station for between 35 to 45 minutes. (Tr., Vol. VII, p. 117) Trivett was under the impression that it was closer to 20 minutes, and became noticeably flustered when asked to clarify how long the suspect had been there. (Tr., Vol. VII, pp. 145-47) Moreover, when asked what color the cab was that

picked up the suspect, Teasley indicated that it was green with bold white letters. (Tr., Vol. VII, pp. 125-26) Trivett, on the other hand, was positive that the cab was red, and insisted that anyone who said it was green would have been mistaken. (Tr., Vol. VII, pp. 144-45) Teasley, (who had mistaken red for green), was able to say with certainty that the driver was a "thin brown-skinned individual, small." (Tr., Vol. VII, pp. 117-18) But Trivett, (who was positive about the color of the cab), admitted that he could not describe the cab driver with any more precision than "black." (Tr., Vol. VII, p. 136) That these inconsistencies occurred throughout the witnesses' testimony casts doubt upon the degree to which they were really paying attention to the suspect that night.

326) Detective Gross indicated that Mr. Teasley had assisted him in creating a composite of the man who had gotten into the cab that night. (Tr., Vol. VII, p. 254) But during his testimony, Gross went on to say that this composite was not exact, like a photograph would be, and in fact, was only "similar." (Tr., Vol. VII, p. 255) The record is devoid of any description that Mr. Trivett may have offered.[16]

327) Regarding Mr. Wallace's opportunity to view his assailant, it was no more reliable than Teasley and Trivett's. Mr. Wallace indicated that his assailant hailed him for a ride, and that Mr. Wallace did indeed drive him around. (Tr., Vol. VII, pp. 173-77) Mr. Wallace was driving, and therefore could not have been focused on his would-be assailant. Moreover, Mr. Wallace himself indicated that "it was pretty dark." (Tr., Vol. VII, p. 176) And Mr. Wallace was in the process of trying to drive off when the two shots were fired; indeed, he was shot in the back of the head (Tr., Vol. VII, pp. 176-77), so that he was not looking directly at his assailant at the time of the crime.

96

328)    The degree of attention that Mr. Wallace paid to his assailant appears to be no more acute.  As previously mentioned, Mr. Wallace was driving the entire time his assailant was with him (Tr., Vol. VII, pp. 173-77); one could justifiably surmise then that his attention would have been focused on driving - especially since he was admittedly unfamiliar with the area.  (Tr., Vol. VII, p. 173)  In addition, Mr. Wallace himself indicated that "it was pretty dark."  (Tr., Vol. VII, p. 176)  With respect to other details that night, Mr. Wallace could not say with any degree of certainty where he had stayed while he was in Hamilton (Tr., Vol. VII, p. 170), whose truck he had borrowed (Tr., Vol. VII, p. 171), where he had driven his assailant (Tr., Vol. VII, p. 173), or whether there was even a struggle during the assault.  (Tr., Vol. VII, p. 177)  And Wallace admitted to having consumed cocaine that very afternoon.  (Tr., Vol. VII, p. 183)

329)    Simpson admitted that Mr. Wallace's identification was not a positive one.  (Tr., Vol. VII, p. 220)  This is not surprising, as Mr. Wallace testified that he was on medication the first time Simpson came by, and consequently could recall nothing about that first visit.  (Tr., Vol. VII, p. 180)  Even when Wallace did see the newspaper picture of Clifford Williams, he still was not completely positive that this was assailant.  (Tr., Vol. VII, p. 191)  Detective Simpson, in his testimony, also noted Mr. Wallace's hesitancy.  (Tr., Vol. VII, p. 221)  Wallace indicated he was certain in his identification of Mr. Williams from the line-up (Tr., Vol. VII, pp. 182, 227); but by this time, he had already seen a photograph of Clifford Williams (even if he did not remember that) and a newspaper picture of Mr. Williams.

330)    The pretrial identification procedures in this case were unduly suggestive.  Mr. Teasley and Mr. Trivett were given three Polaroid's from which to make an identification, and Clifford Williams conformed in appearance to the descriptions they had given.  Mr. Wallace

---

[16] This void may perhaps be cleared up by Mr. Trivett's written statement provided to the police, which statement was required by the trial court to be preserved for purposes of appellate review - a requirement the trial court refused

based his identification upon a picture in the newspaper about another shooting. Moreover, it cannot be said, under the totality of circumstances, that the witnesses' subsequent identifications were independently reliable. Failure to suppress the identification evidence deprived Clifford Williams of his constitutional rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

331) Specifically with respect to the Jeff Wallace identification, the trial court's errors above were further exacerbated by the trial court's abuse of discretion in refusing to grant a continuance of the pre-trial suppression hearing when the State's witness Mr. Wallace failed to appear.

332) On December 5, 1990, defense counsel filed a Motion to Suppress Identification Testimony. This motion challenged, inter alia the identification of Clifford Williams by Jeff Wallace. A hearing was held on the Motion to Suppress on January 2, 1991. Defense counsel had subpoenaed Jeff Wallace to testify at the hearing, but Jeff Wallace did not honor his subpoena. (Tr., Vol. IV, p. 59) Given his failure to appear, defense counsel requested a continuance.

> Defense counsel stated:
>
> Mr. Hedric: Your Honor, we subpoenaed -- or Mr. Davidson subpoenaed Mr. Wallace to appear here, and we cannot go forward without Mr. Wallace because, obviously, his identification of Mr. Williams is very important in this case.
> I think, the State wouldn't have any argument with the fact, they think it is important to their case and it is definitely important to our case.

(Tr., Vol. IV, p. 60-61)

---

to follow. See Fourth ground for relief, *surpa*.

333) Although the court did indicate permission of defense counsel to conduct, prior to the testimony of Mr. Wallace at trial, a special *voir dire* on the issue of the suppression of his identification testimony, the court denied the Petitioner's motion to suppress and ordered the trial to go forward the next day. (Tr., Vol. IV, p. 63)

334) It was unreasonable for the trial court to refuse to continue the suppression hearing. Jeff Wallace's identification was the piece of evidence that linked Clifford Williams to the crime committed against Jeff Wallace. Further, Jeff Wallace's identification of Mr. Williams was certainly suspect. Given this set of circumstances, it was essential that the trial court conduct a pretrial determination concerning the admissibility of Jeff Wallace's identification testimony. The trial court could not do so without Jeff Wallace's testimony.

335) Mr. Williams has the right to present witnesses on his behalf and the right to compel their attendance. Mr. Williams attempted to effectuate this right by subpoenaing Jeff Wallace to testify at the suppression hearing. When the trial court refused to continue the hearing and compel Jeff Wallace's testimony, it deprived Clifford Williams of this constitutional right.

c) the trial court erred in denying numerous other pre-trial motions of Petitioner

336) The trial court erred in denying numerous other pre-trial motions filed by Petitioner's counsel, in violation of Petitioner's federal constitutional rights. These motions denied by the court were:

> (i) motion to compel law enforcement to provide prosecution all investigative files and information
>
> (ii) motion to compel entire prosecution file be submitted for in camera review
>
> (iii) motion to prohibit State from excluding jurors with death penalty reservations

(iv) motion to permit Petitioner 24 peremptory challenges

(v) motion to prohibit death qualification of venire/jury, or to seat two different panels

(vi) motion for individual sequestered *voir dire*.

337)    The trial court's short treatment and improper denial of the above pre-trial motions of prejudiced Petitioner and violated his rights as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**Eighteenth ground for relief:  The trial court's erroneous rulings and remarks during the jury selection process violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

338)    The trial court committed various errors during the jury selection process to the prejudice of Petitioner and in violation of his federal constitutional rights.

(a) The trial court erred in questioning prospective jurors if they would be embarrassed, in light of acquaintances in law enforcement, to return a not guilty verdict.

