IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CLIFFORD D. WILLIAMS, :

Petitioner : Case #: C-1-99CV438

-v- :

BETTY J. MITCHELL, WARDEN, :

Respondent :

The deposition of DAVID DAVIDSON, taken before Barbara J. Enneking, CVR, Court Reporter and Notary Public in and for the State of Ohio, on the 22nd of January, 2002, at 123 North Third Street, Hamilton, Ohio, to be used as evidence in the above entitled cause of action, now pending in the United States District Court, Southern District of Ohio, Eastern Division.

VERBATIM REPORTING
Barbara J. Enneking, CVR
Certified Court Reporter
8930 Steeple Chase Way
West Chester, Ohio 45069
Office: 513-755-9054
Fax: 513-755-0404
E-Mail: ennekingbj@fuse.net
WWW.VERB8M.COM

ORIGINAL

EXHIBIT 5

APPEARANCES:

FOR THE PETITIONER:

W. Joseph Edwards, Esq.
TWYFORD & DONAHEY, P.L.L.
501 South High Street
Livingston & High Streets
Columbus, Ohio 43215

Timothy R. Payne, Esq.
Asst. State Public Defender
8 E. Long Street, 11th Floor
Columbus, Ohio 43215

FOR THE RESPONDENT:

Norman E. Plate, Esq.
Assistant Chief
Capital Crimes
State Office Tower
30 E. Broad Street
23rd Floor
Columbus, Ohio 43215

- - -

STIPULATIONS:

It is stipulated by and between counsel for the respective parties that the deposition of DAVID DAVIDSON, may be taken at this time by the Petitioner and that the deposition may be taken via Stenomask and electronic recording by the Court Reporter/Notary Public and thereafter transcribed by her out of the presence of the witness.

VERBATIM REPORTING

Page 3

EXAMINATION OF WITNESS PAGE

By Mr. Edwards.................................... 4

David Davidson

D A V I D D A V I D S O N , called as a witness, being first duly sworn, testified as follows:

EXAMINATION BY MR. EDWARDS:

Q Mr. Davidson, good afternoon. I'm Joe Edwards and along with Tim Payne we represent the petitioner in this federal habeas action who is Clifford Donte Williams who at one time was your client back in 1990 and 1991 out of Butler County. The courts have given us permission to ask you some questions. I don't know if you have ever been deposed before in any case?

A I have, yes.

Q Okay. But I know that you've taken many depositions?

A Yes.

Q So you understand all the rules and everything and obviously I know that you won't guess or anything like that and I'm not trying to confuse you. I think most of my questions will be pretty straightforward, so we might as well just begin. Mr. Davidson, could you just very briefly summarize your educational background, your work history leading up to this date?

A Let's see, graduated from high school in 1979 from Hamilton Taft High School. From there I

went to Wittenberg University in Springfield, Ohio. Graduated in 1983 with a Bachelor of Arts Degree.

Went from there to the University of Toledo College of Law, graduated from there in 1986. Came back to Butler County, passed the bar in 1986. Let's see, went to work then after passing the bar with a firm called Baden, Jones, Shepard and Crehan, which would have been in 1986.

I was with that firm through various reorganizations and partners leaving, retiring. One partner went on the bench. When I left there, which was in 1996, it was Baden and Jones law firm. I was a partner. I left in 1996 and started my own firm, Davidson Law Offices here in Butler County and located at 127 North Second and have been there since.

Q If there was a way to describe your practice right now, how would you describe it as far as what type of law you practice?

A Well, I'm Board certified, nationally board certified as a civil trial attorney, so I'm a civil trial attorney. Primary focus is insurance defense work. I handle cases for about a dozen different companies.

Q Okay. And as you can understand, and assume I'm sure, most of my questions will deal with

what took place back in mid to late 1990 and also 1991. So if we could kind of go back about 11 or 12 years. Back in August of 1990 when this case first arose, who were you working for at that time?

A August of 1990, I was a partner with Baden, Jones and Shepard.

Q And if I can remember your last answer, and it's already been a long day, so I apologize, but you mentioned you passed the bar in 1986?

A Yes.

Q So back when you were first appointed to this case, which I believe was right around August, September of 1990, you would have been a lawyer approximately four years?

A Correct.

Q At that time back in August, September of 1990, how would you describe your practice as far as what areas you were working in?

A I would say primarily it was insurance defense work, but back then it wasn't -- today I would say probably 90 percent of my practice is insurance defense work. Back then I'd say probably around 60 percent.

I was doing criminal cases, traffic cases, that type of thing. Prior to that date, the

year before, we had lost a partner at Baden and Jones, Baden, Jones, and Shepard. Matt Crehan, who is now a common pleas judge here in Butler County, Matt had a very extensive criminal practice and I would before that -- he left, I would help him on some of his criminal cases and then after he left I inherited some of those.

Q And is it fair to say that the criminal cases you worked on were -- some were retained, private clients and some also court appointed?

A Yeah. You know, when you first begin your practice a lot of them are court-appointed cases and I guess it's everyone's dream to get away from court-appointed cases. I was fortunate enough that after two years, the firm I was with put me on a partnership track and then the following year, after three years with the firm, because of the number of cases I had tried, they made me a partner.

So I could stay away from court-appointed cases. I think I know where you're going. As far as at the time of this particular case with Clifford Donte Williams, I wasn't actively taking court-appointed cases.

Q This though was a court-appointed case?

A Yes, and there's kind of a story behind

that.

Q Go ahead.

A Yeah? I mean you may want to hear it and you may not.

Q I'm always interested in hearing stories.

A At the time of this case, Judge Elliott was the presiding judge, or administrative judge. I can't remember which one. There had been a boycott in Butler County by death penalty case -- or attorneys.

They had all got together and said they were not going to take them because of the fees being paid. Judge Elliott called me and said we have a death penalty case down in Hamilton Municipal Court. It's up arraignment.

I told Judge Elliott that, you know, I wasn't part of the boycott, but I also wasn't first chair. That I was only certified as second chair. He said why don't you go through the preliminary hearing and hopefully we'll get co-counsel.

So I went down to the preliminary hearing, was bound over and then I talked to Craig Hedric who I went to law school with and said hey, since your first chair, take this one. He got involved in the case and that's how he got involved.

Q All right. That's one thing I didn't realize but -- and I think you mentioned it, you and Mr. Hedric, you and Craig had gone to law school together?

A Went to law school together and we also worked in the prosecutor's office as interns during the summers.

Q You know, one thing we showed Mr. Hedric, and I don't know if your memory is any better. It appears as if there was an entry were Mr. Hedric at one time withdrew from this case but then obviously he got back on the case, and I just wondered if you remember --

A I really don't. You know, it may have been because -- Judge Elliott may have appointed him and he withdrew because he was part of that boycott that was going on and then reconsidered and came back.

Q Got back on the case?

A Yeah.

Q Okay. Now back -- and I think it's fair to say that the events leading up to the charge to this case, the shooting of the cab driver occurred, just so it refreshes your memory, August 3rd of 1990?

A Um-hum.

Q And then the shooting involving Jeff

Wallace occurred August 6th, 1990?

A Yeah.

Q And I guess maybe one question I could ask you is before you came here to testify, did you have a chance to review any documents? Did you review any portion or part of your file or anything?

A No. In fact when I talked to Tim on the phone to scheduled this, Tim Payne, he said it may be helpful if I could find my file. I've looked everywhere and I believe I had given it to the appellate counsel that took over, Al Edmonds that did the 12th District Court of Appeals brief and I think I gave my entire file to him. I have nothing.

Q So it's very easy for you to say you didn't review anything because you have nothing to review?

A No. I'm doing this cold, so --

Q Sure. And again, we have a lot of documents here so, you know, if you need to refresh as to anything. I just wanted to give you some basic dates. The two dates I gave you, August 3rd and August 6th, 1990, does that kind of like ring a bell or does that refresh your memory as to --

A As far as that case, yes.

Q Back when you were appointed to this

case, which would have been let's say August or September of 1990, what type of experience had you had doing either homicide cases, murder cases and then also capital murder cases?

A Okay. I had had probably three or four murder cases before that. This would have been, I believe, my first -- I guess it was my first capital murder case as far as being the attorney involved in the case.

Now I had been on the other side and been the intern for John Holcomb the prosecutor for probably four or five aggravated murder cases over the years, and that was the first that I was the second chair in an aggravated murder case for the defendant.

Q And I know back then, because I was also practicing, to become qualified either first or second chair you had to attend -- well, I believe at that time it was called like a Rule 65. I think it's now changed to Rule 102, but I think it's Rule 65 seminar put on by the state public defender's office or some criminal defense attorney group. Do you recall that requirement first off?

A Yes.

Q And do you remember going to such a seminar?

A Yes. I was certified by the Supreme Court.

Q Okay. And it's safe to say that you were appointed by Judge Valen in this case as second chair with Craig Hedric being the first chair?

A Correct.

Q And I'd just kind of like first off maybe talk a little bit about -- strike that. Let's talk about Judge Valen a little bit. What was your relationship prior to the appointment with Judge Valen?

A Very good. In fact the first trial that he had as a judge, when he took the bench, was a civil case which I tried in his court room. So I kind of had a very good relationship with him and still do.

Q He's on the Court of Appeals now; correct?

A Yes.

Q What did he do, just for curiosity sake? What did he do before he ascended to the bench?

A He had a general practice up in Middletown with -- in a small community a general practice is everything. So I think he covered all the bases. I believe at one point he was a prosecutor in either the Middletown Municipal Court or another court years ago.

Q Okay. Did Judge Valen or his bailiff or secretary specifically call you for this appointment or was it Judge Elliott's office?

A It was Judge Elliott's office and it was his secretary called me and said the judge needs you to cover this. And to be honest with you I was reluctant.

I had to go to my partners and tell them I was taking a death penalty case because you know going in on those it's going to take probably two to three months out of your life, concentrating just on that case for a whopping $1,200 fee. So I had to check in with my partners to get their blessing before I agreed to do it.

Q So Judge Valen didn't have to reappoint you when the case was assigned to him?

A No.

Q He just agreed to allow Judge Elliott's appointment to continue with his case?

A Yeah, and I think normally, as the case was back then, it is the judge who had grand jury that month was the judge who would assign court-appointed counsel in cases, and I think Elliott had grand jury so he had the authority to appoint.

Q As far as you know from conversations,

obviously you don't know what was in Judge Valen's mind, but he had no problem with you continuing on the case?

A No. No.

Q We'll talk a little bit about fees. I'm not sure if I caught the exact number, but what was, from your memory, the fee, the top fee that could have been earned by someone like yourself and Mr. Hedric in a capital case?

A I'm not sure if it was $1,200 or $2,500.

Q But that was the cap in Butler County?

A That was the cap, yeah.

Q And I understand that was perhaps part of the boycott that the defense bar thought those fees were too low?

A Yeah.

Q What was the hourly rate, if you can remember?

A I think it was $20 out of court, $30 in court.

Q Okay. And without getting into too much personal stuff, you don't have to give me the exact hourly rate, but back then when you were doing insurance defense work, can you give me just an

approximation of what you would bill per hour?

A I think back then it was either $65 or $75 an hour.

Q Okay. So it was double or sometimes maybe three times, or maybe even four times what the capital case would bill?

A Yes.

Q Going into a case like this, would judges routinely grant what sometimes we call extraordinary fees or were you pretty much limited to the cap?

A We were limited to the cap.

Q Let's talk a little bit about the role between you and Mr. Hedric, and obviously you're both attorneys for Mr. Williams; correct?

A Um-hum.

Q Did you have any discussion ahead of time as far as who would do what as far as working to prepare trial versus mitigation?

A I can't recall that. I really can't. I think we both decided we were going to prepare for the trial, and the mitigation at the same time, but I can't recall that.

Q And let me just kind of as an aside, I realize, in fact I think that when we deposed Mr.

Hedric last week it was 11 years ago when the mitigation hearing was going on, or there abouts.

So I understand I'm asking you questions of something that took place 11 years ago, so I realize it's not something that, you know, happened a year ago or last week. So I understand there might be some difficulty remembering things.

Let me talk about this. Is it fair to say that one of the differences in a capital case versus a non-capital murder case or rape case is that in a capital case you may have what's called a second hearing or a mitigation hearing?

A Yes.

Q What's your understanding as far as the purpose of the mitigation hearing?

A My understanding now or then, which is probably still the same?

Q Yeah. Yeah.

A Well, my understanding was the worst thing you ever wanted to have is the mitigation hearing because your client had been found guilty of aggravated murder. At that point your purpose is to save your client's life by any means possible.

Q And back then, what was your understanding as far as things that you could present

as mitigation during the hearing, during that second phase hearing?

A Mental illness, family life, things that tend to show -- put the defendant in a light, almost to show sympathy on his part, by how his life had developed, in this particular case.

I think in this particular case we were trying to focus in on mental illness more than anything else. With what little time we had.

Q Back then, did you understand what a mitigation specialist was?

A Yes.

Q And back then, what was your understanding of why attorneys like yourself and Mr. Hedric would want to use a mitigation specialist?

A They were more -- well, they were specialists. That had more means of developing the information we needed, to consult with us, to tell us what would be favorable things to use in trial for our client, to be able to go out -- they have resources available to them to go out and get witnesses, to do background checks on our client, to find people to bring into court to help with the mitigation.

Q So your understanding was that a mitigation specialist was somebody who could assist you

and Mr. Hedric in the event that Clifford had been found guilty and then the case would proceed to what we sometimes call the penalty phase?

A Yes.

Q If you can remember, the mitigation specialist and the concept of that, was that learned during your seminar that you attended or was it from talking with other attorneys?

A Both. The Rule 65 seminar that I went to, I mean they harped on that. I think I went to two of them, but the last one I went to was up in Cleveland. They harped on that very much on the mitigation specialist and the need for it. So that seminar was probably within the year prior to this trial.

Q And let me ask you this question. Was Mr. Williams's death penalty case, capital case, was that the only case that you've done that was a capital case?

A Up to that point in time or sense, too?

Q Up to that point time I think you said that was the first one you did as a defense counsel. Since that, have you done any others?

A No, because of that case. When your client is sentenced to die in an electric chair, I had

no desire to be in that situation. You know, the type of practice I have, I deal with money.

You can sleep better at night when you're dealing with money than someone's life, and I just made a conscious decision after that I wasn't going to renew my certification. I didn't want part of the process any more.

Q Okay. Going into the representation of Mr. Williams in this case, did you believe a mitigation specialist was something that you should have to effectively represent him?

A Yes and no. Yes in the sense that it would have been a great tool to have, but I felt that we could still represent him effectively without it but it would just stretch our resources quite thin and put us behind the eight ball going in but, you know, we could still affectively prepare a defense and do what we had to do, but would it have been a Cadillac defense or mitigation as opposed to, you know, a Ford defense. You know, he didn't get the benefit of a Cadillac, no.

Q Do you know if you and Mr. Hedric ever approached Judge Valen for a mitigation specialist?

A Yes.

Q And do you know in what part of -- strike that. When during your representation did you

and Mr. Hedric approach the judge for monies to hire or to retain a mitigation specialist?

A Sometime prior to trial.

Q I think we can all agree that my records are correct here. The trial began, voir dire began, January 3rd of 1991. I believe it lasted approximately two days. Is it fair to say then that you would have approached Judge Valen prior to January 3rd of 1991 and asked him for funds for a mitigation specialist?

A Yeah. I recall that either in November or December, or maybe even prior to then, there were probably six or seven motions we filed. I think one of those was for a mitigation specialist.

Q Do you recall what his ruling was on that motion?

A Either he denied it or he took it under advisement and I recall him telling us we were putting the cart before the horse, that we hadn't been through the trial yet.

Q What were your thoughts on that type of reasoning?

A Mixed because he kept -- we kept scheduling everything with a mitigation hearing in mind, and we started the trial date on a certain date

so that if the jury came back on a certain date that we could go right into the mitigation the following Monday, and I guess my thought was if, you know, he's already thinking there's going to be a mitigation hearing or a probability or even a possibility, then we should be able to prepare for it. That was my thoughts at the time.

Q Let me ask you this question, if you can remember. From the date of your appointment, which I know is part of the record somewhere, but I think it was sometime in August or September of '90, from that date until the beginning of the trial, which was January 3rd of 1991, do you recall what you and Mr. Hedric did, if anything, to prepare for a potential mitigation hearing?

A Yes. I mean we met with family members. I remember Craig and I going through a detailed history from birth until the time of the crime with Donte's mother, meeting with the grandmother, an aunt, because we had learned in talking to them that Clifford had been in some type of youth detention center out in California.

It was a camp, and we were trying to get information on that. So the psychological aspect we didn't start until after the trial itself, but as far

as mitigation, as far as family members, the life of Clifford Donte Williams, the fact that he didn't know his father, that type of thing.