339)    The trial court erred and abused his discretion during group voir dire by questioning prospective jurors regarding whether they would be embarrassed to return a not guilty verdict.   During group voir dire in Petitioner's capital case, the trial court posed the following question to Paul V. Wright, who was later seated as a juror in the case:

> Judge Valen:  If you returned the verdict of not guilty, would it be embarrassing since your son is in law enforcement and there are law enforcement officers in this case?".  (Tr., Vol. V, p. 65)

340)    Defense counsel moved for a mistrial based on the trial court's question.  (Tr., Vol. V, p. 70)  The trial court denied counsel's motion for a mistrial and counsel then lodged an objection to any comments by the trial court regarding embarrassment by jurors in returning a

100

not guilty verdict. (Id. at 71)  Nonetheless, the trial court made the same type comment again during group voir dire:

> Judge Valen:  What is your relationship to law enforcement?
>
> Mr. Douglas:  My sister-in-law, she is a City of Cleveland police officer.
>
> Judge Valen:  Your sister-in-law is a City of Cleveland police officer?
>
> Would it make you favor the State of Ohio since she was a police officer?
>
> Mr. Douglas:  No, sir.
>
> Judge Valen:  If you returned a verdict of not guilty against the State of Ohio, would it embarrass you or make you feel uncomfortable with your sister-in-law being a police officer?

(Tr., Vol. V, p. 130)

341)  Petitioner's jurors could only infer that the trial court deemed a not guilty verdict as an affront to police officers and therefore a source of embarrassment to law abiding persons. This was especially prejudicial given the fact that "sixty-five or seventy" potential jurors would have heard the court's inquiries.  (Tr., Vol. V, pp. 12, 20)  Moreover, the trial court specifically told the jurors that "detectives from the Hamilton Police Department that are sitting at counsel table that will be assisting the Prosecutors are Detective Gross, and Detective Simpson."  (Tr., Vol. V, p. 46)  The trial court then informed Petitioner's jurors of the police officers who were to be witnesses at his trial:

> Judge Valen: ... the witness list, and these people may or may not be called, but have some connection with this case, and I am not going to distinguish between those that have been called by the State and those that have been called by the defense.
>
> I already introduced Detectives Gross and Simpson.

Detective Logsdon, of the Hamilton Police Department.

Detective Joe Nugent, of the Hamilton Police Department.

Patrolman Ron Ledford, Hamilton Police Department.

Stan Spinnelli, Patrolman, Hamilton Police Department.

Detective Mike Laney, Butler County Sheriff's Office.

Russell G. McSeveney.

Mr. Eichel: McSeveney.

Judge Valen: McSeveney.

    Do you know any one close to that name? Let me know.
The Bureau of Criminal Investigation is in London ....

(Tr., Vol. V, p. 54)

    342) In fact, police officers Christian, Ledford, Laney, Simpson and Gross, as well and BCI officer McSeveney, did testify at Petitioner's trial. Further, at least three of the jurors seated at Petitioner's trial had relationships with law enforcement officers: Juror Wright, whose son was a police officer, (Tr., Vol. V, p. 64); Juror Firlit who was friends with a police officer who attended her church of choice, (id. at p. 62); and Juror Gardner was friends with a police officer, (id. at p. 109).

    343) In sum, the presence of police officers and the role they played in the guilt phase permeated Petitioner's trial. The trial court's comments regarding embarrassment at a not guilty verdict, in conjunction with the omnipresence of police at trial, created the impetus for the jurors to impose a guilty verdict in order to avoid embarrassing themselves.

    344) The trial court has a duty to take special care that a capital defendant's rights are protected. The trial court violated that duty when it suggested, via its voir dire questions, that jurors should consider whether a not guilty verdict would be an affront to law enforcement and

102

thus an embarrassment to the jurors. Given the influence of the trial judge on the jury, the judge should exercise great care in the information it imparts to the jury. The trial court in Petitioner's case failed to exercise the requisite care and Clifford Williams was prejudiced, in , in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

    (b) <u>The trial court erred in failing to excuse certain jurors for cause.</u>

    345) The responses given during the individual voir dire of jurors Thompson, Douglas and Baecher revealed that they should have been excused for cause. None of the jurors were excused for cause, and defense counsel was forced to exercise a peremptory challenge for each juror. (Tr., Vol. VI, pp. 87-94)

    346) Juror Thompson revealed during voir dire that he would automatically impose death for a murder. His view was expressed through the following question and answer in individual voir dire:

> Q.   Is it your belief that if somebody murders somebody that their life should be taken then if they committed a murder?
>
> A.   <u>Yes, sir.</u>

(Tr., Vol. V, p. 189, emphasis added.) When Juror Thompson was subsequently asked to provide an example of a situation where a killing should not result in a death sentence, Juror Thompson could only give the example of killing in self-defense. (Tr., Vol. V, p. 190) Given the juror's responses reflecting his feeling that death should automatically be given for a killing, defense counsel moved to excuse the juror for cause. (Tr., Vol. V, p. 192) The trial court refused to excuse the juror for cause. (Tr., Vol. V, p. 192)

347) A juror who will automatically vote for the death penalty in every case will fail to consider the evidence of mitigating circumstances as the instructions require him to do, and should be excused for cause. The trial court in the present case failed to excuse the juror for cause resulting in defense counsel being placed in a position of having to peremptorily challenge Juror Thompson.

348) Similarly, Juror Douglas' voir dire reveals that he too should have been the subject of a cause excusal, as his statements reveal his predisposition not to consider the age of Petitioner as a mitigating factor. (See Tr., Vol. VI, p. 41) Age was a particularly important mitigating factor in Petitioner's case because he was only eighteen at the time of the crime. The court is to ensure that the sentencer has treated the defendant as a 'uniquely individual human being' and has made a reliable determination that death is that appropriate sentence." Penry v. Lynaugh, 492 U.S. 302, 319 (1989). Juror Douglas' responses to trial counsel's questions were inconsistent with these requirements, and should have prompted a cause excusal by the trial court.

349) Juror Baecher also expressed opinions during her individual voir dire that revealed that she would not fairly consider all possible penalties for Mr. Williams. The following exchange occurred between Juror Baecher and defense counsel:

> Q. Is it fair to say that -- that your belief would be, just because one life is taken that a life shouldn't be taken for that reason?
>
> A. Not necessarily, but in some cases, I think it should.
>
> Q. What cases would that be, ma'am?
>
> A. The cases where that the person is just constantly in trouble and, you know, doing wrong things and things they shouldn't be doing, I think they are a detriment to society, and the jails are full, so -- and it is getting out of hand.

104

(Tr., Vol. VI, p. 11)

350)   Juror Baecher's views should have prompted her removal for cause.   As the colloquy reflects, Juror Baecher felt death was always appropriate for "the person ... constantly in trouble."   Clifford Williams had a prior criminal record, and appeared to fall within those class of people that Juror Baecher believed should be sentenced to death.

351)   The trial judge in a capital case has a responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence. Here, the trial court should have excused Juror Baecher for cause.   It did not, and defense counsel was forced to exercise a peremptory challenge for Juror Baecher. (Tr., Vol. VI, p. 89)

(c)   The trial court erred in excusing juror Partin for cause.

352)   During the individual voir dire in Mr. Williams' case, prospective Juror Partin was excused for cause due to his views as to the death penalty.   (Tr., Vol. V, pp. 274)   Defense counsel objected to Juror Partin's excusal. (Tr., Vol. V, p. 274)   A review of the entire record indicates that the excusal was improper.

353)   Mere opposition to the death penalty is not sufficient to disqualify an individual from sitting on a jury in a capital case.   The opposition or viewpoint must prevent the prospective juror from following the law regarding the death penalty. A juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as juror in accordance with his instructions and his oath.

354)   The excusal of Juror Partin in this case violated Petitioner's constitutional rights. The trial court initially asked Juror Partin if he would "automatically vote against capital punishment even if the law said that you could return a verdict of capital punishment." (Tr., Vol.

105

V, p. 255) He responded "no" to this question. (Tr., Vol. V, p. 255.) Juror Partin also expressed during the voir dire that he would "obey the law" (Tr., Vol. V, p. 256); would put his "name on a verdict form that recommended to the court the imposition of the death penalty" (Tr., Vol. V, p. 257); would do his best to follow the instructions of law (Tr., Vol. V, p. 266); and would "stick to the law" (Tr., Vol. V, p. 269).