We started developing that early on, but that went along with our investigation into the crime itself. When we would go out and talk to his mother about when did you last see Clifford this particular day, you know, we spent time talking to her and the grandmother about Clifford.

Q Do you recall when during your representation of Mr. Williams you first thought that he might have some type of mental problem?

A I think it would have been probably around the time that we spent talking with his grandmother, I believe it was, or it may have been his mother, just about the problems he had had out in California, his type of temper, the type of activities he was involved in.

In the back of my mind, I thought there may be some mental problems there, but I wasn't convinced that there was, but that would have been about the time probably in talking to family members that just -- it wasn't clicking right. Something wasn't right with me.

Q Would it be fair to say that it was

early in your representation or was it nearer to the actual trial date when --

A Probably closer to the trial date itself. I would probably say November. I'm trying to think in my mind. Craig and I spent some time out in the housing project where Clifford was living at the time, and I can't remember the date of that.

That was when I first started to get a feeling there may be something there, but mind you, I mean I met with Clifford on a frequent basis. Very nice young man, very articulate. I mean didn't give any impression that he was mentally ill.

In fact, after meeting with him on the first maybe four or five visits I was amazed that he was even part of a gang out in L.A. I think he was a Crip or a Blood.

I can't remember which one but it kind of of amazed me that he was even involved in that, but he didn't give the impression talking to him, his background, events, that he was mentally ill. That came out from the parents.

Q Now during this time period from going to Rule 65 seminar and also talking with other lawyers, you understood that psychiatrists or a psychologist could be used during a mitigation hearing?

A Correct.

Q Do you recall if you and/or Mr. Hedric ever approached Judge Valen before the beginning of trial and requested funds to retain some type of mental health professional to evaluate your client?

A I think we did. I mean I can't say without looking through the entire file if there was a motion filed or not. I do remember asking for funds to go out to California to interview people, and that's why we, you know, told the judge we needed funds for that and needed more time between the mitigation and the trial date so we could have time to send one of us out.

That's why we needed the mitigation specialist. That was part and parcel with our argument on a specialist, but I think at that time we had asked for a psychological examination.

Q Do you recall what Judge Valen's response, his ruling was to that request?

A The ruling was to wait until we got to the mitigation phase.

Q I think the record would reflect that a day after the verdict, which the verdict was January 10th of '91, January 11th of '91 is when Clifford was taken to Dr. Weaver's office and an interview took

place. Does that refresh your memory to some degree?

A Yeah, and I think I either during the trial phase itself or maybe before the trial contacted Dr. Weaver who I had used. He's a forensic psychologist or psychiatrist, excuse me, that I had used in the past.

He was very good and I called and asked him if he could get involved in this case and he said he would. But we had no funds up to that point.

Q All right. Let me ask you this. Is it fair to say that you would have desired or you would have wanted funds prior to the beginning of trial for Dr. Weaver to evaluate Clifford?

A In the sense that yes, that if we went to mitigation hearing, that it would have been already completed and we would have had more time to prepare for the mitigation hearing.

By the same standpoint, it put the prosecutor I believe, if memory serves me correct, you know they didn't have their examination until afterwards. You know, until after the trial phase, too, or maybe they did.

I honestly can't remember if Judge Valen let them have the defendant examined before even the trial phase or not. But it would have helped --

getting back to your question, it would have helped, yes, if we would have been better prepared going into the mitigation. Would it have helped us in the guilt phase, no.

Q You had previously worked with Dr. Weaver?

A Yes.

Q So you had a good relationship with him?

A Yeah, I felt I did, yeah.

Q If the judge had granted your request for monies, would you have had Dr. Weaver evaluate Clifford before the beginning of trial?

A Yes.

Q One thing you mentioned which I'm a little bit confused about. Now, in civil cases there's a thing called an IME; correct, an independent medical exam?

A Yes.

Q Or what plaintiffs' lawyers call the defense medical.

A Yes, independent evaluation, yes.

Q Now, you understand that in a capital case, the state doesn't have a right to have the defendant evaluated themselves by a psychologist;

correct?

A Correct.

Q And that's where I'm a little bit confused when you mentioned about the state's evaluation. Could you explain that a little bit clearer.

A Yeah, and I thought that the prosecution in that case, since we had identified Dr. Weaver as our psychiatrist in the case, had asked for an examination. Now I may be mistaken. Without having the file here I can't remember because, you know, there's been cases in the past that I've handled that were not guilty by reason of insanity.

Of course they're entitled to them there, but without sitting down and reviewing the court file, I couldn't tell you whether or not they had one or not.

Q That's fine. Do you remember the request for the mitigation specialist, was that done on -- when you said Judge Valen denied that request, was that done on the record or was that done back in chambers?

A Oh, if it was in chambers he would have done it on the record. He had a microphone on his desk that he did a lot of the hearings in chambers was on

the record, but whether or not he went on the record at the time, I can't recall. I just remember being denied.

Q Then in likewise fashion, when you requested funds for a psychologist or a psychiatrist, I think you mentioned that Judge Valen didn't want to put the cart before the horse and denied that also until after the verdict came back?

A Yes.

Q Do you recall if the denial of the psychologist, psychiatrist, mental health expert, whatever you want to call it, was that done on the record or was it done back in chambers?

A I couldn't tell you.

Q Let me ask a question. I mean as far as the procedures with Judge Valen, when the judge would allot funds for an expert, like let's say $1,500 for a mitigation specialist, if he would ever do that, would you just go back there with like a piece of paper that was an entry saying the judge hereby grants the defense $1,500, the amount of $1,500, you would just take that back in chambers and he would sign it or was everything with requesting funds on the record in court?

A I think we would submit a motion and

then if he granted it, there would be an entry prepared. Either he would prepare the entry himself or Craig or I would have prepared the entry.

Q And you understand what I'm saying. It's like some judges allow attorneys routinely -- they'll just sign orders and sign entries. In this case, do you ever remember going to Judge Valen with a entry that was like ex parte, you didn't want to let the State of Ohio know you were doing this to get funds and the judge just said no, I'm not going to do that until we know for sure we're having a mitigation hearing?

A I can't recall. I really can't.

Q When you made the request for a psychologist and a mitigation specialist, were those done, if you can remember, ex parte meeting without the state being present or was the state present when those requests were made?

A The state was present because we had asked for other experts too at that time. There was a ballistics expert, which he did grant.

Q Now, let's talk a little bit about the facts in the case. I'll jump back to mitigation after we go through some of the facts and some of the pretrial issues.

To me what's a little bit different about this case, of course every case in and of itself is different, but there were two separate incidents, two separate dates?

A Um-hum. Jeff Wallace and --

Q The cab driver?

A -- the cab driver.

Q The cab driver was August 3rd of '90 and he was found shot and killed and Jeff Wallace incident was August 6th of 1990?

A Yes.

Q Now if I mention Jeff Wallace to you, I mean can you actually -- just so I get a framework of what you remember, I mean do you actually -- can you actually picture him in court testifying?

A Um-hum.

Q Was there attempt by you and Mr. Hedric to get those two cases, those separate charges against Mr. Williams, severed for trial?

A Yes. I was very adamant about that.

Q Why in your opinion was it so important to get those cases severed for purposes of trial?

A Well, for two -- I didn't think they were related offenses. I felt that the Wallace case could prejudice Clifford in both the guilt phase of his

trial and if we ever had to go to a mitigation hearing because then you have a jury sitting there thinking okay, we have a guy who murdered this taxicab driver and then three days later tried to kill someone else.

From that standpoint I didn't want that. The second was is the prosecution couldn't make a case in the murder case without the Jeff Wallace ballistics in that case. So from a strategic standpoint, I wanted that out and we would have fared I think maybe a little bit better in the guilt phase had we not handle the Wallace in there.

So those were my two ideas right there. I just thought it was prejudicial for Clifford, both in the guilt and the mitigation to have that Wallace in there.

Q Did it concern you, some of Mr. Piper's arguments, that this second incident made it look like Clifford had a pattern of doing these kinds of things?

A Yes, and that's what I told the judge that -- one of the reasons why we didn't -- they shouldn't be together, why they should be separated because of this pattern.

You know, that he was trying to show that Clifford was, you know, this deranged guy going around shooting everybody. And that, you know, I

remember saying to the judge something that that -- we don't have anything to show anything before hand.

You know, we have this one isolated allegation afterwards and, you know, Piper wants it in to make his case in the murder case. He could care less what happens in that second case, if he's acquitted or not in that one. He needs that to get him convicted of aggravated murder.

Q And aside from how it would affect the trial phase or the guilt phase, did you have any concern about how that would affect if Clifford was found guilty during the mitigation phase?

A Oh, yeah.

Q Okay. Explain that, please?

A I think I did a moment ago.

Q Okay. I apologize. I'm sorry.

A Yeah, that's fine. That a jury would just think that we had this madman going around shooting everybody. Here he's convicted of murder and then three days later he shoots this guy who was, you know, he is buying crack cocaine off of or selling crack cocaine.

Q So that could somehow undermine your plea to the jury to save this young man's life?

A That it was an aberration, you know,

that this wasn't Clifford Donte Williams, yeah.

Q I asked you some of the things that you -- some of the arguments that you made to get this case severed?

A Yeah.

Q And obviously Judge Valen denied that?

A Correct.

Q The cases were tried together?

A Correct.

Q Let me give you some facts and ask you if you feel that if these facts had been known by you, how if you -- number one, think they would have been important in how you could have used those to argue for severance.

One, is let's assume that Jeff Wallace is now saying that he was actually that night trying to rob your client, Mr. Williams, not the other way around. Do you think that's something that would be important to argue for severance?

A Yes.

Q How so?

A Well, on the murder charge or on the felonious assault charge, you know, I think it makes it better for the felonious assault charge. Here's a guy who is trying to defend himself and is being robbed and

that type of thing, and the murder charge itself, still here's a guy who's out -- because I remember, I believe the allegation was there was a crack deal going down or some kind of drug deal.

Still the jury -- I wouldn't have wanted them together because the fact that there was a drug deal and guns involved, it still doesn't paint that picture of an aberration on Clifford's part.

Q Right. It also makes it look like it's less of a pattern. It makes it look like it's a completely separate incident. Is that fair to say?

A Yeah, well from that standpoint I may have wanted to have kept it in there to say that here's a guy who was being -- you know, but had I known Wallace was trying to rob him, I could have almost turned it around and say it was Wallace's gun, you know, that type of thing. You know, too many factors involved for me right here to --

Q But the fact that if you had known that Jeff Wallace was actually looking to rob somebody that night for crack cocaine, I mean that's something that you would have wanted to know --

A Oh, definitely.

Q -- in preparing your client's defense?

A Definitely.

Q It's not just a minor point. It's something that you would consider very important?

A Very important and especially in light -- if in fact he is saying that or had said that before the trial, it would have been important to know for impeachment purposes because he was a key part in the prosecution's case as far as this -- like I said, they used that incident to tie Clifford to the murder.

Q I'm going to be jumping ahead a little bit at this time, but you understand from doing some criminal work in your career that a prosecutor has a duty to provide certain exculpatory or Brady material?

A Yes, and we filed a Brady motion in that case.

Q If the prosecutor had known that Jeff Wallace was the one doing the robbing on the night of August 6th, 1990, in your opinion, is that something that he should have turned over to you and Mr. Hedric?

A Yes.

Q It's something which you believe would have been material to your defense?

A Yes.

Q Let me ask you this question. If you had known that Jeff Wallace had been smoking crack cocaine that entire day, and was high on crack cocaine

the night of August 6th, 1990, would that be something that you would have wanted to have known in defending Mr. Williams?

A Yes.

Q Why is that?

A Well, for one thing, he identified Clifford Williams as the person who shot him. Crack cocaine could affect your ability to, you know, perceive and observe and yeah, I think it would have been important to know.

Q He's also the one who said Clifford had the gun?

A Yes.

Q And who had the gun and how you tie the shell casings to that person was crucial in this case?

A Yes.

Q Aside from arguing for severance, would you have used Jeff Wallace's crack induced condition on the night of August 6th, 1990, to cross-examine him with during trial?

A Oh, yeah.

Q Do you think that's something that would have been very helpful for you or Mr. Hedric to argue to the jury that Jeff Wallace should not have been believed?

A His credibility and his ability to perceive, yes.

Q If the State of Ohio either through the prosecutor's office or its agents, i.e., law-enforcement officials, if they had known about Jeff Wallace being high on crack that night, do you believe that's something that they should have turned over to his defense counsel?

A Yes.

Q Okay. Do you think that's something that would be material to you and Mr. Hedric doing the best that you guys can do to defend him?

A Yes.

Q Do you recall at some point in time -- strike that. If I use the phrase motion to suppress identification, as it's used in the criminal context, do you understand what I'm talking about?

A Um-hum. Yes.

Q And just so the record is clear, just give a brief summary of what your understanding as to that motion would be, or the purpose of that motion, I should say?

A The motion to suppress the identification?

Q Yes, of a state's witness? Of a

state's witness?

A Of a state's witness?

Q Sure.

A The purpose of that is that there was something that either wasn't a fair lineup or pictures presented or that there was something that was defective about the witness's ability to perceive or to see whatever they were supposedly identifying.

Q Right. What you're basically arguing as a defense lawyer, the buzz words are it was unduly suggestive --

A Yes.

Q -- in some way, so as a result of whether it's a photo array or whether it's an actual lineup, that identification made by the state's witness should be suppressed?

A Yes.

Q Okay. Now in this case, do you recall if there was an identification made during a show up -- not a show up. I'm sorry, a lineup that Jeff Wallace made?

A I believe there was, and I believe I was present for that.

Q And do you remember if you or Mr. Hedric filed a motion to suppress that show up, show up

or lineup? I keep using show up. I think I'm incorrect. It's actually a lineup.

A Yeah. I can't recall.

Q Do you ever remember trying to subpoena Jeff Wallace to pretrial hearings before Judge Valen but being unable to get him to show up?

A I don't recall.

Q Let me ask you this question. You did file for discovery in this case?

A Yes.

Q Part of the discovery that the state is required to give you are the names and addresses of its witnesses?

A Correct.

Q Okay. As far as your understanding of the rules, if a witness for the State of Ohio changes his or her address prior to the start of a trial, is it your opinion that the state should notify the defense by way of a letter or supplemental discovery of the new address so that the defense can either interview that witness or subpoena that witness for pretrial motions?

A Yes, if they're identifying that witness, yes.

Q Do you think it's improper for the state not to notify the defense of an address change of

a witness that the state knows the defense is trying to subpoena for purposes of a pre-trial motion?

A If the person has picked up and moved to a new residence and the prosecution knows about it, yes.

Q So basically if I'm a prosecutor in the State of Ohio and I know that Craig Hedric and David Davidson are trying to subpoena a witness at a certain address that I gave them in discovery --

A And I know is wrong.

Q -- and I know that address is wrong, they're at a drug rehab center in Columbus, it's improper for me not to tell you folks --

A That's different, because what's --

Q Go ahead.

A -- I guess if you had told me that Dave Davidson and Craig Hedric are defending a case and I'm the prosecutor and I know that a person has changed residence and has moved to a different residence, it's different than someone being in a hospital because his residence is still there.

So technically that's different, but I guess if I was a prosecutor I could say okay, that's still a valid address. That's his domicile. That's his residence. He's temporarily in this rehab, that's

a little bit different.

Q Okay. But if I know that you have not properly served him nor can you serve him at his residence because he's somewhere else --

A Are you required to, no, but in fairness, yes.

Q That's fine. Good. Let me ask you this question. I know we've been over this, but again I just want to kind of bring it in as we talk about this fellow a little bit more. Jeff Wallace, is it fair to say he was a crucial witness for the State of Ohio in this case?

A Oh, yes.

Q And you would have had a much better chance of winning this case if Jeff Wallace had not testified?

A Yes.

Q Okay. Do you -- go ahead.

A Well, that's why I wanted that motion to sever so bad, and I believe that would have been the first motion I filed. I mean that's one of the better feelings I have about that whole case because I felt that that testimony was so crucial from a the defense that happened later, that in fairness it should have been severed, and I felt real strong about that motion.

Q I don't want to put words in your mouth. I know as a good lawyer, you won't Let me, but is it fair to say that as you look back, that one of your disappointments or frustrations is that you think that the jury convicted Clifford not so much because of the first incident but because they were sure of the second incident?

A Yeah. Yeah, because if you look at it, we spent more time on the ballistics comparing Wallace's bullet with the one at the crime scene, and the one taken from the body. I mean we spent significant time. So yeah, I mean we had a better chance without him there.

Q Do you recall if you cross-examined Mr. Wallace at trial or did Mr. Hedric?

A I can't remember.