355)     Notwithstanding these response, Juror Partin was excused for cause by the trial court over defense objection. (Tr., Vol. V, p. 274) The trial court's excusal was based on one question the trial court asked of Mr. Partin at the end of his voir dire:

> Q.     Mr. Partin?
>
> A.     Yes, sir.
>
> Q.     Could you vote for the death penalty?
>
> A.     No, sir, I couldn't

(Tr., Vol. V, p. 273)

356)     This question and Mr. Partin's negative response were insufficient to excuse him for cause. The standard is that the juror "unequivocally states that under no circumstances will he follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case." O.R.C. 2945.25(C). The trial court did <u>not</u> ask this question. The question the trial court asked -- "could you vote for the death penalty" -- is not the relevant question.

357)     Juror Partin was asked the relevant questions during his voir dire by counsel. As delineated above, he stated that he would "obey the law" and follow the judge's instructions. These responses were sufficient to allow Juror Partin to serve.

106

358)    Juror Partin's voir dire was also complicated by the questions regarding his religious beliefs and their impact on his position about the death penalty.  Juror Partin's answers did reflect his religious opposition to the death penalty; however, those religious beliefs were insufficient to justify his excusal.

359)    The trial court's exclusion of Juror Partin was improper and violated Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**Nineteenth ground for relief:    The trial court committed numerous other prejudicial errors throughout Petitioner's trial in violation of Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

a)  The trial court erred in failing to promptly and appropriately inquire of the jury after the jury indicated to the court it had reached a stalemate at sentencing

360)    When the jury at the penalty phase returns its verdict after announcing a stalemate and before the trial court can instruct (and one of the jurors then expresses hesitancy in the jury poll), the trial court has a duty to make further inquiry of the jury.  The trial court had a duty to make such an inquiry in this case, but failed to do so.

361)    During its deliberations at the penalty phase, the jury sent a question to the trial court.  The question was the following:  "We are at a stalemate.  What can we do?"  (Tr., Vol. XII, p. 3)  The trial court contacted counsel, but apparently before counsel could arrive and apparently before the trial court provided any instructions to the jury, the jury returned with its death verdict.  (Tr., Vol. XII, p. 3)  The jury returned with its verdict approximately thirty minutes after it had sent its question to the trial court.  (Tr., Vol. XII, p. 3)

362)    The trial court chose not to inquire any further of the jury since it had reached a verdict.  (Tr., Vol. XII, p. 3)  The jury's death verdict was subsequently read in open court.  Counsel for Appellant then requested that the jury be polled.  (Tr., Vol. XII, p. 5)  During the

jury poll, one of the jurors seemed to express hesitancy about the verdict, and the trial court had to prompt a response from her:

> MR. GARRISON: Gladys Pennekamp, is this your recommendation?
>
> JUDGE VALEN: You have to answer. What?
>
> MS. PENNEKAMP: Yes, it is.

(Tr., Vol. XII, p. 6) Additionally, during Petitioner's sentencing for the noncapital counts, the trial court revealed how difficult the penalty decision was for the jury... "I am not going to get into every bit of detail into that, but just enough so that those jurors that were saddened by their decision, and even the alternates, that cried when they made their decision." (Tr., Vol. XIV, p. 36, emphasis added.) Given all of these circumstances, the trial court had a duty to inquire further when the jury returned with its death verdict. At the very least, the trial court had the discretion to make such an inquiry. The trial court's decision not to further inquire violated Petitioner's rights. The constitutional requirement of reliability of a death sentence is eradicated when a question arises as to whether the death verdict returned actually reflects the whole jury's verdict. Here, there is a lack of confidence that the death verdict was the product of the entire jury's deliberation and decision. Since the trial court failed to make any inquiry, Petitioner was deprived his constitutional rights were violated as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

> b.) The trial court erred in allowing introduction of evidence of Petitioner's juvenile record at trial
>
> (See **Sixteenth ground for relief (c)**, *supra*, for thorough discussion of the impropriety and prejudicial impact of the admission of this evidence)
>
> c) The trial court erred in allowing misleading firearms into evidence at trial

(See **Fifteenth ground for relief** and **Eleventh ground for relief (b)**, *supra*, for discussion pertaining to the misleading nature and prejudicial impact of this evidence)

d) The trial court erred with respect to numerous other rulings and remarks unduly prejudicial to Petitioner

363)    Throughout the course of Petitioner's trial and sentencing, from Petitioner's pre-trial motions to Petitioner's post-trial motion based on newly discovered evidence, the trial court committed other numerous errors in violation of Petitioner's constitutional rights.  These additional errors were:

> i.) *the trial court erred in demonstrating its belief in Petitioner's guilt by implying to jury during trial that there would indeed be a mitigation hearing*
>
> ii) *the trial court erred in prohibiting defense counsel from referring to Petitioner's reaction (sobbing) to the jury verdict*
>
> iii) *the trial court erred in denying Petitioner's motion for new trial based on newly discovered evidence*
>
> iv) *the trial court erred in not recusing himself after demonstrating pre-determination of Petitioner's guilt*
>
> v) *the trial court erred in refusing to allow defense counsel to refer to the Petitioner as "innocent" during voir dire*
>
> vi) *trial court erred in allowing inclusion of Petitioner's alleged "alias" in the indictment and references to the "alias" during trial*

364)    The above enumerated errors committed by the trial court, either taken alone or cumulatively, prejudiced the Petitioner at trial and rendered his trial unfair in violation of his constitutional rights as guaranteed under the Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

**Twentieth ground for relief:  The cumulative effect of all the errors at trial and sentencing violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

365)    If none of the allegations set forth above in each respective ground for relief, by itself,  merits granting of this writ, then Petitioner submits that the cumulative effect of the errors and/or omissions establish that his rights were violated under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.   More specifically, the cumulative effect of all of the errors and omissions at the guilt-innocence phase of Petitioner Williams' trial violated the federal constitutional rights of Petitioner and require the granting of a new trial. Further, the cumulative effect of all of the errors and omissions at the mitigation-penalty phase render Petitioner's death sentence inappropriate.   Such errors and omissions require the granting of a new sentencing proceeding for Mr. Williams.

**Twenty-first ground for relief:  The jury selection process in Butler County is racially biased and violated Petitioner's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States' Constitution.**

366)    Petitioner's convictions and/or sentences are void or voidable because the jury selection utilized in Butler County results in petit juries that are racially biased.[17]  The racial composition of capital juries indicates that the jury selection process in Butler County is purposefully overrepresented by whites to an extent that is statistically very unlikely to have been random, given the demographic composition of the area.[18]  In the case *sub judice*, this skewing resulted in the selection of a biased petit jury which convicted and sentenced Petitioner to death.

367)    There were no African-Americans serving on the jury in Mr. Williams' trial. Defense counsel noted for the record that of all the venirepersons called, only a few were

---

[17] See Exhibits I, J, Petitioner's Sept. 20, 1996 state post-conviction petition, Court of Common Pleas, Butler County.

African-Americans. (Tr., Vol. VI, p.121-124) The State asserted that there were four venirepersons called. (Id. at 122) The State did not exercise any peremptory challenges on African-Americans for at that time they had already been excused. Id. at 123.

368) As a result of these actions, Petitioner's rights as guaranteed by the following provisions of the United States Constitution were violated: (1) the prohibition against cruel and unusual punishment guaranteed by the Eighth Amendment; (2) substantive due process and other unenumerated rights guaranteed by the Ninth Amendment; (3) the due process and equal protection clauses of the Fourteenth Amendment; (4) the right to effective assistance of counsel guaranteed by the Sixth Amendment; and (5) the guarantees of procedural and substantive due process protected by the Fifth Amendment.

369) Petitioner Williams' same rights were violated as guaranteed by Sections 1, 2, 5, 9, 10, 16, and 20 of Article I of the Ohio Constitution.