Q That's fine. Obviously one of the goals that you had, and one of your theories of defenses was that Jeff Wallace should not be believed. He's not a credible person?

A Yeah, I do remember that.

Q And is it fair to say that one of the ways that you would cross-examine a witness like this, one of the theories would be to bring up a criminal record?

A Most definitely, yes. Or the fact that he was high on crack cocaine or any of these other factors, yeah.

Q I believe that during the trial that Jeff Wallace admitted that he had been convicted of two prior felonies from the State of Florida. Do you recall him having a criminal record?

A No. I don't remember that.

Q The fact that he was actually -- he actually had been convicted of four previous felonies, not two, is that something that you would have gone into, you or Mr. Hedric, in your cross-examination of him?

A Yeah. I mean it depends on if he had two felonies in distant time, and Florida -- and then we found out that, you know, five or six years later he had two more convictions or that they're spread out over a period of time, you know, we would have spent a lot of time on that to impeach his credibility to show that this guy is a bum that, you know, he's a criminal and will always be a criminal. Why believe him.

Q If you had known that Jeff Wallace, after the August incident, but before his testimony at trial, had picked up other felony offenses in Franklin County, is that something that you would have

investigated and looked into to attack his credibility?

A Most definitely. If it involved drugs or use of a firearm, you know, because that -- again they were using Jeff Wallace to put the gun in Clifford's hand at the time of the crime three days before the Wallace shooting.

Q The fact that he had been in a drug rehab center before trial and actually during trial, due to a severe addiction to crack cocaine, is that something that if you had known about, you could have used to support your argument that he was a drug user. He was on drugs the night of August 6th, 1990, he should not be believed?

A Yeah. I might even have taken it a step further and say he was on August 3rd when he shot the cabby. I mean so many different things, if you have that affirmation, could come in.

Q Let me ask a question. As a criminal defense lawyer or even as an insurance defense lawyer today, do you sometimes when you cross-examine witnesses go after say reasons why they might be willing to lie or be dishonest?

A Yeah.

Q I mean sometimes in civil cases because they stand to make a lot of money?

A Yeah.

Q As a criminal defense lawyer, did you ever cross-examine a witness about them trying -- that maybe they were helping the State of Ohio out because they were looking for some kind of a deal in their own cases?

A Yes.

Q Okay. Let me ask you this question. If you had known that not only that Jeff Wallace had picked up other felonies after the August 6th incident but before trial, but also had been calling Mr. Piper from the Franklin County jail begging him, you know, get me out of here, get me out of here, I'll help you out, I'll do whatever I can, if you had known that was taking place, would you have used that to cross-examine him with at trial?

A Yes.

Q If you had known that Mr. Piper had promised Jeff Wallace that he would get some kind of monies for victims of Crime Compensation Fund, if he assisted the State of Ohio during this trial, would you have used that to cross-examine him on?

A Yes.

Q Okay. Whether it was getting a deal on pending criminal cases, whether it was getting out of

the Franklin County jail, whether it was getting victims of crime's money, is this something that you feel you could have used to attack his credibility at trial?

A Yes.

Q Is it something that you feel the State of Ohio, upon learning this information, should have under Brady turned over to the defense?

A That's kind of a gray area.

Q Okay. I understand that.

A I can't say either way. Out of fairness, yeah, tell us about it.

Q Sure. Do you feel that it would be something that would be material in your cross-examination and your attack upon Mr. Wallace's credibility?

A Oh, yeah, most definitely.

Q And I mean is it fair to say that when -- well, I'll use a term because it seems like your entire legal career you basically been a trial lawyer?

A Yes.

Q And if I use the phrase theory of defense, you understand what I mean?

A Yes.

Q Is it fair to say that at least during

the guilt phase -- I like to call it the trial phase, but that during this first part of the capital case, that one of your theories was ladies and gentlemen of the jury, do not believe Jeff Wallace. He has no credibility?

A That coupled with he didn't do it.

Q Right. And sometimes -- it seemed like in this case at some part that went hand in hand?

A Absolutely. Yeah.

Q If you had known some of this information which I've gone into, do you think you would have made an argument to the jury that maybe Jeff Wallace was actually the shooter of the taxicab driver?

A Yeah.

Q Do you feel that you could have made that argument in good faith and could have presented a good argument to the jury with that regard if all this other information which I've given you, if you assume that to be true?

A Yes, because you have someone who is out looking to rob someone. You know, the cab driver was killed over money. You have someone who has been smoking crack cocaine, who admits that he robbed -- was out looking to rob somebody and was trying to rob Donte Williams at the time, Clifford Williams.

You know, it could be easily made, the argument that yeah, he's the one that shot the cabby. I mean it was his gun and --

Q Let me ask you this question. I'm just going to jump back to this issue of mitigation. Aside from -- I mean obviously you and Mr. Hedric were primarily working on preparing for trial and also do some work on mitigation --

A Um-hum.

Q -- up to this January trial date?

A Yes.

Q I believe the record indicates that at some point in time you may have had an investigator that assisted you?

A Yes. I'm trying to remember who that was that we had. I think we did retain one and I can't remember who it was.

Q If you can remember, what did the investigator do?

A I can't remember.

Q That's fine.

A If I could remember who it was I could probably tell you. If you could tell me who it was.

Q You know, I'm not trying to -- I don't know off the top of my head, but I see that my

assistant, Mr. Payne here, is looking, so he will probably find it much better -- his records are better than mine, but let me ask you this question. Was the investigator, if you can remember, was he working on mitigation or was he working on trial issues?

A I think he was trying to locate witnesses for us.

Q For trial?

A For trial.

Q Okay. Is it fair to say then -- Michelle Samuels?

A No. I think that was the person we wanted for a mitigation specialist.

Q She's the one for mitigation. Okay. Is it fair to say that other than you and Mr. Hedric, there was no other person that came on mitigation type issues as you were nearing this January 3 trial date?

A Correct.

Q And if memory serves you correctly, and I think the record -- the transcript indicates this, the psychiatrist, Dr. Weaver, did not interview your client until after he was found guilty of the indictment?

A Correct.

Q And that would have been the day after

the jury trial?

A Correct.

Q And now in the transcript -- and then also we had the pleasure of taking Mr. Piper's deposition. Apparently something took place after the guilty verdict was read during the trial phase, which sometimes isn't unusual.

The defendant acts out. Do you recall anything that happened, like did Clifford yell and scream or was there anything --

A See I thought that was after the --

Q Maybe I'm wrong.

A I thought that was after the penalty phase when they came back with the recommendation for death that he -- in fact, I know it was because I remember getting down and telling Clifford there's still an appeal, watch yourself, because he had screamed out I'm going to kill you, you son of a bitch, and he went towards Robin --

Q Who did he say that to?

A Robin Piper, and he went towards the prosecutor's bench or table and then the deputies took him down and then we sat there and talked to -- you know, tried to calm him down.

Q Did you talk to Mr. Williams after the

guilty verdict in the trial phase?

A Yes.

Q Without going into what was said, was he depressed, was he down over the fact that he was found guilty?

A Yes.

Q Now as an experienced trial attorney, what's your opinion about having a client who has just been found guilty one day, less than 24 hours later, going to see a psychiatrist who is trying to gain information from him in hopes of saving his life?

A It's not an ideal situation at all.

Q Well, why would you say that?

A Well, because they're distraught over the fact that, you know, they've been just convicted of aggravated murder and the fact that, you know, just the day before disappointed, scared, that type of thing, and, you know, try to put yourself in that situation. The whole world is just spinning and, you know, it's a short period of time.

Q I'm sure that even you and Mr. Hedric were somewhat depressed. I mean you guys thought that you had a legitimate chance of winning the case?

A Yeah. If we weren't disappointed, then there was something wrong. Yeah, I mean --

Q Sure. And just so I understand this correctly, because I read this in the transcript, and this was a little bit unusual because usually like in Franklin County, where I'm from, the psychologist or even a psychiatrist will go to the defendant in the jail.

Is it your memory, sir -- you correct me -- that Clifford was actually taken from the Butler County jail and actually taken to the psychiatrist?

A I can't remember. Wouldn't surprise me though.

Q That would not be an unusual process or procedure here in Butler County?

A Not with a psychiatrist, no, because they -- with Dr. Weaver, he has I think a two hour test that he performs, and these -- under ideal circumstance -- or environment, that type of thing. So it wouldn't surprise me.

Q Sure. And he's actually a medical doctor, so maybe his time is a little bit more valuable so Clifford -- it wouldn't surprise you if Clifford was actually taken to him?

A No. I mean, but if you think about it here you have someone who is just convicted of aggravated murder and you're putting him in a vehicle

and transporting him somewhere. It doesn't make much sense.

Q Right. Do you recall if you had Dr. Weaver talk to any family members of your client?

A I'm not sure. I mean I remember -- it was either his mother or his grandmother or both, and aunt, were very involved with us, as much as they could be. Whether or not Dr. Weaver talked to them or not, I can't recall.

Q Okay. I want to show you volume 11 of the transcript and it's page 12 and 13, and it's just very short. I've underlined it in pencil, but it appears as if this is the beginning of the mitigation hearing which is dated January 17th, Thursday. So it was a week after the verdict came back of guilty and I just wonder if you could take a look at that and read it?

A Okay.

Q Does this refresh your memory as to what took place at all before the mitigation hearing?

A Yeah. It really refreshes my recollection that we had asked for a mitigation specialist back in September and Judge Valen had told us to get -- to prepare for mitigation even though he had told us we didn't need a mitigation specialist,

prepare by getting a psychiatrist or psychologist which we would be required to turn over the report to the prosecutor, because there had been some debate back then, you know, about a report floating around. That kind of refreshes my recollection.

Q And just so I understand that, and we'll go back into this in a second. I mean just so everybody knows, I won't be much longer. Maybe 15 or 20 more minutes with Davidson. I'm going to speed things up here, but is it your understanding back then that if you had been given funds for a psychologist to evaluate your client that you would have had to have returned that report over to the State of Ohio, or is that something that Judge Valen said, you know, if I give you money for an evaluation you're going to have to turn that over?

A I think there was some debate back then about it, based on the -- reading that transcript there. I can't recall.

Q But this does refresh your memory that you did ask for a mitigation specialist in September of 1990 when you were first appointed?

A Right, and it was denied.

Q It was denied by Judge Valen. And it seems here that right before the mitigation hearing

you're saying that you object to the proceedings because we, meaning you and Mr. Hedric, did not have adequate time to prepare for the hearing?

A Yes.

Q Could you explain that a little bit further as to what, as you look back now, what you meant -- you know, what did you mean by saying that. What had you wished you could have done to better prepare to go into this second phase?

A One of them would have been to talk to counselors and other people that Clifford interacted with, teachers out in California, because he spent most of his childhood out there, to explore that more.

Based on some -- and I just remember -- and I can't remember the exact conversation I had had with Dr. Weaver, that he felt that we needed to explore a little bit of his childhood a little bit more. You know, just preparing for the mitigation because I remember telling Craig that that's the reason why we wanted that specialist to help us -- you know, an investigator to pinpoint all those things and get that information. And then that's --

Q Was any attempt ever made to go off to California or you or Mr. Hedric or get somebody to go out there to talk to the California part of the family?

A Well, we were given permission for one of us and we were told to decide between the two of us who was going to fly out on Monday, but be prepared for trial on Wednesday or Thursday morning. I forget which morning it was.

Q It was to be prepared for trial or for the mitigation hearing?

A For the mitigation hearing.

Q Okay. So is it safe to say then, or is it fair to say, that Judge Valen was not going to permit anybody to go out to California and interview family members for mitigation until after there was a guilty verdict?

A I don't know if that's fair to say or not. I'm not sure if he was asked before. You know, we could send an investigator or Craig or I go out before the trial portion of it.

Q Well, let me ask you this question. Is it fair to say that before the trial began in your conversations with your client and with his family members you knew there were potential mitigation witnesses out in California?

A To a lesser degree than we did after the guilt phase and in talking with his mother and grandmother, but yes, I mean there was the potential

out there.

Q I mean is it your understanding that Clifford had spent the first 10 years of his life in California going to school out there?

A Yeah. And I knew from talking with him that he was either a Crip or a Blood, that there had been some type of problems out there.

Q Okay. It seems from the record that a decision was made that neither you or Mr. Hedric would go out to California?

A Yeah.

Q Was that because of just the essence of time and trying to prepare for the hearing coming up?

A Yeah. We couldn't afford to have one or the other out of town. It might have -- during that period of time, you know, Craig was at my House probably -- my office every day, at my house every night.

Thank God my wife likes him or I would paid the price, but Craig, you know, in just bouncing things off of each other, trying this angle, trying that, we would spend some time going out talking to other attorneys who had just had aggravated murder cases in the last year and went through the mitigation phase and pick their brains.

Q I noticed in reviewing the transcript, other than some juvenile records that perhaps the State of Ohio used to cross-examine Dr. Weaver, there were no other records introduced?

A No.

Q Were there any attempts by you or Mr. Hedric to obtain any type of school records or any other like social services or children services records from either California or from Ohio?

A No, because I don't think we had the time to do that.

Q And just so I can add on to that, I mean October, November, December you guys are gearing up for trial. I mean --

A Yeah, and I had had surgery during that period of time, too. Back in I believe it was either late October or early November, so --

Q What kind of surgery was that?

A Back in June of 1990 I had a perforated with, peritonitis, went into septic shock on the operating table and was hospitalized for approximately two and a half weeks.

Well, actually got out of the hospital I think it was the second week or third week in July, and had a temporary colostomy during that period of time

and then they did a take down in late October, which would have been during the period of time that I'm preparing for this trial.

Q But you have had abdominal surgery in October of 1990?

A I believe it would have been either October or November.

Q Do you recall how long you were in a hospital?

A About a week and a half.

Q Like when you were released from the hospital, I mean were you like back in your office the next day or did you have to recover a little bit more at home?

A I was back -- against doctor's advice of was back in the office the very next day. Actually the day that he -- I was in Mercy Hospital, which used to be about a block from here.

I actually remember making my wife drive me to the office and that was after my initial surgery, too. So I mean that's just how I was. And while I was in the hospital but too, files were being brought over and I think the nurses were glad to get rid of me because I had clients even coming over to the hospital, so --

Q And again, something that we often forget about, I mean aside from preparing for this case and you have the surgery, I mean you also are a junior partner or you're a partner in a law firm where you're expected to do a lot of work?

A Absolutely. Yeah.

Q So you're still seeing other clients. You might be going to pre-trials, you might be doing other things --

A I believe I even tried a case around that period of time.

Q You mentioned that I think about the records in California, you guys just didn't have time?

A Yes.

Q And I think even early on in the deposition, I believe it's down here, that I asked you a question about something and you said the little time that we had?

A Yeah.

Q I mean as you look back here, do you have an opinion as do you think that this thing from maybe this case from indictment, your appointment August or September of '90, and then you had a trial within three and half months, do you think this thing was rushed too quickly, the trial?

A Yeah, I do. I mean the whole concept is a speedy trial, as I understand, but when you're dealing with someone's life and they want that time, why not give it to them.

But I felt it was rushed, yeah. We were on a very short timeframe because originally the judge had set trial for, I believe, the record would show in November. And that's when I was having surgery, so it was hard to get him to continue it out but then he wanted a waiver, a time waiver by us -- because I can still remember the bantering back and forth.

We weren't going to get a time waiver. He was going to hold us to the November trial date so, but yeah, in that -- if you think about it, yeah, it was rushed.

Q Because I mean you guys had three and half months not only to prepare for trial but also to prepare for mitigation?

A Yeah.

Q And I think you mentioned the Cadillac versus the Ford, and I mean is it fair to say that because of the rush, there were certain things in mitigation, like getting records, going to California, that were compromised due to this time rush, that you weren't able to do those things?

A We weren't able to do it, but would it have helped? I don't know. I mean that's the thing, but we weren't given the opportunity to see if it helped or not.

Q Let me ask you this question. If Judge Valen had honored your request and given you a mitigation specialist, would you have had any problem flying a mitigation specialist out to California and interview family members?

A No, we wouldn't have had a problem doing that.

Q I mean is that something you would have liked to have done?

A Yes. Any trial you go into you want the most information possible, especially when it's someone's life. I mean just doing civil defense work, the more information, the better equipped you are to try the case.

Q Let me ask a question. Like in civil cases, a personal injury case, do you ever hear like -- I'm sure you've heard of this, the phrase soft tissue case?

A Yeah.

Q And that basically means a case where there's no real --

A Objective --
Q -- objective finding.
A Yeah.
Q You were doing in some of your insurance defense work, back about the same time there were soft tissue type cases where you would represent Grange or whatever insurance company; is that fair to say?
A Yeah.
Q If I was a plaintiff's personal injury lawyer in Butler County back in 1990, 1991, if I filed a soft tissue case, a PI case, what would my trial track me as far as like when would that case be set for -- when would I actually -- if I demanded a jury trial and you and I couldn't settle, how fast would that thing gear up for trial?
A Well, I think we were at that point either -- I think they were setting them about every eight or nine months out from the initial --
Q Filing of the complaint?
A -- no.
Q No?
A That would be from the first report hearing or case management hearing.
Q Which would be from when?