370) Petitioner Williams was prejudiced by these violations of his state and federal constitutional rights in that he was denied access to a fair and impartial jury of his peers and equal protection of the law. Petitioner's petit jury was purposefully composed in such a manner that the proceedings were heavily biased in favor of returning a death sentence, particularly against a racial minority.

371) During state post-conviction proceedings Petitioner Williams requested discovery as provided by the Ohio Rules of Civil Procedure in order to fully develop and pursue this claim. This request was denied. Denial of the request for discovery as it relates to this claim amounts to a denial of substantive and procedural due process as guaranteed by the aforementioned state and federal constitutional provisions.

---

[18] Exhibit O, Id.

**Twenty-second ground for relief:  Various aspects of the Ohio Death Penalty scheme violate provisions of the Eighth and Fourteenth Amendments to the United States' Constitution.**

372)    The Ohio Death Penalty scheme violates the prohibition under the 8th Amendment of the U. S. Constitution against cruel and unusual punishment.

373)    The Ohio Death Penalty scheme is applied in an arbitrary and capricious fashion since it permits prosecutors to exercise discretion in deciding who will be charged with capital offenses.

374)    The Ohio Death Penalty scheme fails to require premeditation or deliberation as the culpable mental state for defendants in all capital cases.

375)    Ohio Rev. Code § 2929.03 sets forth no standard of proof to be applied in determining the existence of mitigating factors.

376)    Ohio Rev. Code § 2929.03 fails to give the jury a standard with which to balance the mitigating factors against the aggravating circumstances.

377)    Ohio Rev. Code § 2929.03 fails to give the jury a comprehensible standard with which to balance the mitigating factors against the aggravating circumstances, in that the standard confusingly and unintelligibly meshes a "beyond a reasonable doubt" standard with a "preponderance of the evidence" (simply outweighing) standard.

378)    The consideration of aggravating circumstances at the guilt phase of the trial is unconstitutional.

379)    The Ohio Death Penalty scheme is unconstitutional in that it does not give the sentencing authority the option to impose a life sentence, or give mercy, when it finds that the aggravating circumstances beyond a reasonable doubt outweigh the mitigating factors.

380) The Ohio Death Penalty scheme is unconstitutional because a bifurcated trial with the same jury denies the defendant an impartial jury and the effective assistance of counsel.

381) The Ohio Death Penalty scheme is unconstitutional because in conjunction with CRIM. R. 11 (C)(3), it encourages defendants to waive their fundamental rights and enter guilty pleas.

382) The Ohio Death Penalty scheme is unconstitutional because it is a mandatory death penalty.

383) The Ohio Death Penalty scheme is unconstitutional in that it fails to provide for adequate appellate review.

384) Ohio Death Penalty statute is unconstitutional because execution by means of electrocution constitutes cruel and unusual punishment in light of modern and evolving standards of decency.

385) The above deficiencies with the Ohio Death Penalty Statute violate Mr. Williams' Rights to Counsel, to be Free from Cruel and Unusual Punishments and Due Process as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**Twenty-third ground for relief: Ohio's post-conviction review system does not provide capital defendants with a meaningful opportunity to redress violations of their state and federal rights, in violation of Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States' Constitution.**

386) Trial level post-conviction proceedings instituted by death-sentenced individuals reveal the corruption of the Ohio capital post-conviction process. From 1981 to date, the Ohio post-conviction trial courts have granted relief on only one post-conviction petition (of 195 post-conviction petitions) by a death-sentenced individual. See State v. Barnes, No. CR83-5911

113

(Lucas C.P. May 17, 1991). They have denied relief on 162 capital post-conviction petitions; they are currently considering 32 capital post-conviction petitions.

387)    From 1981 to date, the Ohio appellate courts have affirmed denial of capital post-conviction relief in 118 instances. They have vacated and remanded only 18 trial court judgments for further review. Thirteen of these 18 trial court judgments were denied for a second time; five are still awaiting action on the remand. Nine of these 13 denials have been affirmed by the Ohio appellate courts; the other 4 denials are awaiting action.

388)    The Ohio Supreme Court has held that it has discretionary review regarding capital post-conviction cases. It has never accepted a capital post-conviction case for review. It has denied 103 memoranda in support of jurisdiction in capital post-conviction cases.

389)    The opportunity for factual development at the trial post-conviction level under the system in Ohio is equivalent to a Catch-22 situation. A post-conviction Petitioner is not entitled to an evidentiary hearing unless he produces sufficient documentation (in the form of evidence outside of the trial and direct appeal record) to demonstrate his entitlement to relief. However, he is not entitled to conduct discovery in order to obtain such documentation unless he has demonstrated his entitlement to an evidentiary hearing.

390)    Like the far majority of capital post-conviction Petitioners in Ohio, Mr. Williams' state post-conviction requests for discovery, an evidentiary hearing, funds for expert assistance, and relief were denied. Specifically, Mr. Williams was denied requests for: funds for a cultural expert and a ballistics expert; conducting of discovery; an evidentiary hearing; and post-conviction relief.

391)    The trial and appellate post-conviction courts erred by denying Mr. Williams these requests. His petition and requests met the standards for granting a hearing, discovery,

114

funds, and relief. The denial of Mr. Williams' requests for a hearing, discovery, and funds

resulted in his inability during post-conviction to further support these claims. Further, the state

trial court erred in applying res judicata to certain of Petitioner's claims, and the state appellate

court erred in failing to decide each post-conviction assignment of error.

392) These errors and omissions violated the Petitioner's rights under the Fifth, Sixth,

Eighth, and Fourteenth Amendments to the United States Constitution. Prejudice may be

presumed from these errors and omissions. In the alternative, these errors and omissions did

prejudice the Petitioner.

> **Twenty-fourth ground for relief**: **The Ohio Supreme Court's denial of Petitioner's appellate motion to complete the record denied Petitioner's rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

393) A court must have the complete record of a capital case in order to adequately

review the case. Due to the Ohio Supreme Court's denial of Petitioner's motions to supplement

the record of his case, however, this Court will not have the complete record before it.

394) On October 19, 1993, Petitioner Williams filed a Motion to Supplement the

Record in his capital appeal to the Ohio Supreme Court. Petitioner sought to have eleven (11)

items supplemented into the record, including transcripts of crucial proceedings in his case. On

November 10, 1993, the State filed a Memorandum in Opposition to Motion to Supplement the

Record. On November 24, 1993, the Ohio Supreme Court denied Petitioner's motion without

elaboration through a three line Entry. On November 30, Petitioner filed a Motion for Rehearing

of Denial of Motion to Supplement the Record. On January 12, 1994 the Ohio Supreme Court

denied Petitioner's Motion.

395) This State Supreme Court's denial of supplementation in Petitioner's case

abrogated his mandatory, constitutional right to a complete record and undermined the

effectiveness of his appeal. Equally so, the Ohio Supreme Court's denial of supplementation in Petitioner's case undermined its ability to conduct the plenary review of his appeal required by O.R.C. § 2929.05(A).

396) Moreover, the United States Supreme Court has emphasized the importance of reviewing capital sentences on a complete record, and has found reversible error when an appellate court refuses to allow supplementation of a transcript into the record of a capital appeal.[19] The Ohio Supreme Court's denial of supplementation in Petitioner's case runs afoul of United States Supreme Court's decisions.

397) Each of the eleven items that Petitioner sought to have supplemented into the record was critical to review. This is especially so due to the factual and legal complexity of Petitioner's trial which encompassed both a capital offense and a separate non-capital offense.