A About 90 days from filing.

Q About 90 days?

A Yeah.

Q Okay. So then --

A I used as a rule of thumb, and I still do to this day, tell my clients that we're not going to trial for at least a year.

Q Okay. So if I had filed a soft tissue five or ten thousand dollar personal injury case in Butler County in August of 1990, and if you were the defense counsel, you and I, no matter how hard we worked and pushed, we probably could not have gotten a trial date until August of 1991?

A Give or take a couple of months here and there, yeah. I mane the easy thing is for me to go pull out a calendar out and I can tell you that easy from looking where I had case management conferences to trial dates.

Q You understand what I'm getting to?

A Yeah.

Q Is that --

A There's a longer period time --

Q -- right, is that attorneys back then in Butler County, and again, I'm not picking on Butler County, but what I'm saying is that back then, is it

fair to say then that Judge Valen was moving a case where a guy's life was at stake faster and putting more pressure on you and Craig Hedric than he would on a case that was worth $5,000?

A Yes, but there are also constitutional matters involved in and too, you know, the right to a speedy trial.

Q Well, let me ask you this question. I mean do you have any doubt that if you had gone to -- you or Craig had gone to Donte and said look, we need more time. We need to get these records. I mean do you perceived there would have been any problem with him raising his constitutional right to a speedy trial to ensure that he received the effective assistance of counsel?

A I think eventually he did waive his right because we set it over to January, mid November, but why it was set in January and not, you know, March or April, I don't know. I can't remember why.

Q Was there any problem in getting Donte to agree to waive his speedy trial rights to ensure that he received -- his attorneys received more time to prepare the case?

A I remember sitting down and telling him, hey, we're on the fast track here. You know, the

only way we can get this continued out is until January or -- continued out to January is if you file a time waiver, sign one.

We need the additional time. You need it Clifford. He had no -- I mean I remember him signing or agreeing to it. I don't actually remember seeing him sign it.

Q Just a couple more questions and then I'll talk to Mr. Payne and we'll follow up with anything. During Dr. Weaver's testimony, the State of Ohio through Mr. Piper brought in some juvenile records, and I just remember -- I just want to know. Do you remember any of those exchanges or what that was all about?

A Yeah, I remember that. I just had an objection to the whole -- Judge Valen was going to let the entire file in, juvenile file, and my argument was there could be things in there that really don't belong in there or the jury shouldn't see.

Because I remember making the crack to the judge then hold on for about five minutes. I want to go over and file something in the juvenile file, and he says well, what's that, and I said that Clifford Donte Williams is a good human being and shouldn't be killed, something to that effect.

And I got admonished over that. I remember that. To try to bring to the point to the judge that anything could be in there. Anybody can file anything in a criminal case, civil case, a juvenile case and it's put into the court file, but that doesn't mean that it goes to a finder of fact.

Q Let me ask you this question. Where were those records located. I mean obviously they were located in the courtroom where Mr. Piper tried to introduce them.

A Yeah.

Q I'm saying like before Piper got his hands on them, where were they, over in juvenile court?

A Yeah, and I don't think Robin had his hands on them. He subpoenaed them probably --

Q Yeah. I don't mean that. Okay. I apologize. You know, I don't mean to be critical of --

A Yeah. Robin Piper is an excellent attorney and has, you know, high ethics and I respect Robin and always have and always will, but he subpoenaed those from the juvenile court judge who retained -- he was his own clerk of courts.

Q Right. And just so you know, and the record is clear, I did not in any way infer that he did something --

A Okay.

Q -- underhanded. No, I mean in fact I think you're right. The record reveals that he subpoenaed the records.

A Okay.

Q Okay. I don't mean he got his hands on them like he went over there and he stuck them in his briefcase and he walked out. I'm just trying to use a little bit of shorthand or slang vernacular. I'm just trying to find out where were the records when he subpoenaed them. They were in the juvenile court building?

A Yes.

Q Was that just like at that time and maybe even to this day, was it just like right across the street from the courthouse?

A I think at that time it was, and then they built the new juvenile detention center and courtroom.

Q Did you and Mr. Hedric know that there was a relinquishment pocket or binder or folder regarding your client that existed in juvenile court?

A I think we did.

Q Were those records ever reviewed by you and Mr. Hedric prior to Mr. Piper using them in court?

A I can't recall, but I -- I can't recall.

Q Is it fair to say that the psychologist, Dr. Weaver, did not review those records prior to his testimony?

A If I remember correctly from his testimony, no, he hadn't.

Q He had not. Was there anything in the records, in those juvenile records as you remember, that was damaging to your client?

A I can't recall, but I would assume that there was because I tried to keep them out.

Q Do you understand that there may have been -- when I say this, I'm not exactly sure myself, but were there other psychologicals of the client in that file?

A There was. That's why -- now I do recall that, and that's why I wanted to keep them out.

Q Okay. And what was the purpose in keeping those other psychologicals out of the mitigation hearing?

A If I remember correctly, it's all coming back in bits and pieces, but I think it may have been basically that he didn't suffer from a mental illness and that's why we wanted to keep them out.

Basically that he was just a mean spirited kid. I mean I can't recall right now, but I think that was the reason Craig and I really wanted to try to keep those out.

Q Now you understood that when you put Dr. Weaver on the stand that he was going to testify that your client suffered from the mental disorder of paranoid schizophrenia?

A Yes.

Q When you called Dr. Weaver to the stand, did you know that Mr. Piper had these juvenile records that had other psychologicals in them?

A I can't recall. But from my -- I don't know because I remember how upset I was about the juvenile record, so I can't recall. I'd have to go back and look at a transcript or look at the court file.

Q Did you know back then that when an expert was testifying about -- a medical expert was testifying about an opinion that other psychologicals or other evaluations could be used to cross-examine that opinion?

A Yes. To a limited extent, yes. In the nature that doctor did you review -- doctor so and so's report concerning this, but I don't think the ultimate

opinion of that psychologist or psychiatrist would have been before the fact finder.

Q Do you feel that by -- or when the doctor testified that he had not reviewed these other reports, in these juvenile records, do you feel that that in some way affected his credibility to the jury?

A From my memory, yes. Because I remember Dr. Weaver coming off the stand somewhat dejected, almost like defeated. That was the feeling I had.

Q All right. And I assume that today in your practice, and even back then, it's not unusual to have an expert medical doctor testify about a plaintiff's medical condition; correct?

A Correct.

Q It's unusual. And is it fair to say it's important to make sure that that doctor has as much of that patient's history as they can to render a solid opinion?

A Normally my case is I'll go back the day you were born and get all the medical records I can, up to the date of the accident, and get them to my independent evaluator.

In psychological cases, because in my practice, you know, posttraumatic stress disorder is a

big cause of action now. We go back and get every school record, psychological record, test results from, you know, when they took the Iowa test in school, everything. It's important to have.

Q I'd like to have you just focus upon again volume 11, page 115, and I'll just read this to you. There's a question to Dr. Weaver by Mr. Piper. Question, the question is, other than what he told you, meaning Clifford Williams, did you know for a fact that he didn't have a support staff when he was at Vision to help him with relationships, to work with him, all the things that you said needed to be done.

Answer, the only knowledge I have is what he told me. Question, thank you, sir. That exchange was -- that was pretty good cross-examination, would you agree?

A Yeah.

Q Okay. As you look back now, when I read that to you, what do you find particularly damaging about that exchange for your client?

A Well, what's now in looking at it because I can't remember what -- I can't remember exactly what Vision was and the support staff was, but just pulling that out, you know, it would be that the doctor had just testified that, you know, Clifford

throughout his life didn't have various support staff, things that he needed, and that obviously the Vision probably said that he did, so I'm not -- without having to look at the whole thing --

Q Right. Is it also fair to say that one of the problems with that cross-examination is it kind of portrays the doctor, or portrays Cliff, the doctor's opinion of this disorder, paranoid schizophrenia, that it's primarily based solely on what Mr. Williams told him?

A Yes.

Q That it's purely subjective and that there's no other evidence, records, school records, juvenile records, family records, family members that could offer any support to that diagnosis?

A Yeah, just taking it out of that little exchange, yes, but I believe that he had also testified about test results, just from my memory, there was a battery of tests performed that he used.

Q That Dr. Weaver performed --

A Yeah.

Q -- on --

A Clifford.

Q -- Clifford, Mr. -- yeah, right.

A So I mean there would have been just

those -- that portion of the history relied upon by the doctor just given by Clifford, but then there were also the test results which Dr. Weaver will tell you are objective, with a little subjective.

Q Okay. What I'm going to do is I'm just going to take a break and I'm going to talk to Mr. Payne, my co-counsel, and see if we have been more questions for you, I don't think we're going to be more the five or ten minutes.

A That's fine.

Q Thank you.

(OFF THE RECORD)

BY MR. EDWARDS:

Q I just have maybe five or ten minutes at the most of questions, and I really mean that.

A That's fine.

Q My five minutes -- my five minutes is actually five minutes. A couple of questions. Somewhere in the record there was a motion filed I guess by defense counsel, but actually on behalf of your client to disqualify Judge Valen as sitting as the judge, and I just wonder if you could -- if you know -- if you remember that, one, and secondly, if you have any idea why that was filed?

A I do remember it, and I think it may

have had to do with some comments that the judge made in chambers as far as, you know, the mitigation, when we get to the mitigation, and Craig -- I remember Craig was real hot on the recusal because he felt that the judge had already made his mind up that the guilt was there and we're going to the mitigation.

Clifford felt throughout that he wasn't getting a fair shake from Judge Valen, and he wanted him removed. So that was part --

Q Right. I remember -- do you ever remember when you filed a motion to disclose the name of the confidential informant --

A Um-hum.

Q -- and the informant apparently -- the state was in going to call the informant, but the informant -- they used it to get a search warrant?

A Um-hum.

Q Do you remember that?

A Um-hum.

Q And then you guys were trying to get the name of the confidential informant disclosed because apparently the confidential informant said someone named Donte had confessed to him about the killings?

A Actually I think he gave a different

name, not Donte Williams.

Q Not Donte Williams, but --

A No, it wasn't even -- it wasn't even the name Donte. It was somebody -- I forget what it was --

Q Right.

A -- and confessed to the -- told them, you know, they did the killing, and that's why we wanted the name. We felt that hey, we need to talk to this person --

Q Right.

A -- because there's someone else out there that did it.

Q And do you remember when Judge Valen said well, if you want to know who the person is, just ask your client, or something to that effect?

A Yes, I do remember that.

Q Okay. What about this area of like the Hamilton Inn? Back in like the late '80s, early '90s, in Hamilton, in this town in Butler County, was that known as some kind of like a drug hangout or was it a bad area of town?

A The best way to describe it is I wouldn't have drove through there at night in a Sherman tank. I mean it was a bad area. And usually, to put

it bluntly, the scum of the earth were staying there.

Q Okay. Was there also something about the facts of this case -- I mean obviously Jeff Wallace is caucasian. Your client is a young African-American. Did anything about that like, you know, when Jeff Wallace testified at trial, well, you know, he was just hitchhiking. I just picked him up.

I mean did any of those facts make it look like maybe there was something else going on there? Did it peak your curiosity at all or your suspicions?

A Oh, I mean, yeah. Of course, but to this day it still does, but I can't recall what answers I got to it from Clifford. I mean what answers I did, I couldn't tell you anyways, but --

Q Sure.

A Well, I mean --

Q Well, we don't -- let's just not even make that an issue right now. How about like South Central and Second Avenue or Second Street? I mean is that considered a pretty bad area back then?

A It was then. Now it's been rehabbed and it's a better area, but back then, a lot of prostitutes, drugs.

Q Okay. Then the last area I want to

talk to you about is the unsworn statement. Apparently Mr. Williams gave an unsworn statement during the mitigation phase, and I just wondered, without going into the actual conversations you had with him, how was that planned out? Was there a lot of reviewing of that? Did he write it out? Did you guys review it? What happened?

A Yeah, and I think we even typed it up for him. I mean we spent a considerable amount of time on that, reviewing it with him, going over different parts of it with him, but we did spend a lot of time on that.

Q And did he actually then read that unsworn statement that was typed up into the record?

A I think he tried to, but if I -- I think he had a problem with really reading it, with -- pretty much, you know, as he had relayed to us what he was going to say, he did relay to the jury.

MR. EDWARDS: Okay. I have no further questions.

MR. PLATE: The state has no questions.

-0-

AND FURTHER THE DEPONENT SAITH NAUGHT

-0-

VERBATIM REPORTING

Page 79

(Signature Waived)

DAVID DAVIDSON

David Davidson

C-E-R-T-I-F-I-C-A-T-I-O-N

STATE OF OHIO,

COUNTY OF BUTLER, TO-WIT:

I, Barbara J. Enneking, CVR, Court Reporter and Notary Public in and for the State of Ohio, do hereby certify:

That on January 22nd, 2002, there appeared before me pursuant to Notice and agreement of counsel, DAVID DAVIDSON, a witness in the previously entitled cause;

That the said witness was sworn by me and examined to tell the truth, the whole truth, and nothing but the truth in said cause;

That the deposition was taken by me via Stenomask and electronic recording and the foregoing 79 pages contain a true, full and correct transcription of all the testimony of said witness;

That I am not related to or in any way associated with any of the parties to said cause of action, or their counsel and that I am not interested in the event thereof.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 19th day of February, 2002.

Barbara J. Enneking, CVR

Barbara J. Enneking, CVR



ADVANCED STUDY IN CHILD DEVELOPMENT

Founded by Irving B. Harris

420 NORTH WABASH AVENUE
CHICAGO, ILLINOIS 60611
TEL: (312) 755-2250
FAX: (312) 755-2255

September 3, 1999

Tim Payne
Office of the Ohio Public Defender
8 East Long Street
11th Floor
Columbus, Ohio 43215-5394

Dear Tim:

Enclosed is the psychosocial evaluation of Clifford Williams. Please let me know if you need anything else. It has been a pleasure working with you.

Sincerely,

Kathleen Kostelny

Kathleen Kostelny, Ph.D.
Senior Research Associate

Psychosocial Evaluation of Clifford Donta Williams
by Kathleen Kostelny, Ph.D.
September 1, 1999

The purpose of this psychosocial evaluation of Clifford Williams was to examine the influences of Clifford William's social environment during childhood and adolescence that would help explain his current situation in prison. This included determining if evidence existed of risk factors during Clifford's childhood and adolescence that thwarted Clifford's healthy behavioral and emotional functioning. The evaluation consisted of an in-depth interview on May 19, 1999 as well as a review of a variety of records and reports of interviews with Clifford and with significant people who knew Clifford well. These records and documents included:

School Records: Chase Intermediate University Demonstration School
Cincinnati Public Schools
Crestview Elementary School
George Washington Middle School
Woodward High School
Winton Terrace Elementary School
Rancho Beuna Vista High School

Medical Records: University of Cincinnati Hospital
Providence Hospital
Winton Hills Medical Center
Cincinnati Health Department

Psychological Evaluation: Nick Sanchez, Ph.D.