398) In his motions to supplement the record filed in the Ohio State courts, Petitioner sought to have the following transcripts supplemented into the record:

1.   Transcript of his initial appearance on August 10, 1990;

2.   Transcript of the preliminary hearing pertaining to Appellant Williams' Case Nos. CR90-08-0665; 90-CRA-2421 - O.R.C. Section 2903.01 Aggravated Murder with Gun Specification, held on August 22, 1990;

3.   Transcript of the preliminary hearing pertaining to Appellant Williams' Case Nos. CR90-08-0665; 90-CRA-2553 - O.R.C. Section 2911.01(A)(2) Aggravated Robbery and Case Nos. CR90-08-0708; 90-CRA-2554 - O.R.C. Section 2933.02 Attempted Aggravated Murder, held on August 28, 1990;

4.   Transcript of the arraignment in Appellant Williams' Case No. CR90-08-0708, filed on September 19, 1990.

5.   Transcript of jury poll held at the request of Appellant Williams' counsel at the conclusion of the trial phase, Case

---

[19] Dobbs v. Zant, ___ U.S. ___, 113 S. Ct. 835 (1993)

No. CR90-08-0665, Vol. X, pp. 7-8. The page pertaining to this poll is simply missing from the transcript;

6. The questionnaires completed by the jurors in Appellant Williams' venire;

7. The transcript of the jury pull in Appellant Williams' case held on November 30, 1990 at 11:00 a.m. (see Case No. CR90-08-0665, Vol. I, p. 20);

8. The transcript of the process ("pulling by lot") in which the three-judge panel was selected in Appellant Williams' case (see Case No. CR90-08-0665, Vol. I, p. 18);

9. The transcript of the scheduling conference held in Appellant Williams' case, CR90-08-0665, on November 30, 1990.

10. Duplicate of a photograph which was State's Exhibit 27(A) which was spoliated while in the custody of the Butler County Clerk of Courts' office;

11. The Presentence Investigation report prepared by the Butler County Adult Probation Department pursuant to the conviction of Appellant Williams of Aggravated Robbery with specifications and Felonious Assault with specification, listed as Counts Three and Four in the indictment against Appellant Williams in Case No. CR90-08-0665 and pertaining to Jeffrey Wallace.

399) Due process requires that a capital defendant be provided with the tools necessary to effectively pursue his appeal. One of those tools is a complete record. The Ohio Supreme Court's denial of Petitioner's requests to supplement the record of his case to ensure a complete record deprived Petitioner of his rights to effective assistance of counsel, equal protection, due process of law, and meaningful appellate review under the Eighth and Fourteenth Amendments to the United States Constitution.

## V. PRAYER FOR RELIEF

**Wherefore**, Petitioner prays the Court as follows:

1. That the Court vacate the jury verdict which found Petitioner guilty of aggravated murder.

2. That the Court vacate the jury verdict as to all other Counts (II, III, and IV)

3. That the Court vacate the sentence of death imposed against Petitioner.

4. That the Court grant Petitioner discovery so that he may fully develop the claims asserted in this Petition.

5. That the Court grant an evidentiary hearing so this Court may fairly determine the claims asserted in this Petition.

6. That the Court grant Petitioner an indefinite stay of execution pending final resolution of this Petition.

7. That the Court grant Petitioner any and all other relief deemed just and appropriate.

Respectfully submitted,

Timothy R. Payne   # 0069329
Assistant Public Defender
Office of the Ohio Public Defender
8 East Long St., 11th Floor
Columbus, Ohio 43215-2998
(614) 486-5394
Counsel for Petitioner Clifford D. Williams

W. Joseph Edwards (0030048)
755 South High St.,
Columbus, Ohio 43206
(614) 444-3900
Co-counsel for Petitioner Clifford D. Williams

118

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of Clifford Williams' Petition for Writ of Habeas Corpus was forwarded by via first-class, postage prepaid U.S. Mail to Stuart Alan Cole, Assistant Attorney General, State of Ohio, 30 East Broad Street, 26th Floor, Columbus, Ohio 43215-3428, this 11th day of June, 1999.

COUNSEL FOR PETITIONER

STATE OF OHIO -VS- CLIFFORD DONTA WILLIAMS
DIRECT APPEAL TO THE BUTLER COUNTY COURT OF APPEALS
CASE NO. CA91-04-060, CA92-06-110

### FIRST ASSIGNMENT OF ERROR

THE COURT ERRED TO THE PREJUDICE OF THE DEFENDANT/APPELLANT BY FAILING TO SEVER A FOUR (4) COUNT INDICTMENT FOR TRIAL PURPOSES, WHEN TWO (2) OF THE OFFENSES OCCURRED THREE (3) DAYS PRIOR TO THE OFFENSES THAT OCCURRED LATER, AND WERE SEPARATE AND DISTINCT AND REQUIRED DIFFERENT PROOF.

### SECOND ASSIGNMENT OF ERROR

THE COURT ERRED TO THE PREJUDICE OF THE DEFENDANT/APPELLANT BY INSTRUCTING THE JURY AT THE PENALTY PHASE OF AN AGGRAVATED MURDER CASE, THAT THEY COULD CONSIDER ALL OF THE EVIDENCE PRESENTED AT THE GUILT PHASE OF THE TRIAL WHEN SOME THE EVIDENCE AT THE GUILT PHASE CONCERNED ANOTHER CASE AND WAS IRRELEVANT TO THE AGGRAVATING CIRCUMSTANCES OF THE MURDER CHARGE.

### THIRD ASSIGNMENT OF ERROR

THE VERDICT OF THE JURY, FINDING THE DEFENDANT/APPELLANT GUILTY OF AGGRAVATED MURDER AND AGGRAVATED ROBBERY WITH DEATH PENALTY SPECFICATIONS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AND CONTRARY TO THE LAWS OF THE STATE OF OHIO.

### FOURTH ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED IN ITS INSTRUCTIONS TO THE JURY DURING THE PENALTY PHASE THAT THE JURY'S DEATH PENALTY VERDICT WAS ONLY A RECOMMENDATION TO THE TRIAL JUDGE.

### FIFTH ASSIGNMENT OF ERROR

THE PROPORTIONALITY REVIEW MANDATED BY OHIO REV. CODE § 2929.05 VIOLATES THE FIFTH, EIGHTH AND



EXHIBIT
A

FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

### SIXTH ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT/APPELLANT WHEN IT OVERRULED THE VARIOUS MOTIONS FILED BY THE DEFENDANT/APPELLANT PERTAINING TO CONSTITUTIONAL RIGHTS AND LEGAL ASPECTS OF OHIO'S DEATH PENALTY STATUTE.

### SEVENTH ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED BY OVERRULING DEFENDANT'S MOTION FOR A NEW TRIAL.

### EIGHTH ASSIGNMENT OF ERROR

THE CLOSING ARGUMENTS OF THE PROSECUTION DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL.

STATE OF OHIO -VS- CLIFFORD DONTA WILLIAMS
DIRECT APPEAL TO THE SUPREME COURT OF OHIO
CASE NO. 93-007

## PROPOSITION OF LAW NO. I

IT IS PREJUDICIAL ERROR IN A CAPITAL CASE TO JOIN
FOR TRIAL TWO SEPARATE OFFENSES OCCURRING AT
DIFFERENT TIMES AND PLACES. JOINDER OF
UNRELATED OFFENSES DENIES A CAPITAL DEFENDANT
THE RIGHT TO A TRIAL AND SENTENCING WHICH IS
BOTH FAIR AND RELIABLE, IN CONTRAVENTION OF THE
SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO
THE UNITED STATES CONSTITUTION AND SECTION 10,
ARTICLE I OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. II

APPELLANT WILLIAMS' DEATH SENTENCE WAS A
PRODUCT OF THE JURY'S CONSIDERATION OF
EVIDENCE THAT WAS NOT RELEVANT TO THE
AGGRAVATING CIRCUMSTANCES CHARGED AGAINST
HIM OR THE NATURE AND CIRCUMSTANCES OF THE
CHARGED CAPITAL CRIME IN VIOLATION OF HIS
RIGHTS UNDER THE FIFTH, EIGHTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION.

## PROPOSITION OF LAW NO. III

AN APPELLATE COURT MUST HAVE THE COMPLETE
RECORD OF A CAPITAL CASE IN ORDER TO
ADEQUATELY REVIEW THE CASE PURSUANT TO OHIO
REV. CODE ANN. SECTION 2929.05. THIS COURT'S
DENIAL OF APPELLANT WILLIAMS' REQUESTS TO
SUPPLEMENT THE RECORD OF HIS CASE TO ENSURE A
COMPLETE RECORD DEPRIVED APPELLANT OF HIS
RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL,
EQUAL PROTECTION, DUE PROCESS OF LAW AND
MEANINGFUL APPELLATE REVIEW UNDER THE EIGHTH
AND FOURTEENTH AMENDMENTS OF THE UNITED
STATES CONSTITUTION AND ARTICLE I, SECTIONS 2, 10
AND 16 OF THE OHIO CONSTITUTION.