Court Records:  Probation Officer's Social Study
Hamilton County Juvenile Court
Superior Court of California, Juvenile Court
San Diego County Probation Officer's reports

Juvenile Reports: Vision Quest
San Diego Youth Involvement Project

Interviews with Clifford Williams and Significant Others:
 Report of interview with Clifford Williams by Felicia Crawford and Jackie Hood, 8/2/95
 Report of interview with Clifford Williams by Felicia Crawford and Jackie Hood, 8/15/95
 Report of interview with Clifford Williams by Nick Bertino, 6/7/96

Report of interview with Clifford George by Martha Phillips on 2/17/99
Report of interview with Clifford Williams by Martha Phillips, 3/17/99
Report of interview with Clifford Williams by Martha Phillips, 4/12/99
Report of interview with Clifford Williams by Tim Payne, 12/3/98
Report of interview with Clifford Williams by Tim Payne, 12/22/98
Report of interview with Clifford Williams by Tim Payne, 1/26/99
Report of interview with Clifford Williams by Tim Payne, 2/11/99
Report of interview with Clifford Williams by Tim Payne, 3/10/99
Report of interview with Larenda Jackson by Martha Phillips, 4/15/99
Report of interview with Clifford Williams by Felicia Crawford and Jackie Hood, 7/6/95
Report of interview with Diane Bauniel by Felicia Crawford, 8/1/95, 8/14,95
Report with Diane Bauniel by Martha Phillips, 3/25/99
Report of interview with David Bauniel by Nick Bertino and Steve Cheney, 5/15/96
Report of interview with Diane Bauniel, Ann Williams by Felicia Crawford and Jackie
    Hood , 7/12/95
Report of interview with Annie Mae Williams by Felicia Crawford and Tracy Leonard,
    7/25/95
Report of interview with Annie Mae Williams by Nick Bertino and Steve Cheney,
    5/15/96
Report of interview with Annie Mae William by Martha Phillips, 3/22/99
Report of interview with LaTanya William by Martha Phillips on 3/24/99
Report of interview with Leon Collins, by Nick Bertino, 6/6/96
Report of interview with Linda Stenson by Nick Bertino, 5/15/96
Report of Interview with Bobby Merz by Steve Cheney, 5/15/96
Report of Interview with Joyce Jones, by Steve Cheney 5/16/96
Report of interview with Larenda Jackson by Felicia Crawford and Jackie Hood, 8/8/95
Report of interview with Walter Williams by Steve Cheney, 5/16/96

Letters to attorney from Clifford Williams

**Risk Factors**

From the interview with Clifford Williams on 5/19/99 and the review of his records and
interviews, a number of significant risk factors emerged that have relevance to Clifford's
development and his current situation in prison.  These risk factors were experiences and
circumstances that occurred during Clifford's formative years in his social environment --
particularly at the family and community level -- that presented obstacles to healthy
emotional and behavioral development, and contributed to his socialization into a model
of aggression and violence.  Risk factors to his development at the family level included
poverty, maternal neglect, biological father absence, lack of positive male role models,
family violence, and instability in the family due to frequent moves. Risk factors at the
community level included witnessing and being a victim of violence, community
disorganization, lack of social support, and exposure to violent role models.

**Maternal Neglect**

Clifford's mother, Diane, was 14 years old when she gave birth to Clifford. She was herself born to a 14 year old girl. His mother's lack of nurturing and emotional security impaired her ability to provide a supportive, nurturing environment in the critical early years of Clifford's life and diminished her ability to form a secure attachment relationship with Clifford.

His mother's substance abuse further contributed to her inability to attend to Clifford's emotional needs. By the time she was 18 years old, his mother was frequently shooting up drugs (downers and asthma medication) "to feel numb." She also used drugs while pregnant with his sister LaTonya. According to Clifford's maternal grandmother, the drug use "got so bad" that on one occasion she and her husband had to "bust the door of a drug house down" and physically take Diane away. This was during Clifford's crucial early childhood years. Because his mother was too sick to care for Clifford during this time, his maternal grandmother took care of both him and his mother. During first grade, Clifford was sent to live with his grandfather, with the mother visiting Clifford on weekends. Clifford recalls that "drugs were kept at home", and that by age ten he "would take hits" of marijuana from a bong that his parents kept out in the open. In addition to being unable to provide the necessary emotional nurturance for Clifford, his mother physically left Clifford in the care of others on at least four occasions during his early years while she went to be with her boyfriend David.

One of the most important resources for a child is a stable, positive emotional relationship with at least one parent or other reference person. Such a caregiver is the primary source for validating a child's experiences, forming a positive identity, and developing emotional bonds. Such an early positive relationship teaches young children to trust, to respond pro-socially, and to form caring, empathic relationships. If early relationships are unreliable or negative, children learn to fear, to turn away and to become numb to theirs and others feelings (Garbarino, 1995; Garbarino, Dubrow, Kostelny & Pardo, 1992).

Clifford did not have this crucial, nurturing relationship during his childhood. While his mother cared about Clifford, because she did not have her own emotional needs met and lacked the necessary parenting knowledge and skills, she was unable to provide the critical emotional nurturing a child needs for healthy development. Furthermore, Clifford was intermittently "passed around" to others (i.e., his grandmother, grandfather, and biological father) while his mother left to visit her boyfriend. This lack of nurturance and emotional availability from a primary caretaker has been shown to result in mistrustfulness, difficulty in forming close attachments with others, engaging in reckless behavior, insecurity, and unstable relationships (Bowlby, 1980; Garbarino, Kostelny & Dubrow, 1991).

**Paternal Neglect**

Clifford's biological father had only sporadic contact with Clifford during his early years. From the beginning, Clifford's father exhibited rejecting and uncaring behavior towards his son. When first informed of Diane's pregnancy with his child, his response was "It's not mine." Blood tests were required to confirm that he was indeed the father. As he did not volunteer to offer financial support for his child, he had to be ordered by the court to pay child support. During Clifford's first year, the father stated that he visited him "regularly," but then reported that after the first year he only visited infrequently because he "lived far away" -- approximately 15 miles -- and that he did not want to "interfere".

Clifford suffered from this abandonment and rejection by his biological father. Clifford "never liked" or formed an attachment to his step-father, and he longed for a relationship with his father throughout his childhood and adolescence. In addition to Clifford not having a positive paternal role model, the absence of a father can contribute to a lack of identify formation and low self esteem (Adams, et. al., 1984). That one's father did not care enough to stay or visit on a regular basis has damaging effects on a child's self-concept.

**Physical and Emotional Abuse by Step-father**

Clifford's step-father, David, was physically and emotionally abusive to both Clifford and Clifford's mother. Clifford's reports of the step-father's fits of rage, physical abuse of his mother, and emotional unavailability to him were supplemented by accounts from his mother, his half brother David, and his mother's sister Larenda. The step-father would frequently "hit and scream" and "go off" and physically abuse Clifford's mother. Larenda reported that David would "torture" Diane and "pop her on the head." Larenda also reported that on one occasion when Diane was pregnant, David hit her, which may have resulted in the miscarriage she later had. Clifford recalled that his step-father had "good days and bad days" in the home, but that when he "got pissed" his step-father would "beat up" his mother. Clifford stated that his step-father would "beat my mom and I couldn't do a damn thing about it."

The step-father was also physically abusive to Clifford. He was described as "cruel, mean, and cursing at children." He frequently used harsh, inconsistent discipline, beating Clifford with belts, switches, and extensions cords. This would occur "in spurts" when he was frustrated. For example, Clifford recalled an incident when he laughed at a salt shaker top falling off when his step-father was using it, and as a result of his laughing, his step-father hit him in the head with a backgammon case.

Children who experience chronic family violence, directed either at themselves or their mother, evidence significantly more behavioral and psychological problems than children who do not experience such chronic family violence, including low self esteem and

aggressive and violent behavior (Cicchetti & Toth, 1989; Gelles & Straus, 1988). Repeated exposure to violence leads to a desensitization of violent behavior. Children learn that violence is an acceptable way of resolving conflicts and getting what they want (Garbarino, 1999; Garbarino, Dubrow, Kostelny & Pardo, 1992). Violent behavior is normalized and is not seen as wrong within the developmental frame of reference within which the child was raised. Such desensitization can result in a higher threshold for tolerating behaviors that others would find abominable. Repeated violence teaches the child to be violent in the event that such violence is directed at them.

It is also possible that the early traumatic and violent experiences that Clifford experienced affected his brain development. Exposure to violent behavior during the early years of life has been shown to predispose children to violent behavior during adolescence and adulthood (Eron, Gentry, & Schlegel, 1994). The intensity and frequency of the trauma, as well as the presence of protective factors, will influence how the brain will internalize the traumatic event. Age and developmental level are important factors in children's response to trauma. Individuals who experience an initial trauma before the age of eleven are three times more likely than those who experienced their first trauma as teens to develop psychiatric symptoms (Davidson & Smith, 1990). Thus, experiences which an adult could withstand, would be devastating to a young child.

Research has found that the lack of critical nurturing experience and chronic exposure to traumatic violence can alter the developing central nervous system, predisposing the child to becoming a more impulsive, reactive, and violent individual (Perry, 1998). The brain's capacity to mediate impulses is related to the excitatory activity of the lower, more-primitive portions of the brain and the modulating activity of higher, subcortical and cortical areas. Variables which increase the activity or reactivity of the brainstem (such as chronic traumatic stress) or decrease the moderating capacity of the limbic or cortical areas (such as emotional neglect) will increase an individual's aggressivity, impulsivity, and violent behavior. For children who are exposed to traumatic experiences, such as physical abuse or community violence, more than half of the children will develop significant neuropsychitraic sympotomatoloy, depending on the severity, frequency, nature, and pattern of traumatic events (Perry, 1998).

**Models of Aggression and Violence**

Clifford had numerous contacts with people who modeled aggression and violence as an acceptable form of behavior and as a justifiable solution to problems. These individuals included his mother, who was described as being "bad" and "fighting a lot." In one instance his mother had Clifford help kick and beat up her friend who was having an affair with her husband. Clifford also experienced violence by one of his mother's boyfriends, Robert Pittman, who beat him with a baseball bat on one occasion. This injury was serious enough to require treatment at a hospital.

His uncle "Meatball", who was a role model to Clifford, gave him wine to drink in his baby bottle, shot up drugs in front of Clifford, and committed criminal acts that put him in prison. To Clifford, Meatball was "the coolest dude" who "everybody respected." Meatball died in prison, where "drugs finally caught up with him." Furthermore, Clifford knew, or was associated with, six people who ended up on death row.

A young child's identity is shaped by images present in his development. In addition to the primary caretaker, other adults can play an important role in fostering either healthy development or pathological development in a child (Garbarino, 1995). While Clifford viewed his grandmother as a positive model, she was struggling on welfare to raise eight children, and could not devote the time to him that he needed for healthy development.

Thus, Clifford lacked role models that would instill values and model pro-social behavior for him. For example, Clifford was taught by his family to physically fight, and was beaten by them if he didn't fight. The people who were role models for Clifford did not adhere to personally and socially responsible codes of conduct. Instead of providing prosocial images for Clifford to emulate, they normalized violent and criminal behavior for him. Such relationships to violent people are linked to a child seeing the world as threatening and dangerous, and feeling vulnerable to influences of things beyond his control (Garbarino, Dubrow, Kostelny & Pardo, 1992). A tendency develops to confront unfamiliar situations and people from a defensive and aggressive position. By sixth grade Clifford was described as "fighting with peers," "taking lunch money," "being antisocial," "having a temper," and "cursing out teachers." He was suspended from school for fighting. Clifford believes that he graduated from junior high school only because the school "wanted to get rid of me."

Children need a moral framework, acquired by the dynamic relationship between the child's competence and being in the company of a guiding teacher that leads to forward movement (Garbarino, 1995). Clifford did not have such teachers during his childhood to instill values and impart pro-social messages. His mother, the primary caretaker and the primary teacher of values, taught Clifford by her example to steal. He remembers that, while still in diapers, she would steal items from various stores, and stuff the stolen merchandise in his diaper.

**Unstable Home Life**

Clifford did not have the stability of a consistent, stable home during his entire childhood and adolescence. From the time he was born until he was seventeen years old, Clifford was moved at least fourteen times. When he was two years old, Clifford moved with his mother from his grandmother's home in Cincinnati to North Carolina so his mother could be near her boyfriend, David, who was still married. When Clifford was three years old he was moved back to Cincinnati for a brief period before moving to California so his mother could again be near David who was now stationed there. When Clifford was four

years old, he was again moved back to Cincinnati by his mother after David returned to his wife. When Clifford was seven years old, he was once again moved to California so his mother could be near David. During the next few years, Clifford was sent back and forth to Cincinnati to live intermittently with his maternal grandmother. When his mother and David married when Clifford was 9 years old, Clifford moved with them to live on base in California. The next year, when Clifford was 10, he moved with his mother back to Cincinnati to live with his maternal grandfather. When he was 12, his mother moved to three different locations in California. And when he was 17 years old, his mother moved back to Cincinnati again, where Clifford lived first with his maternal grandmother, then at the Winton Terrace housing project, and then with his biological father.

One of the most important aspects of a child's development is having a place to call home (Garbarino, 1995). Home implies permanence and stability -- more than just a roof over a child's head. Social disruption in the lives of parents is a threat to children's stability. When parents aren't able to create and sustain a stable home for young children, negative effects occur for children's development, putting them in jeopardy for developmental harm.

**Unstable School Life**

In addition to not having a stable place to call home, Clifford transferred in and out of school at least six times. Although several teachers had noticed Clifford as bright, by adolescence he was failing in school. In addition to this being disruptive to his cognitive development, such instability interfered with his ability to form lasting friendships and to find identity as part of a group.

After home, the biggest influence on children's identities is school (Garbarino, 1995). Because Clifford did not have stability or consistency at school, he had no chance to develop leadership roles or other identity enhancing activities.

**Community Violence**

Clifford spent his early years growing up in Winton Terrace -- an impoverished, crowded, public housing project with high levels of violence, including gang activity. Such communities are often hotbeds of antisocial and self-destructive behavior (Garbarino, Dubrow, Kostelny & Pardo, 1992). People who lived in Winton Terrace reported that living there was like living "on the edge," with "fights, gunshots, and drug deals" common occurrences. Throughout his life, Clifford had experiences with violence in the communities where he lived. Clifford reported that he had "been shot at a couple of times." One time the gun skipped – "otherwise ," he said, "I wouldn't be here."

Security is a primary tenet for a child's well-being -- children need to feel safe and taken care of. Violent experiences are powerful stressors that increase their vulnerability to developmental harm. These stressors tax these children's resources, endanger their well-being, impose new limitations and new threats to their current situation, and present new obstacles to learning. It only takes intermittent shooting to create a climate of danger and to establish insecurity as a child's dominant psychological reality. Such experiences lead a child to conclude that he isn't safe, that adults cannot protect him, and that it is up to him to protect himself, including using pre-emptive violence (Garbarino, Kostelny & Dubrow, 1992).

Clifford had numerous experiences with chronic community violence throughout his childhood and adolescence. Research has demonstrated that such experiences with violence during childhood have been shown to have negative developmental consequences on human development. These consequences include post traumatic stress disorder, diminished expectations for the future, truncated moral development, and missocialization into a model of violence (Garbarino, Dubrow, Kostelny & Pardo, 1992; Garbarino, Kostelny, Dubrow, 1991). Children who experience violence are also more likely to legitimize the use of aggression, to act aggressively, and be drawn to values and ideologies that legitimize and reward their aggression. As adolescents, they are more prone to engage in acting-out and self-destructive behaviors, such as substance abuse, delinquent behavior, promiscuity, and aggressive acts.

For some children, repeated exposure to violence can produce what appears to be a functional adaptation to the violence but is actually a pathological effect. Although the adaptation is successful in the short run, it may prove detrimental in the long run. For example, children growing up in highly threatening social environments are likely to become hypervigilant. From numerous studies, children living with family violence are likely to develop hypervigilance in their interpersonal relationships (Cicchetti and Toth, 1989). Children experiencing violence both at home and in the community operate in a high state of anticipation: they know what aggressive individuals are likely to do and they are motivated to prevent being the recipients of those attacks. The response is preemptive assault (Garbarino, 1999).

Another adaptation to chronic violence is that children develop a sense of futurelessness, or a profound fatalism about their lives. They come to expect more violence directed at them and death at an early age. Participation in dangerous, violent activities loses its threatening character and takes on a special psychology for them, since they expect to die no matter what they do (Garbarino, Dubrow, Kostelny & Pardo, 1992). Clifford developed a sense of hopelessness, powerlessness, and futurelessness. From such experiences often develops a survival mentality -- to act before being acted upon. He "saw a lot of friends buried." He states that as a teen he believed he "wasn't supposed to live to see 21, or even "live to see the next day." He saw two ways to get out of his situation – "with a bullet or jail." He thinks the reason he is alive now is because he went to jail.

Children's early adaptation to violence may also lead to a process of identification with the aggressor. They model themselves and their behavior on those powerful, aggressive individuals and groups in their environment who caused the danger in the first place. Joining a gang is one type of identification with the aggressor. Children who experience recurring violence will themselves feed into the cycle of violence, victimization, and fear. In violent communities, a gun is a status symbol, and using it gets positive reinforcement. Exposure to violence increases the likelihood of the child's engaging in future violence and other antisocial acts. Observing violence may lead to an acquisition of that behavior if the child identifies with the perpetrator and the outcome of the violence (Garbarino, Dubrow, Kostelny & Pardo, 1992). Furthermore, by age eight, patterns of aggressive behavior and legitimization of aggression tend to become stable, with predictability to adulthood (Eron, Gentry, & Schlegel, 1994). By age six Clifford was already modeling the aggressive behavior he experienced in his community. For example, on one occasion while picking up a big stick, he was reported to say "If anybody mess with us, I'll crack them."