EXHIBIT

B

## PROPOSITION OF LAW NO. IV

THE JURY AND TRIAL COURT'S CONSIDERATION OF DUPLICATIVE AGGRAVATING CIRCUMSTANCES TIPPED THE WEIGHING PROCESS AGAINST THE APPELLANT, DESTROYED THE RELIABILITY OF THE SENTENCING PROCESS AND RESULTED IN THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH SENTENCE IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 9 AND 16 OF THE OHIO CONSTITUTION.  FURTHER, THE COURT OF APPEALS' CONSIDERATION OF THE DUPLICATIVE SPECIFICATIONS ERADICATED THE RELIABILITY OF ITS OHIO REV. CODE ANN. SECTION 2929.05 REVIEW.

## PROPOSITION OF LAW NO. V

WHEN THE JURY AT THE PENALTY PHASE RETURNS ITS VERDICT AFTER ANNOUNCING A STALEMATE AND BEFORE THE TRIAL COURT CAN INSTRUCT, AND ONE OF THE JURORS THEN EXPRESSES HESITANCY IN THE JURY POLL, THE TRIAL COURT HAS A DUTY TO MAKE FURTHER INQUIRY OF THE JURY.  FAILURE TO MAKE SUCH AN INQUIRY VIOLATES THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 2, 9, 10 AND 16 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. VI

MISCONDUCT BY THE GOVERNMENT'S ATTORNEYS THROUGHOUT APPELLANT WILLIAMS' CAPITAL TRIAL DEPRIVED HIM OF HIS RIGHTS TO DUE PROCESS, A FAIR TRIAL AND A FAIR AND RELIABLE DETERMINATION OF HIS GUILT AND SENTENCE AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

## PROPOSITION OF LAW NO. VII

IT WAS IMPROPER FOR THE TRIAL COURT, AT THE GUILT PHASE OF APPELLANT'S CAPITAL CASE, TO REFER TO THE PENALTY PHASE WHEN THAT REFERENCE COMMUNICATED TO THE JURY APPELLANT'S GUILT.  THOSE REFERENCES VIOLATED

THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION
AND ARTICLE I, SECTIONS 9, 10 AND 16 OF THE OHIO
CONSTITUTION.

## PROPOSITION OF LAW NO. VIII

A CAPITAL DEFENDANT IS ENTITLED TO HAVE A JUDGE
PRESIDE OVER HIS CAPITAL TRIAL WHO HAS NOT
PREDETERMINED HIS GUILT. A CAPITAL TRIAL
CONDUCTED BY A JUDGE WHO HAS PREDETERMINED
GUILT VIOLATES THE FIFTH, SIXTH, EIGHTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION AND ARTICLE I, SECTIONS 9, 10 AND 16
OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. IX

A CAPITAL DEFENDANT IS DENIED THE RIGHT TO
ADEQUATE APPELLATE REVIEW WHEN THE TRIAL
COURT REFUSES TO ORDER A STATE'S WITNESS'S
STATEMENT TO BE PRESERVED IN THE RECORDS OF
THE COURT SO AS TO BE MADE AVAILABLE TO THE
APPELLATE COURT UPON APPEAL IN VIOLATION OF
THE SIXTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION AND SECTIONS 2, 9, 10
AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. X

AT THE PENALTY PHASE OF A CAPITAL CASE, DEFENSE
COUNSEL MUST BE PERMITTED TO ARGUE THE
DEFENDANT'S REACTION TO THE GUILT VERDICT. THE
REACTION CONSTITUTES RELEVANT, MITIGATING
EVIDENCE UNDER THE FIFTH, SIXTH, EIGHTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION AND ARTICLE I, SECTIONS 2, 9, 10 AND 16
OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. XI

THE OUT-OF-COURT IDENTIFICATION PROCEDURES
USED TO IMPLICATE CLIFFORD WILLIAMS FOR THE
MURDER OF WAYMAN HAMILTON AND THE SHOOTING
OF JEFF WALLACE WERE UNDULY SUGGESTIVE. THE
SUBSEQUENT IN-COURT IDENTIFICATIONS WERE NOT

INDEPENDENTLY RELIABLE, AND SO THE FAILURE TO
SUPPRESS THE IDENTIFICATION EVIDENCE DEPRIVED
APPELLANT WILLIAMS OF HIS DUE PROCESS RIGHTS AS
GUARANTEED BY ARTICLE I, SECTIONS 9, 10, AND 16 OF
THE OHIO CONSTITUTION; AND THE SIXTH, EIGHTH AND
FOURTEENTH AMENDMENTS OF THE UNITED STATES
CONSTITUTION.

## PROPOSITION OF LAW NO. XII

WHEN IRRELEVANT AND HIGHLY INFLAMMATORY
EVIDENCE IS PRESENTED AT THE GUILT PHASE OF A
CAPITAL TRIAL IT TAINTS THE GUILT PHASE AND
OPERATES TO DENY THE CAPITAL DEFENDANT A FAIR
TRIAL.

## PROPOSITION OF LAW NO. XIII

THE FAILURE TO EXCLUDE MISLEADING FIREARMS
IDENTIFICATION EVIDENCE WHOSE PREJUDICIAL
EFFECT WAS COMPOUNDED BY INACCURATE
PROSECUTORIAL ARGUMENT VIOLATED APPELLANT'S
RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION.

## PROPOSITION OF LAW NO. XIV

CLIFFORD WILLIAMS WAS UNFAIRLY PREJUDICED BY
THE INCLUSION OF AN ALIAS IN HIS INDICTMENT, AND
REFERENCES TO THAT ALIAS DURING HIS TRIAL.
BECAUSE THE ALIAS WAS NOT NECESSARY FOR
CONNECTING HIM TO THE ACTS CHARGED, THE
INCLUSION AND USE OF THAT ALIAS DEPRIVED
APPELLANT WILLIAMS OF HIS DUE PROCESS RIGHTS
GUARANTEED BY ARTICLE I, SECTIONS 9 AND 16 OF THE
OHIO CONSTITUTION AND THE EIGHTH AND
FOURTEENTH AMENDMENTS OF THE UNITED STATES
CONSTITUTION.

## PROPOSITION OF LAW NO. XV

THE TRIAL COURT'S FAILURE TO SUPPRESS ILLEGALLY
OBTAINED EVIDENCE FOR WANT OF STANDING WAS
ERRONEOUS. THE COURT DID NOT CONSIDER, NOR DID
CLIFFORD WILLIAMS' DEFENSE COUNSEL ARGUE, THE

PROPER STANDARD FOR DETERMINING ONE'S STANDING TO CHALLENGE THE VALIDITY OF A SEARCH. HENCE, CLIFFORD WILLIAMS WAS DEPRIVED OF HIS RIGHTS GUARANTEED BY ARTICLE I, SECTIONS 9, 10 AND 14 OF THE OHIO CONSTITUTION, AND THE FOURTH, SIXTH, AND EIGHTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

## PROPOSITION OF LAW NO. XVI

THE TRIAL COURT'S ACTIONS DURING APPELLANT'S TRIAL PREVENTED APPELLANT FROM RECEIVING A FAIR TRIAL AND VIOLATED APPELLANT'S CONSTITUTIONAL RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 9, 10 AND 16 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. XVII

A CAPITAL DEFENDANT IS DENIED THE RIGHT TO A FAIR AND IMPARTIAL TRIAL AND ADEQUATE APPELLATE REVIEW OF HIS CONVICTION WHEN THE TRIAL COURT REFUSES TO ORDER THE PROSECUTOR'S FILE TO BE SEALED FOR IN CAMERA REVIEW IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 2, 9, 10 AND 16, ARTICLE I, OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. XVIII

THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION REQUIRE THE STATE TO PRODUCE SUFFICIENT EVIDENCE TO PROVE EVERY ESSENTIAL ELEMENT OF THE CRIME BEYOND A REASONABLE DOUBT. IF SUFFICIENT EVIDENCE IS NOT PRESENTED, THE ACCUSED MUST BE ACQUITTED OF THE CHARGE.