One of the most important features of child development is the child's capacity to form social maps. These representations of the world reflect the simple cognitive competence of the child, but also the child's moral and affective inclination. Thus, children who experience violence draw conclusions of the world that adults are not to be trusted, people will mistreat you, and that one needs to act before being acted upon. For children experiencing violence, when trying to understand these experiences, the child is forced into patterns of behavior, thought, and feelings that are themselves "abnormal" when contrasted with that of the untraumatized healthy child (Garbarino, Dubrow, Kostelny & Pardo, 1992). Children who learn to live with chronic violence do not escape unscathed and may adapt in ways that are dysfunctional in "normal" situations in which they are expected to participate. For example, children's adaptive behavior in the situation of chronic violence may be to defend themselves by becoming hyperaggressive, but such behavior at school stimulates rejection by peers and teachers. Such an adaptation may become a stable feature of personality and social ideology early in life.

Idealization of violence, and family and cultural acceptance of violence, nurture violent individuals. The presence of a strong supportive family network or a strong stable adult figure is critically important in mediating such incidents. Clifford had no such supportive network or adult figure to mediate his experiences with violence, or to help him acquire a belief system that did not endorse violence as an acceptable behavior.

**Lack of Affirmation and Acceptance**

Clifford lacked affirmation and acceptance in his social environment. His family did not create situations where he felt valuable. For example, Clifford had a curiosity about how things worked, and would take things apart and put them back together. However, instead of encouraging this curiosity and aptitude, he was punished.

A child's sense of identity is formed by messages received from parents, peers, community, and the culture. Identity is an important resource, serving as a protective factor for children encountering risk factors in their environment. Acceptance and appreciation contributes to the development of a positive self-concept, while ridicule and rejection diminish self worth (Garbarino, 1995).

Lacking affirmation and acceptance in his family and community, Clifford was vulnerable to the negative influence of gangs. Gangs provide belonging, identity, and status. If parents aren't able to provide the structure and experiences necessary to provide a sense of identity and belonging, youth often turn to gangs to provide a sense of belonging. Being part of a gang allows gang members to achieve a level of status they feel is impossible to achieve outside of the gang, as well as to have protection in an unsafe environment. At an early age, Clifford was associating with gang members, and was initiated into a gang, the Oceanside Crypts, during adolescence. Even though he referred to his peers as "dope boys" and a "bad crowd," Clifford stated that the "homies had his back." Clifford felt needed and wanted by them for who he was. Clifford saw joining a gang as the "thing to do." In the gang, he found identity as a gang member, and received the attention, affirmation, and acceptance he did not have at home.

**Accumulation of Risk Factors**

Research has found that the more risk factors a child experiences, the greater the likelihood of developmental harm (Garmezy & Rutter, 1983). Permanent developmental damage is more likely to occur when multiple risks are present in a child's environment. The risk of developmental harm from exposure to violence increases when that exposure is compounded by other biological, cultural, psychological, and social risks. Thus, developmental harm tends to occur when a child is subjected to cumulative stress from a variety of stressors throughout the course of development. When risk factors accumulate, the chance of damaging consequences increases dramatically. Resilience diminishes as risk accumulates.

In order for children to develop optimally, they need a positive relationship with an emotionally available, nurturing caretaker. They also require security, affirmation, support from community, and instillation of values. When children do not have these, the prospects for healthy development into a pro-social adult are severely diminished. While strong families prepare children to handle most stresses in their environment, dysfunctional families place children at risk for developmental harm. Children who experience family violence are the most vulnerable to the effects of community violence, evidencing the most psychological problems and modeling the aggression they see around them. The experience of violence at home does not make these children immune to the violence outside, it makes them more vulnerable to it.

For Clifford, the risks of living in the midst of violence was compounded by the risks of maternal neglect, family disruption and instability, family violence, maladaptive child-rearing patterns, lack of affirmation and acceptance, violent role models, and community dysfunction. Clifford's immediate family did not provide the nurturance and protection he needed for healthy emotional development, but rather imposed dysfunctional behaviors on him as a child. Moreover, his social environment expanded to extended family and others outside the family that imposed dysfunctional behaviors on Clifford, making him vulnerable to the destructive pressures of the toxic social environment in which he lived. Institutional support or remedial assistance during Clifford's childhood that may have intervened in his downward trajectory was also lacking. There was no mentor, counselor, or supportive person to provide guidance or advice to him. Clifford grew up in a socially toxic environment, with a history of emotional deprivation, and experiencing chronic family and community violence, with few, if any, protective factors that would have mediated the accumulation of risk in his life.

**Clifford's Current Situation**

With the passage of time in prison, Clifford has had time for reflection. He reads books, writes letters, and "thinks about things now." Looking back, he says "I know I was bad, but no one could tell me anything at 18." Now he knows he would "act differently" given the same circumstances – that "trivial things ain't worth it" (i.e., acting aggressively). He states that "being in jail saved my life, but in a way it's trying to take my life." He talks about how he has "learned to respect life." Clifford appears to have changed from an angry, aggressive teen, to a more reflective, insightful and emotionally mature individual. During this time he has established a more positive relationship with his biological father. With time Clifford has grown and matured. He hasn't had any significant discipline problems in prison, and it would appear that he is no longer a danger to society.

Kathleen Kostelny

Kathleen Kostelny, Ph.D.
Senior Research Associate
Erikson Institute for Advanced Study in Child Development

**References**

Adams, P., Milner, J. and Schrepf, N. (1984). *Fatherless Children.* New York: Wley Press.

Bowlby, J. (1980). *Attachment and Loss*. New York: Basic Books.

Cicchetti, D and Carlson, V. (Eds.). (1989). *Child Maltreatment: Theory and Research on the Causes and Consequences of Child Abuse and Neglect*. Cambridge: Cambridge University Press.

Davidson, J. & Smith, R. (1990). Traumatic Experiences in Psychiatric Outpatients. *Journal of Traumatic Stress Studies*, 3(3), 459-475.

Eron, L., Gentry, J., & Schlegel, P. (1994). *Reason to Hope: A Psychosocial Perspective on Violence and Youth.* Washington, D.C.: American Psychological Association Press.

Garbarino, J. (1999). *Lost Boys: Why Our Sons Turn Violent and How We Can Save Them.* New York: The Free Press.

Garbarino, J. (1995). *Raising Children in a Socially Toxic Environment.* San Francisco: Jossey Bass Publishers.

Garbarino, J. and Associates (1992). *Children and Families in the Social Environment*. New York: Aldine de Gruyter.

Garbarino, J., Kostelny, K., and Dubrow, N. (1992). *No Place to Be a Child: Growing Up in a War Zone*. Lexington, MA: Lexington Press.

Garbarino, J., Dubrow, N., Kostelny, K., and Pardo, C. (1992). *Children in Danger: Coping with the Consequences of Community Violence.* San Francisco: Jossey Bass.

Garmezy, N. and Rutter, M. (1983). Stress, Coping, and Development in Children. New York: McGraw-Hill.

Gelles, R., & Straus, M. (1988). *Intimate Violence: The Definitive Study of the Causes and Consequences of Abuse in the American Family.* New York: Simon & Schuster.

Perry, B. (1998). Incubated in Terror. In *Children, Youth and Violence: Searching for Solutions* (J. Osofsky, Ed.) New York: Guilford Press.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| CLIFFORD DONTA WILLIAMS | ) | |
| | ) | |
| Petitioner, | ) | *DEATH PENALTY CASE* |
| | ) | ***NO EXECUTION DATE SET*** |
| | ) | |
| -vs- | ) | Case No. MS-1-98-128 |
| | ) | |
| BETTY MITCHELL, WARDEN | ) | Judge Smith |
| | ) | Magistrate Judge King |
| Respondent | ) | |
| | ) | |

**EXHIBIT B**

**AFFIDAVIT OF CLIFFORD GEORGE**

STATE OF OHIO,

COUNTY OF HAMILTON: ss

I, Clifford George, being first duly sworn according to law, state the following:

1) My name is Clifford George; I was born on April 15, 1954; my current address is 1140 Considine Avenue, Apartment 15, Cincinnati, Ohio; I am currently employed at Globe Tailoring;

2) I am the biological father of Clifford Donta Williams ("Clifford");

3) During the time of Clifford's arrest and capital trial in 1990 and 1991, I never spoke with Clifford's trial attorneys (or anyone else connected with his trial), nor did they ever contact me or attempt to contact me about Clifford's case or about the possibility of my testifying on his behalf, either at the guilt/innocence phase or at the mitigation phase of his trial;

4)    Had I been contacted by Clifford's trial attorneys and asked to testify in defense of my son at the mitigation hearing, I would have wanted to testify on his behalf and certainly would have done so;

5)    Had I been asked to testify at my son's mitigation hearing, I would have been able to testify to, among other things, the following:

i) My son Clifford was born out of wedlock on June 6, 1972;  I had just turned eighteen years of age at the time;   I did not marry Clifford's biological mother, Diane, as we were both too young and both still in high school at the time;  I was in the 11th grade at the time of Clifford's birth;  I believe Diane was only fourteen years old and was in the 9th grade at the time;

ii) When Clifford was born I was living at home with my mother;  Clifford lived with his mother Diane, who lived in her mother's house, just up the street from our home;

iii) When Clifford was a baby, during his first year, I saw him fairly regularly; then, in 1974,  I married someone other than Clifford's mother and from around that time onward I saw Clifford only in spurts;  I would try to see Clifford two times a month, but seeing him became more difficult because there was constant jealousy between my wife Elaine and Clifford's mother Diane, and because his mother and I became involved in a court battle regarding child support;    also, around this same time, I moved further away (about 15 miles) from Clifford and I had no car with which to go see him;

iv) From the time Clifford was approximately three to six years of age, his mother Diane had different boyfriends; I recall on one occasion learning that one of her boyfriends had beaten Clifford with some kind of baseball bat; I remember being very upset about the incident and looking for the perpetrator the following day, but I did not find him;

v) During this time I had visitation rights but would only see Clifford sporadically; his mother Diane never prevented me from seeing him; however, I recall that I moved a few times, and his mother moved a few times, and that I did not want to interfere too much with his mother's life; from time to time I would take Clifford a present or toy and would see him and spend time playing with him;

vi) When Donta was approximately six or seven years old his mother Diane married a man named David and they all moved to southern California; I did not know much about my son's stepfather, David, at the time;

vii) When Clifford was approximately 10-11 years old, he came to stay with me and my wife and two sons in the Cincinnati area for approximately four months; at this time I could see that Clifford had been lacking guidance and discipline at his home in southern California; there were some problems with Clifford, more so at first, though nothing too serious; I do recall that he once took twenty dollars from my wife Elaine; for misbehavior like this I would give him a whipping (not to the point of drawing blood) or ground him;

viii) Clifford had been living in a rough neighborhood in California, and he seemed to be used to doing what he wanted; I believe his mother let Clifford get away with bad behavior, unless the misconduct was aimed directly against her. I also believe that Clifford was allowed to hang around with anyone he wanted, including bad influences.

ix) While Clifford resided in my home for these four months, I did try to impose restrictions and a sense of discipline on him – for example, I made him come straight home after school and do his homework (which he told me his mother did not make him do), and I did not allow him to associate with certain boys; I had been raised in a strict, church-going household and tried to impose a similar structure in my home; all of my sons, except for Clifford, graduated from high school;

x) Clifford had some difficulty responding to the discipline I tried to impose, and twice ran away to his maternal grandmother's home; however, by the time Clifford left to return to California, his behavior and grades had clearly improved; also, he was participating in a "Green Thumb" program (a school garden club) at school which he enjoyed very much and which kept him occupied and out of trouble; further, Clifford had gotten to the point where he would do his homework without me having to tell him to;

xi) During this time Clifford also impressed me as being inherently a good boy; he was almost always polite, respectful of his elders; I remember that he would address his elders as "sir" or "ma'am", and obediently did the chores asked of him

at our home and at his grandmother's (my mother's) home; he was also a caring and nurturing big brother to his two younger half-brothers (my other two sons) in our home; he often tried to help them in different ways or teach them how to do certain things, like teaching them how to dance, how to play various video games such as "Atari", and how to dress and groom themselves.

xii) Clifford was originally going to stay with me for an additional two months (six months instead of four) in Cincinnati; I believe that part of the reason Clifford returned to California two months early was because he wanted to return due to the fewer restrictions imposed upon him at his home out there;

xiii) In approximately 1988 my son Clifford moved back to the Cincinnati area with his family; at first he resided again at his maternal grandmother's home with his mother Diane and Diane's other children; they later moved, I believe, into their own apartment; at this time his stepfather, David, for reasons unknown to me, had returned to live with his own mother in the Cincinnati area apart from Diane and Clifford;

xiv) After Clifford returned to Cincinnati I saw him occasionally and spent time with him; sometimes we would go to the Grand Prix amusement tracks together and drive the race cars; on one occasion I took Clifford shopping to get him some new clothes; on another occasion, in the spring of 1990, we went fishing together; I also went to see Clifford and spent the day with him on his eighteenth birthday in June of 1990;

xv)  On these occasions Clifford and I would talk, but seldom about anything serious;  I do know that Clifford felt that his stepfather, David, had always treated him differently than his own sons;  Clifford also had some problems with his stepbrothers; Clifford confided to me that he and his stepbrothers got along okay but they were always trying to outdo one another for their parents' attention;

xvi)  I remember being concerned at this time (around 1989-1990) about the crowd Clifford  was running around with in Hamilton, Ohio, and I tried to talk to Clifford about it;  Clifford seemed to listen to my advice, and sometimes he appeared to be getting himself on the right track; I do recall that he got a job at a Frisch's or Shoney's restaurant in Fairfield, and that he was a good employee and his boss liked him;

xvii) At some point Clifford began staying at his aunt Precious' home in Hamilton, Ohio;  his aunt had a boyfriend that I knew was not a good influence on Clifford;  looking back I feel that I should have talked to Clifford further about the crowd he was around, or done something more than I did;

xviii) I do not believe that my son Clifford is a bad or evil person, nor the kind of hardened criminal who deserves the death penalty;  rather, Clifford hung around and got caught up with or was influenced by the wrong people;  Clifford's personality was such that he was a follower and easily led, and he desired to be accepted, approved or recognized by those around him;  unfortunately, I believe that where he was raised in California was in an environment where there was a

lot of drug dealing, gang activity, and individuals who carried guns; when he returned to Cincinnati he was in a similar environment;

xix) I believe that Clifford's lack of a stable and disciplined environment growing up and his lack of an adequate father figure or someone to be a role model for him contributed significantly to the troubles he got into; looking back I believe that Clifford needed someone to give him direction and push him into positive pursuits, as opposed to allowing him to run freely and do whatever he wanted with whomever he wanted with all of his free or idle time;

xx) Had Clifford had the stability in the home and the fatherly love and guidance that he needed throughout his childhood, I do not believe that he would be in the position he is in today;

xxi) I also believe that Clifford, despite the bad things that he has done, has inherently good values and is the kind of person that is capable of change for the better;

xxii) For all of the reasons stated above, I do not believe my son Clifford deserves to be punished by death;

Further Affiant sayeth naught.

CLIFFORD GEORGE

Sworn to before me and subscribed in my presence this 29th day of March, 1999.

NOTARY PUBLIC

NOTARIAL SEAL
STATE OF OHIO
MARTHA PHILLIPS
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES OCT. 20, 2003

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| CLIFFORD DONTA WILLIAMS | ) | |
| | ) | |
| Petitioner, | ) | *DEATH PENALTY CASE* |
| | ) | |
| | ) | |
| -vs- | ) | Case No. MS-1-98-128 |
| | ) | |
| BETTY MITCHELL, WARDEN | ) | Judge Smith |
| | ) | Magistrate Judge King |
| Respondent | ) | |
| | ) | |

**EXHIBIT F**

**AFFIDAVIT OF DIANE BAUNIEL**

STATE OF OHIO,

COUNTY OF HAMILTON, SS:

I, Diane Bauniel, being first duly sworn according to law, state the following:

1) Clifford D. Williams is my son.

2) My parents are Annie Mae and Walter Williams, Jr. Annie Mae is a native of Birmingham, Alabama and Walter Williams is a native of Georgia.

3) My mother's parents are Emma Brown (deceased) and Reon Collins who currently resides in a downtown senior citizens' apartment.

4) My father's parents are Odessa and Walter William, Sr.

5) I learned that my mother, Annie Mae was pregnant at the age of 13 with her first child Nancy.

6) Me and all my siblings were all born in Cincinnati, Ohio.

7) My earliest memory is of my family residing in the Millville projects. Annie Mae was a housewife and Walter Williams, Jr. worked on the railroad and was later employed by Drake Hospital.

8) ~~During my third grade school year, my parents separated because Walter Williams, Jr. was a "whore."~~ DB At this time, Annie Mae had met Walter Davis. Then we moved to the Blue Ash area of Cincinnati on ~~Kimper~~ Kemper DB. The Blue Ash area was a nice place to live and the area was predominately populated by "White people."

9) Walter Davis "acted like a Daddy to all of us."