## PROPOSITION OF LAW NO. XIX

THE INSTRUCTIONS THE TRIAL COURT GAVE DURING THE COURSE OF APPELLANT WILLIAMS' TRIAL VIOLATED APPELLANT'S CONSTITUTIONAL RIGHTS AS

GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION AND ARTICLE I, SECTIONS 9, 10 AND 16
OF THE OHIO CONSTITUTION.

### PROPOSITION OF LAW NO. XX

QUERIES BY THE TRIAL COURT DURING GROUP VOIR
DIRE AS TO WHETHER APPELLANT'S JURORS WOULD BE
EMBARRASSED TO RETURN A NOT GUILTY VERDICT
VIOLATED APPELLANT'S CONSTITUTIONAL RIGHTS AS
GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION AND ARTICLE I, SECTIONS 9, 10, AND 16
OF THE OHIO CONSTITUTION.

### PROPOSITION OF LAW NO. XXI

THE TRIAL COURT FAILED TO ENSURE THAT THE JURY
SELECTION PROCESS ACCORDED MR. WILLIAMS HIS
CONSTITUTIONAL RIGHTS AS GUARANTEED BY THE
FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS
TO THE UNITED STATES CONSTITUTION AND ARTICLE I,
SECTIONS 5, 9, 10 AND 16 OF THE OHIO CONSTITUTION.

### PROPOSITION OF LAW NO. XXII

THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS
TO THE UNITED STATES CONSTITUTION, SECTIONS 9, 10
AND 16, ARTICLE I OF THE OHIO CONSTITUTION AND
SECTION 2945.25(C) OF THE OHIO REVISED CODE
SECTION GUARANTEE AN ACCUSED A FAIR TRIAL AND
AN IMPARTIAL JURY.  THE TRIAL COURT'S EXCLUSION
OF POTENTIAL JUROR RONALD PARTIN DENIED
APPELLANT THESE CONSTITUTIONAL GUARANTEES.

### PROPOSITION OF LAW NO. XXIII

THE TRIAL COURT'S DENIAL OF APPELLANT'S REQUEST
FOR EXPERT ASSISTANCE TO PREPARE FOR THE
SENTENCING PHASE OF HIS TRIAL VIOLATED
APPELLANT'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH
AND FOURTEENTH AMENDMENTS TO THE UNITED
STATES CONSTITUTION AND SECTIONS 10 AND 16,
ARTICLE I, OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. XXIV

THE TRIAL COURT'S INSTRUCTIONS AT THE PENALTY PHASE OF APPELLANT'S CAPITAL TRIAL WERE CONSTITUTIONALLY INFIRM. THE INSTRUCTIONS VIOLATED THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 2, 9, 10 AND 16 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. XXV

THE TRIAL COURT'S INSTRUCTIONS AND THE STATE'S VOIR DIRE DISCUSSION ON REASONABLE DOUBT, VIOLATED APPELLANT'S CONSTITUTIONAL RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 9, 10 AND 16 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. XXVI

THE TRIAL COURT'S COMMENTS AT APPELLANT'S SENTENCING HEARING AND ITS OPINION ISSUED AFTER THE HEARING CONTAIN IRRELEVANT AND IMPROPER CONSIDERATIONS FOR SENTENCING MR. WILLIAMS TO DEATH. THESE CONSIDERATIONS VIOLATED APPELLANT WILLIAMS' CONSTITUTIONAL RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 2, 9, 10 AND 16 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. XXVII

THE SENTENCE OF DEATH IMPOSED ON APPELLANT WILLIAMS IS UNRELIABLE AND INAPPROPRIATE. THE DEATH SENTENCE IN HIS CASE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, ARTICLE I, SECTIONS 9, AND 16 OF THE OHIO CONSTITUTION AND OHIO REV. CODE ANN. SECTION 2929.05.

## PROPOSITION OF LAW NO. XXVIII

THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 5, 9, AND 16, ARTICLE I OF THE OHIO CONSTITUTION, GUARANTEE A CAPITAL DEFENDANT AN IMPARTIAL DETERMINATION BY THE JURY AT HIS GUILT AND MITIGATION PHASES. TO COMMIT JURORS TO A DEATH VERDICT DURING INDIVIDUAL VOIR DIRE VIOLATES THESE CONSTITUTIONAL GUARANTEES.

## PROPOSITION OF LAW NO. XXIX

THE PROSECUTOR'S SYSTEMATIC USE OF PEREMPTORY CHALLENGES TO EXCLUDE ALL PROSPECTIVE JURORS WITH SOME RESERVATIONS ABOUT THE DEATH PENALTY VIOLATED APPELLANT WILLIAMS' RIGHT TO EQUAL PROTECTION AND A FAIR AND IMPARTIAL JURY IN A CAPITAL CASE UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 2, 5, 10 AND 16 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. XXX

DEFENSE COUNSEL'S ACTIONS AND OMISSIONS AT MR. WILLIAMS' CAPITAL TRIAL DEPRIVED HIM OF THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 9, 10 AND 16 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. XXXI

THE FAILURE TO RAISE OR ADEQUATELY ADDRESS SUBSTANTIAL CAPITAL AND OTHER WELL-ESTABLISHED CRIMINAL LAW ISSUES ON APPEAL AS OF RIGHT DEPRIVES THE CAPITAL DEFENDANT OF THE EFFECTIVE ASSISTANCE OF APPELLANT COUNSEL AND THE MEANINGFUL APPELLATE REVIEW OF A CAPITAL CONVICTION GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION, ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION AND OHIO REV. CODE ANN. SECTION 2929.05.

## PROPOSITION OF LAW NO. XXXII

OHIO'S MANDATORY CAPITAL SENTENCING SCHEME PREVENTED THE JURY FROM DECIDING WHETHER DEATH WAS THE APPROPRIATE PUNISHMENT IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 9, 10 AND 16 OF THE OHIO CONSTITUTION.

## PROPOSITION OF LAW NO. XXXIII

THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION AND OHIO REV. CODE ANN. SECTION 2929.05, GUARANTEE A CONVICTED CAPITAL DEFENDANT A FAIR AND IMPARTIAL REVIEW OF HIS DEATH SENTENCE. THE STATUTORILY MANDATED PROPORTIONALITY PROCESS IN OHIO DOES NOT COMPORT WITH THIS CONSTITUTIONAL REQUIREMENT AND THUS IS FATALLY FLAWED.

## PROPOSITION OF LAW NO. XXXIV

THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 2, 9, 10 AND 16 OF THE OHIO CONSTITUTION ESTABLISH THE REQUIREMENTS FOR A VALID DEATH PENALTY SCHEME. OHIO REV. CODE ANN. SECTIONS 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 AND 2929.05, OHIO'S STATUTORY PROVISIONS GOVERNING THE IMPOSITION OF THE DEATH PENALTY, DO NOT MEET THE PRESCRIBED CONSTITUTIONAL REQUIREMENTS AND ARE UNCONSTITUTIONAL, BOTH ON THEIR FACE AND AS APPLIED.

STATE OF OHIO -VS- CLIFFORD DONTA WILLIAMS
DIRECT APPEAL TO THE UNITED STATES SUPREME COURT
CASE NO.

### FIRST QUESTION PRESENTED

IS IT ERROR TO ALLOW A CAPITAL SENTENCER IN A
WEIGHING STATE TO CONSIDER IN FAVOR OF THE
DEATH PENALTY EVIDENCE FROM A NON-CAPITAL
CRIME THAT WAS JOINED FOR TRIAL BUT WHICH WAS
NOT RELEVANT TO THE AGGRAVATING
CIRCUMSTANCES CHARGED OR THE NATURE AND
CIRCUMSTANCES OF THE CHARGED CAPITAL CRIME?