10) Sometime later, the city forced the residents out of their homes due to the city's plans of building the Cross County Highway. This new construction resulted in the family relocating to the Garden ~~Findlater~~ Findlylater DB, Winton Terrace Projects.

11) In 1968 when Annie Mae was pregnant with ~~Alicia~~ Alisa DB, my youngest sister, she secured employment as a janitor for one of Cincinnati's downtown buildings and later enrolled into the Stokes School "for cooking."

12) When Annie Mae gave birth to ~~Alicia~~ Alisa DB, Walter Davis was in jail for reasons I never knew about. Walter Davis "was a wild man."

13) Findlater was a low income housing project and a "bad" place to live. I was "bad" and physically fought everyday in the projects because I imitated my older brother, David. Also, I had to protect me and my younger sister, ~~Lorenda~~ Larenda DB from our peers.

14) ~~Lorenda~~ Larenda DB "would always get stuff started." When Lorenda instigated a fight, she would run home and get me to fight her battle.

15) Me and all my peers were petrified of a bully named Karen, and each day Karen chased me home. After having repeatedly run away from Karen, once Annie Mae escorted me outside where Karen was. Annie Mae then told me that if I ran from Karen again, she was going to "beat my butt." I then fought Karen and "beat her ass good."

16) My mother, Annie Mae, utilized the disciplinary methods of grounding and whipping when we misbehaved, but I was never disciplined for fighting.

17) In addition to fighting Lorenda's battles, I also assisted my older brother, David, and on occasions I fought more than one person at a time.

18) I was transferred from Winton Terrace Elementary School to Gifford Elementary School at Winton's request because of my fighting and lack of interest. Gifford Elementary School was the school for children with behavioral problems. At Gifford Elementary School, I received all F's on my report card. I lacked interest in school because I just wanted to be outside.

19) When I was 13 years old, I met Clifford and his brother in a car on the street. The next day Clifford and I walked all around downtown Cincinnati talking. Clifford was 17 or 18 years at the time.

20) I never told Annie Mae I got pregnant from Clifford, but she found out when I was four or five months pregnant.

21)     When David, my brother, learned of my pregnancy he "threw me down the steps."  David also went over to Clifford's home and beat him up for getting his 13 year old sister pregnant.

22)     When I told Clifford I was pregnant, he stated "it ain't mine."  However, the welfare agency and/or court demanded that Clifford take a blood test to confirm or deny his parentage.  After the blood test confirmed that Clifford was the father, he was ordered to pay child support to me.  I never pushed Clifford to financially support our child.

23)     In October of 1972 when my son, Donta was 4 months old,  David who was 19 or 20 years old,  drove his car slowly by and asked if he could give me a ride.  I accepted the ride home and when I entered the home I asked Annie Mae if I could sit outside and talk to David.  Annie Mae told me that Donta needed milk and "pampers."   David drove me to the store and asked if the baby was mine.  When I went to pay for my purchases David interceded and paid for them.  I gladly then "put my money back I my pocket."

24)     When I met David I was attending the 8th grade.  It wasn't long before I learned that David was married to Donetta.

25)     David enlisted into the marines around October 1973 and was sent to North Carolina.  Once while I was at work, I received a call from David's wife who threatened me with physical assault if I did not leave David alone. I told the wife that I did not know David was married.

26)     Sometime during my 9th grade school year I visited David in North Carolina. When I was 16 years old, I visited David in California and decided to relocate there to be with

him.  After two years of living with David in California, I learned of David and Donetta's plans to adopt some children.  I did not want to interfere with these plans and decided to end the relationship with David and return to Cincinnati.

27)     When I was 18 years old, I got an apartment and was introduced to Robert "Papa" Pittman.  Papa introduced me to "T's and B's" and I began to shoot these drugs frequently.

28)     Once Donta was locked out of the house so he broke the house's back window to enter the home.  Papa discovered the broken window and began to beat Donta with an object.  When I came home I saw Donta's bruises on his body and the neighborhood children told me that Papa had beaten Donta with a rubber baseball bat.  I contacted all of my relatives and reported Papa's behavior to them.  When Annie Mae arrived at my home, she took Donta to Children's Hospital where he was medically treated and prescribed medication. My brother David went out looking for Papa and after he found him, "jumped on him."

29)     I started using T's and B's because my brother with whom I was very close was in the penitentiary for robbery.

30)     David had returned to Cincinnati on a military leave. This resulted in me getting hepatitis and  pregnant.  I became depressed.  I did not want to be in Cincinnati because I was still in love with David.  At this time Donta was living with my mother, Annie Mae.  Neither Annie Mae nor David were aware of my drug usage.  At this time, David told me of his divorce proceedings from Donetta.

31)     I gave birth to La Tonya in 1978, and when she was approximately 2 months old, me and the children relocated to California.  David had sent enough money for us to purchase bus tickets to go to California.

32)     David and I resided on 29 Palm Spring in a 1 bedroom apartment and shortly thereafter we moved into a 2 bedroom apartment on the military base.

33)     David was very good to Donta and refused to allow Donta to have his way whereas I would always give in to Donta's wishes.

34)     Donta knew who his biological father was - Clifford, but David had been present since his toddler years.

35)     When David's son, David III (8 years old) came to reside with us, Donta who was 7 years, started getting into trouble.  David III ended up living with us because Donetta used to leave David II with different babysitters and have several affairs.   David III lived with us until he was 17 years old.

36)     David III was sneaky and did little things that got Donta in trouble with David. David III always blamed Donta for the trouble they both were involved in and Donta took the punishment without ever refuting David III's allegations.

37)     I was a house wife, was homesick for my family, and thought that I may still be in love with Tony, a guy I left behind in Cincinnati.  I threatened to leave David and secretly applied for welfare and to have my monthly checks mailed to my next door neighbor.  I was saving the money to leave California and David.  At this time, David was physically abusive to

me. He started accusing me of having intimate relationships with other males but I wasn't and couldn't convince him otherwise.

38)      I recall on one occasion, when Donta was about twelve years old, I began to suspect David was having an affair with my friend, Leslie, who was white.  My kids told me that while I was working at night, Leslie would visit, and she and David would spend a lot of time in the bathroom.   The kids even tried to poison Leslie by injecting her donut with bleach and detergent.  LaTanya stopped Leslie from eating the donut.  I was so mad when I found out about all of this that I let my brother-in-law go into Leslie's house and steal some of her money.  I also beat up Leslie - I felt like I had to.  David, Donta, and LaTanya helped me by kicking LaTanya and pulling her hair.  When David got home he was mad and hit me with a pipe in the ankle, breaking my ankle.  I went to the hospital for treatment.

39)      David hit me other times as well.  He usually did so after I caught him in a lie. He would punch me, but I also fought back at him.  Donta might not have seen our fights, but he would hear them.  Donta would get mad at David and tell me that he wanted to hit him.  I stopped him because I feared David might hurt Donta.   I recall another time, when Donta was about six years old, he and LaTanya joined in to help me fight David.

40)      I ended up staying with David because I loved him and we had been together since I was 15 years old.  Me and David got married in 1980.  I don't recall the exact date.

41)      I recall that Donta would tell me he wanted to see his dad.  David was there for him, but Donta might have felt he was not his real dad.  I can understand how Donta would have felt because I know how not having a father around affected my brother David (also known as "Meatball").

42)     When Donta was enrolled into the first or second grade, David was assigned to overseas military duty. We returned to Cincinnati. Donta resided with his grandfather Walter and attended a school. I started using drugs and visited Donta on the weekends.

43)     On one occasion during the summer months Walter and/or one of his family members stole my money that I stored in his house. The family said that my daughter had tore it up and put it in the toilet. I packed everything up, and we moved away from there.

44)     I recall that for a few months or so, Donta lived with his father, Clifford George, and his family in Cincinnati. Donta called me and told me that Clifford's wife, Elaine, told him that Clifford was not his father. Donta was upset. Donta said Elaine was mean to him and that he wanted to leave. Elaine treated her own children better than Donta. I later called Clifford and told him if I could get to Cincinnati, I would beat up Elaine.

45)     In school, Donta was a good student. Donta was a likeable person and all of his teachers loved him. He did not have any problems with any subject. He earned his GED at Vision Quest. David's son, David III, on the other hand, did not like school.

46)     In California, I knew Donta's friends from school. I always believed Donta would have his own mind and not follow others. Donta stayed by himself usually. I realize that I did not have time back then to check up on Donta because I was working so much. I believe that David III was a bad influence on Donta.

47)     After approximately one year, the family and me relocated to Vista, California.

48) Donta at 13 or 14 years was "never really" involved or joined a gang although he owned one of the gang's T-shirts. I disapproved, "wouldn't have it" and forbade Donta to join a gang.

49) When Donta was 14 years old, he started to get into illegal trouble. On one occasion when Donta was given permission by someone to ride their moped, a "cable man" arrived at Donta's home, saw his moped accused Donta of stealing it and proceeded to choke Donta with some cable wire. When David learned of the incident, he went searching for the cableman.

50) In about 1983 or 1985 after David was discharged from the marines, I became homesick and decided to move back to Cincinnati. David and me stayed with Annie Mae, while Donta spent the majority of his time with ~~Alicia~~ Alisa DB, a.k.a "Precious," his maternal aunt in Hamilton, Ohio.

51) Donta was about 17 years old when we moved back to Cincinnati. After a while we moved back to Winton Terrace. I did not like living there, but I thought Donta would be all right. Donta probably saw drug dealing in the projects but not any violence. There were not a lot of shootings. However, when LaTanya was thirteen years old, she saw a man shot. I was scared to live there and was glad to move.

52) At 17 years, Donta associated with "Precious," her male friend West and his cousins, Tippy and Robert.

53) Donta "was in love with a tramp" Nicky, and on one occasion when she threatened to leave him, Donta shot himself in the thigh area "almost shooting his balls off."

Donta was using the same manipulation tactic that Tippy had done when his female friend threatened to leave him. Donta was hospitalized for the gunshot wound.

54) I had a gun in the home and on occasions, Donta pretended that he was the police with my gun. As a child, Donta wanted to be a police officer.

55) When the crime occurred I was living in the Dutch Colony apartments and lacked a telephone. One morning around 2 a.m. a detective came to her home and indicated that Donta was a suspect in a murder case.

56) Donta's arrest and trial "kind of mess me up" and that I was/is unable to recall "anything."

57) I don't recall speaking with Donta's attorneys or being asked mitigating questions by the attorneys.

58) I do not believe that my son deserves the death penalty.

**Further Affiant sayeth naught.**

Diane Bauniel

DIANE BAUNIEL

Sworn to before me and subscribed in my presence this 9th day of June, 1999.

Martha Phillips

NOTARY PUBLIC







**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| CLIFFORD DONTA WILLIAMS | ) | |
| | ) | |
| Petitioner, | ) | *DEATH PENALTY CASE* |
| | ) | |
| | ) | |
| -vs- | ) | Case No. MS-1-98-128 |
| | ) | |
| BETTY MITCHELL, WARDEN | ) | Judge Smith |
| | ) | Magistrate Judge King |
| Respondent | ) | |
| | ) | |
| | ) | |

**EXHIBIT E**

**AFFIDAVIT OF LARENDA JACKSON**

STATE OF OHIO,

COUNTY OF HAMILTON, SS:

I, Larenda Jackson, being first duly sworn according to law, state the following:

1) My name is Larenda Jackson; my residence is 2956 Jackfrost Way, Cincinnati, Ohio.

2) My parents are Annie Mae and Walter Williams, Jr.; Diane Bauniel is my older sister.

3) I was a very small infant and slept in a dresser drawer instead of a baby crib.

4) I was 11 years old when my parents separated. I heard ~~Their~~ the separation stemmed from Walter mismanaging their finances. Walter may have spent his paycheck or a portion somewhere else.

5) After my parents separated, Annie Mae and the kids moved to the Winton Terrace projects. Annie Mae worked "odd and ends" jobs, sold cigarettes, and had the children make "ice balls" which she sold from her home.

6) When the family moved to Winton Terrace, I was shy and "felt like a little girl in a big town." The projects were crowded with people and roaches.

7) As a child, Diane was "hard headed" and a daredevil. Diane received frequent whippings from Annie Mae due to her misconduct where as I did what I was told. My siblings referred to me as a wimp and a chicken.

8) Diane was bad, had poor grades in school and fought a lot, whereas I ran home and away from fights. On one occasion when Diane was fighting a peer, I ran home to safety. After Annie Mae learned of my behavior, Annie Mae threatened to hit me with a broom if I ever left Diane alone in the streets fighting again.

9) Diane had to attend Gifford School for "slow learners."

10) When the family learned of Diane's pregnancy, Annie Mae was unhappy but took Diane to the doctors and bought her some maternity clothes. I saw Annie Mae's behavior towards Diane and became angry, thinking that Diane was getting everything. I told Annie Mae that "I might as well get pregnant you don't buy me clothes."

11)     Clifford, or Donta, was a "happy go lucky child."   The whole neighborhood knew him and referred to him as "Cookie Man." Diane being young gave Donta cookies a lot.

12)     When Diane was pregnant with Donta or had recently given birth to Donta, she met David "Chucky."  David had a car and occasionally gave Diane money.

13)     The family forbade Diane to take Donta to David's home due to Donta returning home smelling like urine and dirty.  David's home also had bugs.

14)     After Diane met David she began to skip school to spend time with David. Diane's family didn't know this was going on.  I believe David helped to destroy Diane.

15)     Diane loves her children, but she was a young, and often irresponsible mother.

16)     David enlisted into the marines and was stationed in California.  While Diane attended the 11th grade she went to visit David in California.  Shortly after Diane's return she quit school and relocated to California.

17)     When David left for his overseas duty, Diane returned to Cincinnati, and sometime after her return she began to use drugs, "Teddy's and Betty's" ("T's and B's").  Diane used drugs while she was pregnant with La Tonya and increased her drug usage after La Tonya was born on July 3, 1978.  Diane's drug usage "got so bad" that on one occasion Annie Mae and Walter went to Lee Earl's home, busted the door down and took Diane from the drug house.  I recall when Diane and Donta were living with their mother in Cincinnati, when Donta was about six years old,  Diane appeared to be on drugs.  Her friends at that time were drug users.  On one occasion I recall visiting Diane and becoming extremely upset because I discovered a man doing drugs in the bathroom.  I threw him out of the apartment.

18) I heard also that Diane was doing drugs in California. However, I never saw Diane use drugs when I was out there. David smoked pot, and I think he was discharged from the army after they found it in his urine. J.J.

19) In September of 1979, I visited Diane in California for a couple of weeks. At this time, Diane resided on 29 Palm Springs and David III, David and Donetta's child, were residing in the home. During this visit David was cruel, mean and cursed at the children. He had an "I'm the boss" attitude, and sometimes was a maniac. David would tell the children to "sit your ass down, " and "I ain't gonna have this shit."

20) Later, Precious, my sister, and I visited Diane at Camp Pendleton in Oceanside, California. I decided to relocate there, secured a job, enrolled in school and agreed to share in the household expenses. I brought my daughter with me. David's brother Johnny was also residing in the home. David continued to be crazy and mean. At the grocery store, Diane and I had to buy only those items that David wanted. Donta answered David with "yes sir or no sir." David was "easy" on David III and La Tonya but not on Donta. David frequently yelled at the children and cussed at everyone. He always seemed to be in a bad mood. I was like walking on pins and needles around him for fear of making him mad. I moved ~~back to Ohio~~ out of David and Diane's house because I did not want my daughter around David.

21) David's son, David III, "was like the exorcist," acted horrible, and constantly blamed Donta for everything so that Donta stayed in trouble with David.

22) David also tortured Diane and would pop her on the head or hit her, but Diane never fought him back.

23) I believe that David did not give Donta the attention he needed. David did not take the time to talk to Donta about school, and David never participated in family activities. He rarely did things with the kids, like take them to the park, play ball with them, or even watch tv with them. It seemed like the kids were always in trouble and as result were made to stay in their rooms.

24) David was physically abusive to Diane in Cincinnati and in California. ~~Diane sought medical treatment from various hospitals, the Mellville Clinic, Providence Hospital and Camp Pendleton's hospital due to David's abuse.~~ ~~On one occasion when Diane was pregnant, David hit her which resulted in a miscarriage.~~ "Diane has had about 20 miscarriages," unknown as to the reason why.

25) I saw the knots on Diane's head and knees after David hit her. David and Diane fought over silly stuff. For instance, David would get mad when LaTanya went to church, or when Diane would give the kids cookies. David did not want Diane giving the kids snacks - Diane was only allowed to spend a certain amount of money. I never confronted David about his abusive behavior, but I did often talk about it with David's brother.

26) I sometimes talked to Diane and David about how they raised their children. I told them that they needed to show the kids they loved them. Diane was not affectionate with them because she was abused by David. David fought and/or hit Diane two to three times a week during the time I lived with them.