### SECOND QUESTION PRESENTED

IS A PETITIONER DENIED DUE PROCESS WHEN A
REVIEWING COURT DECIDES A FOURTH AMENDMENT
CALIM ON THE BASIS OF EVIDENCE WHICH THE
PETITIONER WAS PREVENTED FROM INTRODUCING TO
SUPPORT HIS MOTION TO SUPPRESS IN THE TRIAL
COURT?

### THIRD QUESTION PRESENTED

DOES A PETITIONER HAVE STANDING TO CHALLENGE A
SEARCH AND SEIZURE WHEN THERE IS SUFFICIENT
INDICIA OF A PRIVACY INTEREST BUT NO EVIDENCE OF
BEING AN OVERNIGHT GUEST AS IN MINNESOTA V.
OLSON, 495 U.S. 91 (1990)



STATE OF OHIO -VS- CLIFFORD DONTA WILLIAMS
PETITION FOR POST CONVICTION RELIEF
IN THE BUTLER COUNTY COURT OF COMMON PLEAS
CASE NO. CR90-08-0665

### FIRST CLAIM FOR RELIEF

PETITIONER'S CONVICTION AND/OR SENTENCE ARE
VOID OR VOIDABLE DUE TO JUDGE VALEN'S REFUSAL
TO RECUSE HIMSELF TO AVOID ACTUAL AND THE
APPEARANCE OF IMPROPRIETY.

### SECOND CLAIM FOR RELIEF

PETITIONER WILLIAMS' CONVICTION AND/OR
SENTENCES ARE VOID OR VOIDABLE BECAUSE THE
STATE HAS NOT RELEASED THE SHELL CASINGS AND
BULLET FRAGMENTS TO WILLIAMS IN ORDER THAT HE
CAN HAVE THOSE EXHIBITS TESTED BY AN
INDEPENDENT BALLISTICS' EXPERT.

### THIRD CLAIM FOR RELIEF

PETITIONER WILLIAMS' CONVICTION AND/OR
SENTENCES ARE VOID OR VOIDABLE BECAUSE TRIAL
COUNSEL WERE DEFICIENT IN THEIR FAILURE TO
PRESENT SCIENTIFIC EVIDENCE WHICH EXCULPATES
WILLIAMS IN THE SHOOTING OF HAMILTON.

### FOURTH CLAIM FOR RELIEF

PETITIONER'S CONVICTION AND/OR SENTENCE ARE
VOID OR VOIDABLE BECAUSE JUDGE VALEN DENIED
DEFENSE COUNSEL'S REQUEST FOR FUNDS FOR A
MITIGATION SPECIALIST.

### FIFTH CLAIM FOR RELIEF

PETITIONER'S CONVICTION AND/OR SENTENCE ARE
VOID OR VOIDABLE BECAUSE HE WAS DEPRIVED OF
THE EFFECTIVE ASSISTANCE OF COUNSEL AS A RESULT
OF THEIR FAILURE TO PRESENT CULTURAL EXPERT
MITIGATION TESTIMONY.



EXHIBIT
D

## SIXTH CLAIM FOR RELIEF

PETITIONER'S CONVICTION AND/OR SENTENCE ARE VOID OR VOIDABLE DUE TO THE INEFFECTIVENESS OF DEFENSE COUNSEL DURING VOIR DIRE.

## SEVENTH CLAIM FOR RELIEF

PETITIONER'S CONVICTION AND/OR SENTENCE ARE VOID OR VOIDABLE DUE TO THE MULTIPLY AMBIGUOUS, MISLEADING AND UNINTELLIGIBLE INSTRUCTIONS GIVEN BY THE COURT. FURTHER, DEFENSE COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THESE INSTRUCTIONS.

## EIGHTH CLAIM FOR RELIEF

PETITIONER'S CONVICTION AND/OR SENTENCE ARE VOID OR VOIDABLE BECAUSE THE STATE FAILED TO PROVIDE RELEVANT DISCOVERY INFORMATION TO HIS DEFENSE COUNSEL.

## NINTH CLAIM FOR RELIEF

IN THE CASE *SUB JUDICE*, THE STATE COURTS DID NOT AFFORD PETITIONER WILLIAMS A FAIR PROPORTIONALITY REVIEW THAT EXTENDS BEYOND MERE "LIP SERVICE."

## TENTH CLAIM FOR RELIEF

PETITIONER'S CONVICTIONS AND/OR SENTENCES ARE VOID OR VOIDABLE BECAUSE DEATH BY ELECTROCUTION CONSTITUTES A BLATANT DISREGARD FOR THE VALUE OF HUMAN LIFE, ENTAILS UNNECESSARY AND WANTON INFLICTION OF PAIN AND DIMINISHES THE DIGNITY OF MAN.

## ELEVENTH CLAIM FOR RELIEF

PETITIONER WILLIAMS CONVICTION AND/OR SENTENCE ARE VOID OR VOIDABLE BECAUSE THE PETITIONER WAS REQUIRED TO PROVE THE EXISTENCE OF MITIGATION FACTORS BY A PREPONDERANCE OF THE EVIDENCE.

TWELFTH CLAIM FOR RELIEF

PETITIONER WILLIAMS' CONVICTIONS AND/OR
SENTENCES ARE VOID OR VOIDABLE BECAUSE THE
DEATH PENALTY IS DISPROPORTIONATELY METED OUT
TO THOSE DEFENDANTS WHO ARE RACIAL MINORITIES
AND/OR THOSE DEFENDANTS WHO ARE ACCUSED OF
KILLING WHITE VICTIMS.

THIRTEENTH CLAIM FOR RELIEF

PETITIONER WILLIAMS' CONVICTIONS AND/OR
SENTENCES ARE VOID OR VOIDABLE BECAUSE THE
JURY SELECTION UTILIZED IN BUTLER COUNTY
RESULTS IN PETIT JURIES THAT ARE RACIALLY BIASED.

FOURTEENTH CLAIM FOR RELIEF

PETITIONER WILLIAMS' CONVICTIONS AND/OR
SENTENCES ARE VOID OR VOIDABLE BECAUSE TRIAL
COUNSEL WERE DEFICIENT IN FAILING TO
INVESTIGATE, PRESENT AND REQUEST FACTUAL
DEVELOPMENT OF CLAIMS REGARDING THE RACISM
WHICH APPEARS TO BE INHERENT IN BUTLER COUNTY
IN ITS ENFORCEMENT OF THE DEATH PENALTY.

FIFTEENTH CLAIM FOR RELIEF

PETITIONER WILLIAMS' CONVICTION AND/OR
SENTENCE IS VOID OR VOIDABLE BECAUSE THE TRIAL
COURT ERRED TO MR. WILLIAMS PREJUDICE WHEN IT
PERMITTED THE STATE TO ARGUE THE NATURE AND
CIRCUMSTANCES OF THE OFFENSE WERE
AGGRAVATING RATHER THAN MITIGATING FACTORS.

SIXTEENTH CLAIM FOR RELIEF

PETITIONER'S CONVICTION AND/OR SENTENCE ARE
VOID OR VOIDABLE BECAUSE OHIO'S DEATH PENALTY
STATUTE IS UNCONSTITUTIONAL.

SEVENTEENTH CLAIM FOR RELIEF

PETITIONER WILLIAMS' CONVICTION AND/OR SENTENCES ARE VOID OR VOIDABLE BECAUSE THE CUMULATIVE EFFECTS OF THE ERRORS AND OMISSIONS AS PRESENTED IN THIS PETITION IN PARAGRAPHS ONE (1) THROUGH ONE HUNDRED SIXTY-SEVEN (167) HAVE BEEN PREJUDICIAL TO THE PETITIONER AND HAVE DENIED THE PETITIONER HIS RIGHTS AS SECURED BY THE FOURTH, FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 2, 9, 10, AND 16 OF THE OHIO CONSTITUTION.