27) Donta seemed to change after he moved to California. I noticed that at around the age of nine, Donta was not a happy child. Donta had been a happy boy. I attribute this change to his abusive step-father.

28) During the end of 1988 or the beginning of 1989, Diane and her family relocated back to Cincinnati. Diane and her family resided with Annie Mae in the Winton Terrace projects.

29) Donetta, David's former wife, lived in the house with Diane and the kids in California for a while.

30) Donta was very close to Precious, she "kept him in check." On October 14, 1990 Precious died in an auto accident only 2 or 3 minutes away from her home.

31) Donta's ~~friends,~~ cousin Robert died in a drive by shooting and friend West died in a coma.

32) My brother David has been incarcerated at Orient Correctional Institution since the beginning of 1990. Before that, David spent time with Donta whenever he got a chance.

33) I grew up in Winton Terrace, in Cincinnati. It was difficult growing up in the area. It was hard to stay straight. My first boyfriend was in a gang as were some of my female friends. Many of the people I knew growing up are now strung out and living on the streets while their mothers take care of their children.

34) In 1989, drug dealing and drug use were common sights in Winton Terrace. I heard about shootings and fights. People shooting dice often got into fights. Hamilton, Ohio is a very dangerous place and I would not go there alone or at night.

35) At this time, in 1989, after Diane had moved back to Cincinnati from California, I suspected that Diane was using drugs again. After Donta's arrest, I confronted her about it.

L.J.

36) No attorney or criminal investigator or mitigation specialist ever talked to me at the time of Donta's trial.

37) I would have testified on behalf of Donta at his sentencing if anyone had asked me to do so. I do not want to see Donta executed.

**Further Affiant sayeth naught.**

Larenda Jackson
LARENDA JACKSON

Sworn to before me and subscribed in my presence this 9th day of June, 1999.

Martha Phillips
NOTARY PUBLIC

NOTARIAL SEAL
STATE OF OHIO
MARTHA PHILLIPS
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES OCT. 20, 2003

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| CLIFFORD DONTA WILLIAMS | ) | |
| | ) | |
| Petitioner, | ) | *DEATH PENALTY CASE* |
| | ) | |
| | ) | |
| -vs- | ) | Case No. MS-1-98-128 |
| | ) | |
| BETTY MITCHELL, WARDEN | ) | Judge Smith |
| | ) | Magistrate Judge King |
| Respondent | ) | |
| | ) | |

**EXHIBIT D**

**AFFIDAVIT OF LA TANYA WILLIAMS**

STATE OF OHIO,

COUNTY OF HAMILTON: ss

I, La Tanya Williams, being first duly sworn according to Law, state the following:

1) My name is La Tanya Williams; I was born on July 3, 1978; my current address is 2003 Sutter Ave., Cincinnati, Ohio, 45225; I am currently employed at Burger King in Fairfield, Ohio;

2) I am the half-sister (born of same mother but different father) of Clifford Donta Williams (hereinafter "Clifford"); Clifford is also commonly referred to by family or friends as Donta;

3) I was born in Cincinnati, but when I was 2 months old we moved to southern California; the family moved back to Cincinnati when I was about 12;

4) During the time of Clifford's arrest and capital trial in 1990 and 1991, I never spoke with Clifford's trial attorneys;  his attorneys did have some contact with my mother, Diane Bauniel, but I was never approached, questioned or interviewed by the attorneys about the possibility of my being able to testify or offer other assistance at Clifford's sentencing/ mitigation hearing;

5) Had I been approached by Clifford's trial attorneys and asked to assist in his defense at the mitigation hearing, despite the fact that I was only 13 years of age at the time, I would nonetheless have been willing and wanting to help in any way that I possibly could;

6) Had I been asked to testify at Clifford's mitigation hearing, I would have been able to provide, among other things, the following testimony:

   i) as siblings Clifford and I are very close to one another;

   ii) Clifford has always been a good brother to me;  he would always share things with me,  and any time he would have extra money he would buy me something;  as an example, Clifford bought me my first radio;

   iii) Clifford has always been there for me when I needed help, and I have always felt that I can talk to him about anything;

   iv) iv) I know Clifford very well and I know he is not a violent person; in my whole life I only saw him get into a fight once, and that was after another boy had hit him with a rock;   I do recall Clifford getting into trouble at school, and recall

him having to go to Vision Quest (a juvenile detention facility or camp) due to his troubles;

v) at home our father David, also known as "Chucky", would punish the boys (Clifford and my other brother David III) by whipping them when they got into trouble; my father used belts to do the whipping; Clifford often would be the one blamed for things (usually by David III), and on these occasions would be the only one punished;

vi) David III and I often got more attention from ~~our parents~~ my father than did Clifford;

vii) also at home, my mother and father fought constantly; I recall occasions when my father struck my mother, which scared me; when my parents fought, Clifford, David III and I would stay together in one of the bedrooms; I remember wanting to get away from it all and move back to Cincinnati;

viii) after the family moved back to Cincinnati we eventually lived in the Findlater Gardens projects, adjacent to and commonly referred to as part of the Wynton Terrace projects; these projects are a rough area; I was not allowed to go outside because of the fighting and dangers there; it was common to see people buying drugs in the open, and to see fights;

ix) Clifford did not talk much about his real father, Clifford George;

x) I do not recall much about my mother's problems with drug abuse; I believe that my mother did use illegal drugs before I was born;

7) For all of the reasons stated above, I do not believe that my half-brother, Clifford Donta Williams, should be punished by the sentence of death;

**Further Affiant sayeth naught**.

LaTanya Williams
LA TANYA WILLIAMS

Sworn to before me and subscribed in my presence this 9th day of June, 1999.

Martha Phillips
NOTARY PUBLIC

...IPS
... OHIO
... OCT. 20, 2003





**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| CLIFFORD DONTA WILLIAMS | ) | |
| | ) | |
| Petitioner, | ) | *DEATH PENALTY CASE* |
| | ) | |
| | ) | |
| -vs- | ) | Case No. MS-1-98-128 |
| | ) | |
| BETTY MITCHELL, WARDEN | ) | Judge Smith |
| | ) | Magistrate Judge King |
| Respondent | ) | |
| | ) | |

**EXHIBIT_C**

**AFFIDAVIT OF MARIE GEORGE**

STATE OF OHIO,

COUNTY OF HAMILTON: ss

I, Marie George, being first duly sworn according to law, state the following:

1) My name is Marie George; my current address is 6413 Savannah Ave., Cincinnati, Ohio;

2) I am the paternal grandmother of Clifford Donta Williams (hereinafter "Clifford"); I am the mother of his father, Clifford George, Sr.

3) During the time of Clifford's arrest and capital trial in 1990 and 1991, I never spoke with Clifford's trial attorneys (or their investigators), nor did they ever contact me or attempt to contact me about Clifford's case or about the possibility of my testifying on his behalf at the mitigation phase of his trial;

4) Had I been contacted by Clifford's trial attorneys and asked to assist with information or otherwise be of help regarding Clifford's trial or mitigation hearing, I would have wanted and have been willing to assist in any way possible;

5) Had I been asked to testify at Clifford's mitigation hearing, I would have been able to provide, among other things, the following testimony:

i) I saw Clifford fairly often and spent considerable time with him when he was a young boy, until he reached approximately seven or eight years of age when he moved to California; before then I would see Clifford about every day as I lived in the same neighborhood as Clifford's maternal grandmother, Anna Mae Williams; after Clifford moved to California, I heard very little about him and more or less lost track of him;

ii) Clifford was an average child, though sometimes he could be a brat; he would get into trouble because he copied his uncle David Williams (his mother's brother), who was also known as "Meatball", and who was into everything; Clifford wanted to be tough like Meatball and would copy his behavior and ways;

iii) Clifford's mother Diane had a drug problem when he was a child; I can recall her looking "spaced out", like drug addicts do; during this time Clifford Sr., Anna Mae Williams and I took care of Clifford; also during this time there was a lot of drinking going on at Anna Mae's house, where Clifford lived for awhile along with his mother Diane; I believe, though am not positive, that another one of Clifford's maternal aunts was on drugs at this time as well;

iv) When Clifford was about twelve years old, he came to stay with his father (my son) and his step-mother Elaine; I recall that Elaine did not get along well with Clifford because he was a "brat"; Clifford was a nice boy, but sometimes would get upset and throw a tantrum if he didn't get his way; Clifford did not have tantrums around me too much though, because he came to know that they didn't work with me;

v) I never met Clifford's step-father Chucky, who Clifford lived with in California, and know nothing about him;

vi) When Clifford moved back to Cincinnati, a few years before his arrest, he would occasionally visit me; I know that he cared about me, and I cared about him;

6) For the reasons above and other reasons, I do not believe that my grandson, Clifford, should be put to death by the State of Ohio;

**Further Affiant sayeth naught.**

Marie George
MARIE GEORGE

Sworn to before me and subscribed in my presence this 9th day of June, 1999.

Martha Phillips
NOTARY PUBLIC

NOTARIAL SEAL
STATE OF OHIO
MARTHA PHILLIPS
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES OCT. 20, 2003

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| CLIFFORD DONTA WILLIAMS | ) | |
| | ) | |
| Petitioner, | ) | *DEATH PENALTY CASE* |
| | ) | |
| | ) | |
| -vs- | ) | Case No. MS-1-98-128 |
| | ) | |
| BETTY MITCHELL, WARDEN | ) | Judge Smith |
| | ) | Magistrate Judge King |
| Respondent | ) | |
| | ) | |

**EXHIBIT ___**

**AFFIDAVIT OF DAVID BAUNIEL III**

STATE OF OHIO,

COUNTY OF HAMILTON: ss

I, David Bauniel III, being first duly sworn according to law, state the following:

1) My name is David Bauniel III; I am 28 years of age; my current address is 1957 Millvale Court, Cincinnati, Ohio;

2) I am currently employed during days as a forklift operator at Sakrete Concrete Company in Cincinnati, and during nights at Burger King in Fairfield, Ohio, (where my half-sister La Tanya is also employed);

3) Clifford Donta Williams (hereinafter "Clifford") is my step-brother;

4) During the time of Clifford's arrest and capital trial in 1990 and 1991, I never spoke with Clifford's trial attorneys (or anyone else connected with his trial), nor did they ever

contact me or attempt to contact me about Clifford's case or about the possibility of my testifying on his behalf at the mitigation phase of his trial;

5) Had I been contacted by Clifford's trial attorneys and asked to assist with information or otherwise be of help regarding Clifford's trial or mitigation hearing, I would have wanted and have been willing to assist in any way possible;

6) Had I been asked to testify at my step-brother's mitigation hearing, I would have been able to provide, among other things, the following testimony:

i) in approximately 1980, when I was about 10 years old, I moved to southern California to live with my natural father, David Bauniel, along with my step-mother Diane, step-brother Clifford, and half-sister La Tanya; Clifford was about 8 or 9 years old at this time and was just like a little brother; I lived in that household for 2-3 years and then returned to Houston, Texas, to reside again with my natural mother, Donetta; after a few years in Houston, I returned to California and rejoined the household of my father, step-mother, Clifford and La Tanya; my movements back then resulted from my parents' decisions, not my own;

ii) my step-brother Clifford and I got along well together; I had trouble adjusting to my step-mother, Diane, as I felt that she was trying to take the place of my natural mother;

iii) I felt that my parents (David and Diane) favored my half-sister La Tanya over Clifford and I, probably because she was the youngest, and was the only child borne of both of them;

iv) my father David handled the discipline, and would usually whip us; he started out using a belt, but when we appeared to get used to it, he began using an extension cord; he would hit us on the butt, often producing painful welts; the beatings typically lasted about 5 minutes; to some extent Clifford and I got used to the beatings;

v) the beatings made me mad at my father; my father's beatings occurred in spurts; however, for awhile he was hitting Clifford and I about every other day; this increase occurred right around the time that my father received a dishonorable discharge from the service; as I understand it, he was discharged because Clifford had broken into a school and vandalized it and stolen some school supplies such as pencils;

vi) my father would abuse us and beat us often for little or no reason, over things such as spilled milk; when something came up missing in the house, he would accuse one of us of stealing it and then beat us if we didn't confess -- and then later the missing item would turn up as having just been misplaced; I can remember how Clifford and I, right before my father would get home from work, would go into our room and talk to each other about whether my father would accuse us of stealing something or doing something bad that day;

vii) eventually, Clifford and I began staying away from the house so we would not be blamed and beaten for things we didn't do;

viii) my father and step-mother used to fight about once every couple of weeks; I never actually saw them striking each other, as they would usually fight in their bedroom with the door closed; I would usually leave the house when the fighting

began because I didn't want to be around it, and I didn't want to see Clifford or LaTanya try to break up the fight or start to cry; Clifford and I would talk about the fights and I recall Clifford wanting to get back at our father (his step-father); I could not blame him because my father also beat and abused my natural mother, Donetta, and so I knew how he felt;

ix) Frequently the fights between my father David and step-mother Diane were over her not doing anything around the house all day while my father worked; the house was often a mess; Diane usually just watched her stories on tv or hung out with her friends all day; I recall when my paternal grandmother came to visit one summer; Diane would leave the children with my grandmother while she went out with her friends, and then about half an hour before David was due home from work she would rush home and make the children quickly clean up the house;

x) during the school year I was not sure what Diane did throughout her days; after school, Diane was sometimes at home, sometimes not; she would cook us dinner sometimes, and other times we would fix our own meals;

xi) I do not recall Diane having a drug problem; I did hear rumors around the neighborhood that my father David did drugs;

xii) I remember that I did not get into as much trouble as did Clifford; I think when Clifford got into trouble it was to get attention from Diane; I also believe that Clifford's friends got him into trouble, because Clifford was not the type to be a ring leader;

xiii) when Clifford was around 12 years old he started hanging around with kids in gangs; he joined the local Crips gang; a lot of the kids at school were gang members, as it was the thing to do; when I saw that my little brother had joined a gang, I decided to do so as well;

xiv) of course, most of the gang members were older - some were even in their early 30's; we did not really plan any acts of violence, but if we saw someone we didn't like (who wore the wrong colors), we would chase the person and beat him up; sometimes knives were used; I never used a gun myself nor ever saw anyone shot; I do remember on one occasion being asked to hold a gun for one of the older members, and I liked doing it at the time;

xv) drugs were not a major part of the gang, and I never sold any drugs; I did, however, steal for the gang; I recall that Clifford stole things too;

xvi) I believe that Clifford and I joined the gang because the gang gave us the attention and the connection that we didn't have at home;

xvii) on the occasions when Clifford got into legal trouble it seemed that I was always away, either living with my natural mother or my grandmother;

xviii) I was living with my mother in Cincinnati when my father, step-mother, Clifford and LaTanya moved back permanently to Cincinnati; eventually they moved to the Wynton Terrace projects, where I lived with them again for awhile; Wynton Terrace is a rough place, where fights are commonplace - sometimes 3 a day in the summer; one would hear gunshots go off at least 3 times a week; when residents would hear a gunshot go off, they would all run in their houses and

come out later to see what happened; drug deals were made openly there, and the police did not do much to control the activity;

xix) at some point after the family returned to Cincinnati, Clifford started spending a lot of time in Hamilton, Ohio; his friends in Hamilton were his cousin Scott, his aunt Precious and her boyfriend Wes; Wes was the big brother figure to Clifford that I always wanted to be - he had money and a nice car and things that impressed Clifford; at the time I thought Wes was pretty straight, but I later learned that he dealt drugs;

xx) I do not know of Clifford being involved in any gang after he moved back to Cincinnati;

xxi) Clifford, as far as I can recall, never talked about his natural father, Clifford George;

xxii) Clifford's aunt Precious was on the right path, and I think she was the only one who tried to correct Clifford and get him on the right path; Clifford had other maternal aunts in Cincinnati who stayed straight, such as his aunts Linda and Larenda, but they had their own families to take care of;

xxiii) I believe that one of Clifford's biggest problems was that he never had the kind of father figure or role model that he needed in his life; had Clifford had a more stable environment, with such a father figure to give him the guidance that he needed, I don't believe he would have gotten into the kind of trouble with the law that he did;

xxiv) I do not want to see my step-brother, Clifford, executed; I think it would be wrong if he were put to death by the State;

7. For all of the reasons stated above, I do not believe that my step-brother, Clifford Donta Williams, should be, or deserves to be, put to death;

**Further Affiant sayeth naught.**

DAVID BAUNIEL III

Sworn to before me and subscribed in my presence this 21st day of August, 1999.

NOTARY PUBLIC

NOTARIAL SEAL
STATE OF OHIO

MARTHA PHILLIPS
PUBLIC, STATE OF OHIO
EXPIRES OCT. 20, 2003